No. 24-3636

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

ESTATE OF IAN SIMMERS By And
Through Administrator Donna Berube,

*Plaintiff-Appellant,*

*v.*

KING COUNTY, et al.,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court
for the Western District of Washington
No. 2:21-CV-00100-BJR

**OPENING BRIEF OF APPELLANT DONNA BERUBE**

<div style="margin-left:40%">

David B. Owens
Loevy & Loevy
c/o Civil Rights And Justice Clinic
University Of Washington Law School
William H. Hates Hall, Ste. 265
P.O. Box 85110
Seattle, WA 98145
312-243-5900
312-243-5902 (Fax)
*Counsel for Plaintiff-Appellant*

</div>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... v

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 2

ISSUES PRESENTED .............................................................................. 2

STATEMENT OF THE CASE .................................................................. 3

I.    Facts ................................................................................................ 3

    A.    Ian Monroe Simmers Is Innocent of, And Had Nothing to Do With, the Murder of Rodney Gochanour ........................ 3

    B.    Officers Developed Promising Leads Into the Murder; None of It Pointed to Simmers ............................................ 6

    C.    Despite The Mounting Evidence Pointing to Fred as a Suspect, The Officers Abandon Their Honest Investigation Zero-In On Teenagers Who Had Nothing to Do With, and Heard Nothing About, The Murders .................................................................. 9

    D.    Unlawful Questioning and Interrogation of A 16-Year Old Who Had Been Held In Police Custody For Hours ........................... 13

    E.    His Will Overborne, Simmers Falsely Confesses ...................... 18

    F.    Following Coercive Tactics and Unrecorded Rehearsal Defendants Obtain A Recording of A False Confession ........... 22

    G.    Defendants Fabricated Evidence Concerning Jon Wyatt And The Interrogations .................................................................... 24

    H.    Defendants Knew, Or Should Have Known, Simmers Was Innocent, But Hopkins Fabricated Additional Evidence .......... 29

    I.    As a Result of Defendants' Misconduct, Simmers Is Wrongfully Convicted Of A Murder He Did Not Commit ........................... 32

ii

J.    Simmers' Wrongful Murder Conviction Was Vacated and the Charges Were Dropped ..................................................... 33

II.    Procedural History ........................................................ 35

SUMMARY OF THE ARGUMENT ........................................... 36

ARGUMENT .............................................................................. 37

I.    Standards Of Review .................................................... 37

II.    REVERSAL IS WARRANTED BECAUSE THE TRIAL COURT IMPROPERLY MADE CREDIBILITY DETERMINATIONS AND CONSTRUED THE EVIDENCE AGAINST PLAINTIFF ............ 38

A.    The Trial Court Impermissibly Made Credibility Determinations, Construed the Record Against Simmers, and Misapplied the Law on The Fifth Amendment Claim .............. 39

1.    The Trial Court Made Impermissible Credibility Determinations, Warranting Reversal ...................................... 41

2.    The Trial Court Failed To Accept and Appreciate the Inferences that Flow From Simmers' Vulnerability Due to His Age ......... 46

3.    The Trial Court Construed the Evidence Against Simmers By Disregarding Evidence of Simmers' Mental Vulnerabilities .... 51

4.    The Trial Court's Refusal To Accept that a Child Being In Police Custody for 11 Hours Can Contribute to Involuntariness Was Error ..................................................................... 54

5.    The Trial Court's Refusal to Accept Simmers' Innocence, and Inferences that Flowed From It, Was Error ............................. 55

6.    The Trial Court's View of Defendants' Tactics Improperly Weighed The Evidence in Their Favor ...................................... 57

7.    The Trial Court's Disposition of the Fifth Amendment Claim, On The Whole, Misapplied the Law .......................................... 59

iii

III.  THE TRIAL COURT ERRONEOUSLY CONSTRUED THE
      EVIDENCE AGAINST SIMMERS IN GRANTING SUMMARY
      JUDGMENT ON THE DUE PROCESS CLAIMS ........................ 60

IV.   THE TRIAL COURT CONSTRUED THE EVIDENCE AGAINST
      PLAINTIFF WHEN DISMISSING THE CONSPIRACY
      CLAIM .................................................................................. 68

V.    THE TRIAL COURT'S DISMISSAL OF PLAINTIFF'S *MONELL*
      CLAIMS MISAPPLIED ESTABLISHED LAW ........................... 70

VI.   A Different Judge Should Be Assigned On Remand .................... 71

CONCLUSION ...................................................................................... 72

iv

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................ 37

*Ayers v. City Of Cleveland*, 773 F.3d 161 (6th Cir. 2014) ................ 56, 63

*Baker v. Roman Catholic Archdiocese Of San Diego,* 725 F. App'x 531
    (9th Cir. 2018) ................................................................... 37, 39

*Bator v. State Of Hawai'i,* 39 F.3d 1021 (9th Cir. 1994) ........... 37, 43, 63

*Bellotti v. Baird*, 443 U.S. 622 (1979) ...................................................... 50

*Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678
    (9th Cir. 2023) ........................................................... 37, 38, 52

*Blackburn v. Alabama*, 361 U.S. 199 (1960) .................................... 40, 54

*Boyd v. City And County Of San Francisco*, 567 F.3d 938
    (9th Cri. 2009) ................................................................... 53

*Braxton-Secret v. Robins Co.*, 769 F.2d 528 (9th Cir.1985) ................... 68

*Caldwell v. City & Cty. Of San Francisco*, 889 F.3d 1105
    (9th Cir. 2018) ................................................................... 61

*City Of Los Angeles v. Heller,* 475 U.S. 796 (1986) ................................ 70

*Coghlan v. Am. Seafoods Co. Llc.,* 413 F.3d 1090 (9th Cir. 2005)....37, 66

*Collazo v. Estelle* 940 F.2d 411 (9th Cir. 1991) ....................................... 42

*Colorado v. Connelly*, 479 U.S. 157, 164 (1986) ..................................... 41

*Com. Of N. Mariana Islands v. Mendiola*, 976 F.2d 475
    (9th Cir. 1992) ........................................................... 57, 70

*Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992).................................... 42

*Costanich v. Dep't Of Social & Health Servs.*, 627 F.3d 1101
    (9th Cir. 2010) ........................................................... 60, 63

**Cases (Cont.)**

*Crawford v. City Of Bakersfield*, 944 F.3d 1070 (9th Cir. 2019) ............ 53

*Crowe v. County Of San Diego*, 608 F.3d 406 (9th Cir. 2010) .......... 46, 58

*Curtis v. Abb Inc.*, 622 F. App'x 661 (9th Cir. 2015) ................................ 45

*Devereaux v. Abbey,* 263 F.3d 1070 (9th Cir. 2001) ................................. 60

*Dickerson v. United States*, 530 U.S. 428 (2000) .................................... 40

*Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) .............................. 41, 46, 59

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ...................................... 47, 49

*Edwards v. Arizona*, 451 U.S. 477 (1981) ............................................... 42

*Emeldi v. Univ. Of Oregon*, 698 F.3d 715 (9th Cir. 2012) ....................... 45

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002) ..................................... 70

*Fikes v. Alabama*, 352 U.S. 191 (1957) ....................................... 51, 52, 56

*Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180 (9th Cir. 2016) ... 38

*Furnace v. Sullivan*, 705 F.3d 1021 (9th Cir. 2013) ............................... 38

*Gallegos v. Colorado*, 370 U.S. 49 (1962) ........................................ 47, 49

*Gladden v. Unsworth*, 396 F.2d 373 (9th Cir. 1968) ............................... 51

*Glenn v. Washington Cnty.*, 673 F.3d 864 (9th Cir. 2011) ...................... 38

*Haley v. State Of Ohio,* 332 U.S. 596 (1948) ..................................... 47, 50

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d. Cir. 2014) ..................... 55, 56, 59, 63

*Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir. 1979) ............................. 68

*Hutto v. Ross*, 429 U.S. 28 (1976) .......................................................... 58

*In Re Gault*, 387 U.S. 1 (1967) ......................................................... 46, 49

## **Cases (cont.)**

*Jones v. Harrington*, 829 F.3d 1128 (9th Cir. 2016) ............................... 41

*Malloy v. Hogan*, 378 U.S. 1 (1964) .................................................. 39, 40

*Manley v. Rowley*, 847 F.3d 705 (9th Cir. 2017) ......................... 38, 52, 63

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ...................................... 53

*Mendiola-Martinez v. Arpaio*, 836 F.3d 1239 (9th Cir. 2016)........... 58, 70

*Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283
    (9th Cir. 1999) ............................................................... 68, 69

*Michigan v. Mosely*, 423 U.S. 96 (1975).................................................. 41

*Miller v. Alabama*, 567 U.S. 460 (2012) .................................................. 33

*Nealy v. Shinn*, 2024 Wl 3842094 (9th Cir. Aug. 16, 2024) .................... 39

*Nelson v. City Of Davis*, 571 F.3d 924 (9th Cir. 2009) ...................... 45, 66

*Parsons v. Sanchez*, 46 F.3d 1143 (9th Cir. 1995)................................... 37

*Qidwai v. Prudential Ins. Co. Of Am.*, 56 F. App'x 425
    (9th Cir. 2003) ..................................................................... 39

*Reed v. Lieurance*, 863 F.3d 1196 (9th Cir. 2017) .................................. 53

*Republic Of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469
    (9th Cir. 1991) ..................................................................... 39

*Richards v. Cnty. Of San Bernardino*, 39 F.4th 562
    (9th Cir. 2022) ............................................................... 61, 70

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ................................... 41

*Smith v. Illinois*, 469 U.S. 91 (1984)...................................................... 42

*Spano v. New York*, 360 U.S. 315 (1959) ........................ 40, 49, 51, 56, 57

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ............................... 60, 61

**Cases (Cont.)**

*State v. Houston-Sconiers*, 391 P.3d 409 (Wa. 2017) .............................. 33

*Thomas v. Cnty. Of Riverside*, 763 F.3d 1167 (9th Cir. 2014) ............... 70

*Tolan v. Cotton*, 572 U.S. 650 (2014) ............................... 37, 44, 52, 53, 55

*United Nat. Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102
    (9th Cir. 2001) ...................................................................... 71

*United States v. Baker*, 999 F.2d 412 (9th Cir. 1993) ............................ 39

*United States v. Gardner,* 475 F.2d 1273 (9th Cir. 1973) ...................... 64

*United States v. Preston*, 751 F.3d 1008
    (9th Cir. 2014) ........................................ 40, 41, 51, 55, 56, 59

*United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981) ........ 39, 41, 46, 49

*United States v. Two Tracts Of Land In Cascade Cnty., Mont.*,
    5 F.3d 1360 (9th Cir. 1993) ...................................................... 45

*United States V. Villalpando,* 588 F.3d 1124 (7th Cir. 2009) ................ 56

*Ward v. Eeoc*, 719 F.2d 311 (9th Cir. 1983) ............................................ 68

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004) ............................. 58

*Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001) ............... 56, 59

## Other Authorities

28 U.S.C. § 1291 .................................................................................... 2

28 U.S.C. § 1331 .................................................................................... 2

28 U.S.C. § 2106 .................................................................................. 71

FED. R. CIV. P. 56(A) ............................................................................ 37

U.S. CONST. AMEND. V. ....................................................................... 39

viii

## INTRODUCTION

Arrested at 16-years old, Ian Simmers spent more than two decades wrongfully convicted of a murder he did not commit. No physical evidence linked to Simmers. Instead, the evidence against Simmers was the recording of a false confession and (fabricated) police documents. Following the presentation of new DNA results and evidence concerning juvenile brain science, the wrongful conviction was vacated in 2019, and the murder charges were dropped.

This action followed. After discovery, Simmers died in a car accident, an estate was created, and his mother, Donna Berube, continues to pursue this case. Defendants then sought summary judgment by inviting the court to adjudicate under the wrong legal standards, including by refusing to accept the veracity of Plaintiff's competence evidence and Simmers' own account of the interrogation.

The trial court accepted the invitation and went further, including by outright rejecting portions of Simmers' deposition testimony and an interview he gave in 2018 as incredible. These errors infected the Court's analysis on each of Plaintiff's claims.

1

Reversal is required. A court at summary judgment cannot weigh evidence, make inferences against the non-movant, or make credibility findings.

In addition, because the trial court has already adopted views on the credibility of Simmers and Berube, remand to a different judge is warranted.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. The appeal is timely. 10ER-2570.

## ISSUES PRESENTED

1.     Whether the trial court's order at summary judgment that makes credibility determinations, weighed evidence, and construed the record against Plaintiff must be reversed?

2.     Whether a different judge should be assigned on remand?

## STATEMENT OF THE CASE

I.    **Facts**[1]

A.    **Ian Monroe Simmers Is Innocent of, And Had Nothing to Do With, the Murder of Rodney Gochanour**

On <u>Friday</u>, March 10, 1995, Ian Simmers spent the evening at home with his family where he watched Disney's *The Lion King*, and where Simmers stayed all night. 2ER-285-86; 3ER-361, 397, 400.

<u>Saturday</u> March 11, 1995, Simmers spent the afternoon bowling with family and returned home at approximately 4:30-5:00. 2ER-287-89. The family lived in Carnation, Washington. Simmers' mother, Donna Berube, left the home around 6:00 that evening. *Id.* at 290. Sometime later, Simmers, who was just 16 years old, set out to meet his friend, Jonathan Wyatt, a 14-year-old boy. 3ER-361; 8ER-1933. Simmers walked some of the way before Wyatt's mom picked him up and drove Simmers to their apartment in Redmond, Washington. 3ER-362, 398.

Simmers and Wyatt spent the next few days engaging in some criminal—albeit reckless and childish—behavior that included breaking

---

[1] The facts are presented in the light most favorable to Plaintiff, as required at this juncture.

3

into cars and boats, stealing alcohol, shooting off flare guns taken from those boats, and setting small fires. 3ER-384-85, 484-85, 586-88.

Meanwhile, and completely unbeknownst to the teenagers, Rodney Gochanour had spent the Friday evening hanging out at Bothell restaurants and bars near the Burke-Gillman trail with a woman named Hope Fleischaker. 8ER-1931-32; 3ER-576-76. Gochanour never made it home; he was murdered after leaving a bar on the Friday night-come-Saturday morning (when Simmers was at home watching *The Lion King*). 8ER-1925; 3ER-595.

Simmers is innocent of the Gochanour murder and neither he or Wyatt had anything to do with the crime whatsoever. 3ER-358-60, 364-65, 367, 380, 482-83; 8ER-2093. Gochanour's body was discovered near the Burke-Gilman trail around 4:00 p.m. 3ER-491; 8ER-1925.

Bothell Police investigated. Defendant Hopkins was the lead; Defendant Miner processed evidence; and Defendant Schlaegel, then a Sergeant, supervised Hopkins and Miner and conducted some investigative work. 3ER-491-501, 577-82; 8ER-1924-37.

When discovered, Gochanour had "blood on his face," 8ER-1925; his clothing was saturated to the point where items in his pockets were "wet

4

and blood stained," *id*. at 1926; there was a "large degree of blood" on trees, 3ER-491; and the "significant amount of blood still present in the area" limited search efforts. 8ER-1928. Near the body, investigators found the victim's glasses with blood inside the lenses. *Id*. at 1929-30.

Gochanour's clothing and items were strewn about near a slough (aka river) near the trail but out-of-sight. *Id*. at 1925-27. Gochanour's boots and jacket were found nearby. *Id*. at 1926, 1930-31.

The officers also found the murder weapon; a large "Ginsu"-style knife with an approximately 10-12-inch serrated blade and a double-pointed tip. 8ER-1929; 3ER-631-32; 4ER-745. The blade was bent and had fiber and blood stains on it. 8ER-1929. The officers were able to confirm they had found the murder weapon when Hopkins attended the autopsy and made a positive comparison of the knife to the wounds on, which fit the double-tipped blade. 3ER-598.

Gochanour had been stabbed once in the face and six times in the back and had a number of scrapes and abrasions on his hands and arms consistent with defensive wounds. 4ER-636-340.

Defendants Schlaegel, Hopkins, and Miner learned important non-public information about the murder—including Gochanour's wounds,

that he was found without boots and jacket, and the exact location of his body—from their work. 8ER-1924-37; 3ER-491-501, 577-82, 594. These officers understood the importance of ensuring non-public facts were not leaked to the public to prevent contaminating the investigation. 3ER-596.

## B. Officers Developed Promising Leads Into the Murder; None of It Pointed to Simmers

Hopkins and other Bothell officers investigated leads and people who might have information about the victim. 3ER-492-94. The investigators learned that Gochanour was into drug dealing and was a frequent substance user. 3ER-493.

The officers also found a drink coaster with a phone number written on it in Gochanour's pocket. 3ER-495. Hopkins figured out the phone number belonged to Hope Fleischaker—a woman associated with "outlaw motorcycle gangs." 8ER-1932.

On March 12, the Bothell Defendants learned Gochanour was well known in area bars and restaurants and was last seen Friday evening with Fleischaker. 3ER-496; 8ER-1931-32. Hopkins and Schlaegel were pointed to two potential suspects by Gochanour's former roommate: (1) an outlaw biker man named Fred who was also Fleischaker's ex-

6

boyfriend; and (2) a violent person who Gochanour owed "a large amount of money." 3ER-496.

Hopkins and Miner interviewed Fleischaker the next day. *Id.*; 8ER-1932. Fleischaker reported she and Gochanour had eaten dinner together Friday night at "Shirley's Bar" and had drinks afterwards at "Nieuw Amsterdam." 8ER-1932. Fleischaker confirmed Fred was an abusive outlaw biker; was jealous and stalking her; and had potentially killed people in the past. *Id.* Fred had left two angry voicemails at Fleischaker's home—one confirming he had followed her Friday evening and another calling her a "worthless slut." 3ER-496. Fleischaker indicated someone she believed was a private investigator took a photo of her and Gochanour at Nieuw Amsterdam, which was the sort of thing Fred had done before. 3ER-497.

Additional information pointed to Fred as a suspect. Defendants learned Fred had seen Gochanour the night before the murder; confirmed that Fred was jealous; and that Fleischaker had just seen Fred the week prior. *Id.* at 496-97. Hopkins and Miner told Fleischaker the victim had been stabbed and her demeanor changed. Fleischaker asked suspicious questions about whether Gochanour's throat had been slashed and

whether he had his glasses or hat on. *Id.* Fleischaker changed her tone and became more restrictive, *id.* The officers instructed Fleischaker not to contact Fred and said she would not. *Id.* at 497-98.

The next day, March 14th, Bothell investigators learned more about Fred's potential motive and opportunity to kill Gochanour. That information lined-up with Fleischaker's odd behavior. For example, Gochanour's best friend confirmed rumors were circulating that Gochanour and Fleischaker had been seen together Friday evening and that Fred "may have become jealous." 3ER-498-99. Fleischaker's suspicious conduct continued: she disregarded police instructions and told Fred about police interest in the murder; and she lied to police by denying giving Gochanour her phone number. *Id.* The officers further learned that when Gochanour and Fleischaker had been seen at Shirley's on Friday, Fred was also there. 3ER-500. This information also called into question Fleischaker's claim she had left Gochanour much earlier in the evening. *Id.*

Investigators also learned Gochanour was reportedly addicted to cocaine and that his best friend was concerned because he had "received

8

dope fronted to him and wouldn't pay for it later." 3ER-498-99. Gochanour

had a conflict at dinner with Fleischaker Friday. 3ER-500.

### C. Despite The Mounting Evidence Pointing to Fred as a Suspect, The Officers Abandon Their Honest Investigation to Focus On Teenagers Who Had Nothing to Do With, and Heard Nothing About, The Murders

The next day, March 15, 1995, totally unrelated to the Gochanour

homicide investigation, and as part of their childishness, Simmers and

Wyatt shot off flare guns in the mid-morning, drawing attention to

themselves and were then unsurprisingly arrested by King County

officers. 3ER-384-85; 9ER-2144-49.

Simmers and Wyatt were taken into custody and arrested shortly

before noon on March 15, 1995. 9ER-2145. Before being arrested,

Simmers and Wyatt did not know anything about the Gochanour murder.

3ER-372. Without being questioned at all, Simmers and Wyatt were

separately taken to King County's Kenmore station, kept separate, and

then interrogated about property crimes. 3ER-385-87; 9ER2144-45.[2]

---

[2] Despite it contradicting their own evidence, Defendants latched on to a misstatement by Wyatt in an interview suggesting he and Simmers were in a car together on the way to the station and the murder came up. 2ER-268; 1ER-43. He is mistaken—they were not transported together and the murder did not come up until later when, separately, King County Detective Rusk brought it up driving them to the marina. 8ER-1893.

Over the next few hours, Simmers was repeatedly questioned by Detective Rusk about a flare gun fire for which Simmers gave a statement; about vehicle prowls for which Simmers gave a statement; and then about breaking into boats for which Simmers also made a statement. 3ER-608-18; 3ER-354.

When being questioned about these property crimes, Simmers indicated that his time as a runaway with Wyatt began on Saturday evening (not Friday). 8ER-1996-99. Wyatt also told Defendant McSwain the same thing—he did not meet up with Simmers until 6 or 7 p.m. Saturday evening. 9ER-2121, 2138, 2140; 8ER-1890.

As part of the property-crimes investigation, Simmers was taken to the marina by Rusk and King County Detective Raftis. 8ER-1901. Wyatt was not in the car—it was just Rusk, Raftis, and Simmers. 8ER-1940. This was the first time the murder was brought up to Simmers and how he learned about the fact of the murder. 3ER355; 3ER372. With Simmers in the backseat, Rusk brought up the murder, including by saying the victim had been stabbed and was "a transient." 3ER-355, 385-86, 388, 403. Rusk asked Simmers whether he committed the murder, and Simmers truthfully denied it. 3ER-385. Rusk asked Simmers how he

heard that the victim was a "bum" and Simmers truthfully responded he had learned the information from Rusk himself. 3ER-619-20; 4ER-734.

Simmers was placed in a holding cell at the station and tried to sleep. 3ER-386, 412.

In the meantime, 14-year-old Wyatt had been questioned by numerous officers, and eventually admitted involvement in property crimes to King County Detective John McSwain. 9ER-2138-40. Wyatt was obviously vulnerable, emotional, and should not have been questioned at all, as he had he invoked his right to counsel and his counsel told the officers he would not be speaking. *Id*. Nonetheless, in derogation of Wyatt's rights, the Detectives questioned him anyway when they should have left him alone. *Id*.; 3ER-509-10.

Though they should not have been interacting with him at all, Rusk and McSwain then took Wyatt to the marina, and Rusk again brought up the murder. 8ER-1893. Simmers was not with them. *Id*. Though McSwain's report makes it seem as if Wyatt was emotional because of some sort of consciousness of guilt related to homicide, *e.g.*, 8ER-1893, that was simply not the case—he was already upset and then accused of being a party to a murder he knew nothing about. 3ER482. Wyatt

11

invoked his right to counsel again, 3ER486, but McSwain *still* did not cease questioning the 14-year old about the murder. *See* 9ER-2128. Wyatt did not tell the officers he was afraid of Simmers and knew Simmers hurt someone on the trail—such a claim is "not true at all." 3ER-489.

Though Simmers and Wyatt had learned about the murder *from* the police officers, and though they had both described their interactions beginning on Saturday night (not Friday night when Gochanour was killed), King County Officers contacted Bothell officers and falsely reported that Simmers and Wyatt had provided inculpatory information about the murder. 3ER-571, 581; 8ER-1933. Bothell officers (including Hopkins, Miner, and Schlaegel) reported to the King County station and met with the Rusk and McSwain.

The King County and Bothell officers had a literal meeting of the minds. 4ER-720-21. In that meeting, among other things, the officers agreed to: accuse Simmers of the crime; to treat Wyatt as a witness against Simmers; to attempt to get a confession from Simmers; that "Hopkins and Rusk would interview Simmers"; that Miner would "obtain a warrant for their clothing." 3ER-572; 8ER-1933. As Hopkins described it, they worked together over hours "discussing what [their] plan would

12

be before the interview" of Simmers. 4ER-722-23. That plan involved consultation with Defendant Schlaegel over the "next several hours" where he "discussed interview strategies and investigative matters" with the Bothell and County officers. 3ER-581.

Defendants reached this agreement despite the fact that they all knew, as a result of the conversation where Bothell officers provided information to the County officers about the crime, that no one had believed the victim was homeless. 3ER-597. In other words, though they knew the thing that Simmers allegedly said about a "bum" had *come from* Rusk and was not suspicious or inculpatory, the officers pressed ahead with the plan to accuse Simmers, make Wyatt a witness, and to abandon entirely the investigation into Fred or whether Gochanour had been killed due to a drug debt.

### D. Unlawful Questioning and Interrogation of A 16-Year Old Who Was Held In Police Custody For Hours

Pursuant to the joint-plan, Rusk and Hopkins were the only ones who attempted to speak with Simmers about the Gochanour murder while he was trying to sleep in a cell after returning from the marina. 3ER-375, 389-90, 571. Defendants claim they did not begin questioning Simmers until around 9:30 or 9:45 p.m., meaning he had been in

prolonged isolation in a holding cell for hours. 3ER-621-22. Isolation is a powerful interrogation strategy because it "engenders feelings of hopelessness," 3ER-548. During that time, Simmers' mother, Berube, had been informed Simmers had been picked up and went to the Youth Center (where she thought he would be) to try to locate her son but he was not there. 3ER-400. The family called the station to attempt to find out what was happening. *Id*. These phone calls from a concerned parent whose 16-year-old was, unbeknownst to her, being accused of murder were ignored by Rusk and Hopkins. 3ER-628-29; 4ER-746. Had Berube mother known her child was being questioned about something as serious as a murder—not just held as a runaway for violating juvenile probation—she would have gone to the station. 5ER-0934-35.

Between roughly 6:00 and 9:30-9:45 p.m. Simmers tried to sleep but Rusk and Hopkins would not let him and instead awoke Simmers seeking to question him about the murder. 3ER-386; 3ER-356. This process was repeated. As Simmers put it: "A number of instances where they continued to ask me whether or not I wanted to talk with them. I would tell them no, so they would leave. An indeterminate amount of time later they would come back, ask me if I want to talk. Tell them no. They would

14

leave." 3ER-386. Any reasonable officer would have known that the questioning should have ceased. 3ER-510.

The officers did not relent. As Simmers put it, "I was mentally exhausted, so I just agreed to talk so they would leave me alone." 3ER-386. When describing why he spoke to officers about a murder when he "originally didn't want to," Simmers explained: "I came to the conclusion that they weren't going to stop until I talked to them." 3ER390.

At some point Simmers also invoked his right to counsel. 3ER-369, 378. As with Wyatt, this request was ignored. *Id.*; 3ER486. Again, any reasonable officer would have known that all questioning should have ceased. 3ER-510. Instead of stopping, consistent with the fact Simmers sought counsel, the officers asked Simmers to waive his right to an attorney and conveyed it would be beneficial to cooperate without counsel. 5ER-0935.

Juvenile vulnerabilities were very well known to law enforcement in 1995, 3ER-526, and made Simmers more susceptible to providing a false confession, to being compliant with the officers' requests, to having poor impulse control, and to be more suggestible. 3ER-541-42. Yet, acting pursuant to the (deficient) practices of their respective agencies, Rusk

15

and Hopkins did not adjust their tactics from what might be used on an adult because they were questioning a child. 3ER-607; 3ER-600.

Rusk and Hopkins did not attempt to learn or account for the length of time Simmers had been in custody before they questioned him. 3ER-627; 4ER-746. The interrogation was unrecorded and Hopkins destroyed his contemporaneous notes of what occurred. 3ER-592-93.

Hopkins and Rusk engaged in guilt-presumptive questioning that accused Simmers of committing the crime right off the bat. 4ER-747. Hopkins accused Simmers of murder while rejecting his (truthful) denials. 4ER-747.

The tactics also included a false evidence ploys. One ploy was saying Wyatt had told them Simmers committed the crime and led them to the murder weapon. 3ER-573, 624. Hopkins also threatened that the murder weapon included fibers that would link Simmers to the crime. *Id*. These were lies. 3ER-573, 630; 4ER-748. These sorts of evidence ploys can contribute to coercion, particularly where the suspect has is a juvenile and, moreso, where the lie the false claim Simmers had been "ratted out" by another juvenile/peer. 3ER551. Indeed, Simmers became upset when

16

the officers claimed Wyatt told them Simmers did it and that Wyatt had identified the murder weapon. 4ER-735; 4ER-725.

Hopkins and Rusk employed additional psychologically manipulative efforts—which they call "themes" and scientists call "minimization"—to try to convince Simmers to confess. 3ER-549, 624-25; 4ER-726-28. Because the point of these tactics was not a search for the truth but an effort to obtain a confession, the officers were totally fine using these tactics even if the things Simmers said were obviously false or entirely made-up by the officers themselves. 3ER-549-50, 624-25; 4ER-726-28. These techniques are used as an attempt to trick the suspect into a "false sense of security by offering sympathy, tolerance, face-saving excuses, and even moral justification" for the crime. 3ER-549.

Additional manipulative and coercive tactics were employed. 3ER548-52. For example, with Simmers upset, Hopkins and Rusk suggested to Simmers a false form of relief—a cigarette—with Rusk even pretending to leave the room to go get one. 3ER-573, 624. This was a lie, *id.*, which can cause hopelessness and frustration when the officers reneged on their false promise. Likewise, the manipulative efforts to obtain a confession (rather than a search for the truth), included Rusk

17

making up the idea that Gochanour had been accosting people on the Burke-Gilman trail generally and that Simmers must have acted in self-defense personally, 3ER-573, 624-25. In attempting to invoke that false sense of security and to prompt a confession, Hopkins suggested that Simmers would not want to be seen as "someone who killed for no reason," and so he should tell the police that reason this happened, 4ER-726-28; 3ER-624-25, and even suggested Simmers should not have to go down for the crime alone, 4ER-735. Such manipulation can also contribute to coercion and false confessions. 3ER549-50.

### E.    His Will Overborne, Simmers Falsely Confesses

Simmers' will was overborne by Hopkins' and Rusk's unlawful tactics, 3ER-625. At that point (not before) Simmers agreed to go along with the fake story the officers had made-up, *id.* Consistent with juvenile's greater "tendency to acquiesce to requests" that makes juveniles "less able to resist interrogative pressures than adults," 3ER541-42, having been "raised to cooperate with authority," once Simmers started cooperating, he did as he was told. 3ER371. Though Simmers had a thought about "reputation," it was not until *after* his will had been overborne that Simmers made claims about the murder.

18

Simmers knew he was "telling detectives something that wasn't true" but, exhibiting compliance, did so because it was "very clear" to him "that is what they wanted." *Id.*

Showing his susceptibility and the obvious falsity of what he was saying, Simmers adopted the notion of self-defense by saying he had been attacked and the dude "socked me up in my ribs." 3ER-573.

### *Non-Public Details Came From the Police*

Simmers understood that the police wanted him to claim he committed the Gochanour murder even though he had not. But, being innocent, he did not know the details of the crime. *Id.*

As a result, the non-public details about came from the police, 3ER-402, who used a variety of tactics to convey details to Simmers. For example, when Simmers would say incorrect things about the wound locations, or incorrectly pantomime guess of how the murder happened, the officers would provide suggestion or negative feedback and so Simmers would "evolve" his interpretation until they were happy with his answers. 3ER-391-92; 3ER-373-74. For example, Simmers thought the torso wounds were on the front of the body—which is consistent with a claim of self-defense that the offices had suggested—but he was

19

corrected to describe them in the back (and so he had to make up a story to fit that). 3ER-395-96. Another way information was conveyed to Simmers was through suggestive and leading questions. *Id.* The leading questions allowed Simmers to understand when it was "not the right answer [he] was giving." 3ER-373-74.

Finally, the officers and Simmers physically rehearsed and re-created the process until Simmers believed he had provided the officers with a "satisfactory scenario." 3ER-395-96.

The events just described were not recorded. 3ER393.

Defendants admit they engaged in some sort of "demonstration" of the manner the crime allegedly happened during the non-recorded interrogation (and again during the recording, corroborating Simmers' account. 3ER-626; 4ER-738, 743-44.

*Officers Disregard Simmers' Demonstrated*
*Vulnerability and Adolescent Fantasy*

Even with the officers leading questions, corrections, suggestions, pantomimes, and rehearsals, 3ER371, 391-93; 3ER373-74, Simmers still made patently false claims as he tried to create a story of a murder he did not commit, all of which revealed his innocence, juvenile vulnerability, and susceptibility. For example, Simmers said he had killed 13 people, all of whom were gangsters, 4ER-735. Simmers said he would never kill a "regular guy" as opposed to a "gangster," *id.*, and that he divides the world into "regular people" and "gangsters." 3ER-629.

As Hopkins knew, Simmers was not a gang member—he was a wannabe kid from a rural/suburban area "who had fallen under the influence of pop culture." 3ER-603; 3ER-377. Consistent with Simmers personally, 3ER-357, 4ER-732-732, Hopkins knew it "wasn't uncommon for kids" like Simmers to "act like they were tough and sag their pants and think they were cool." 3ER-603. This did not make the kid a "gang member or mobster"; it made them a "wannabe." *Id.*

### F. Following Coercive Tactics and Unrecorded Rehearsal Defendants Obtain A Recording of A False Confession

A recorded conversation followed hours of Simmers being in isolation, not permitted to sleep, and being subject to questioning while in police custody. Though Simmers was arrested around noon, the recording did not end until after 11:00 p.m. 9ER-2262.

Defendants' actions resulted in some non-public facts they provided being in the recording, including: (1) Gochanour was slashed in the face; (2) Gochanour was stabbed in the back six times; and (3) the blade of the murder weapon was bent. 9ER-2252.

Other details were irreconcilable with the crime, including:

- Simmers still described going out Saturday night, not Friday. 9ER-2249.

- Simmers gave a description of a knife that was far too small, comparing it to a paring knife or a "juvenile knife" about 4-5 inches, not the large 10-12-inch murder weapon. 9ER2249, 2253.

- Simmers described, and drew a picture of, a knife with one point, not two. *Id.*

- Simmers did not know about the shoes not being on the victim's feed (and indicated he'd been asked about it before). 9ER-2256.

- Simmers claimed Gochanour did not really bleed a lot, 9ER2260, when in fact it was an extremely bloody crime.

22

Moreover, even with the tape rolling, the interrogators continued to use leading questions that introduced facts or guided Simmers to certain answers, including:

- Hopkins is the one who introduces being on the Burke Gilman trail, 9ER-2251.

- Hopkins is the one who introduces that the victim was killed near the slough (or suggests that Simmers might not recall, and Simmers adopts the suggestion). *Id*. at 2255.

- Hopkins introduces the idea of running through brush. *Id*.

- Knowing it was found in the slough, Hopkins introduces the idea that something was done with the coat. *Id*.

- Hopkins suggests, and has Simmers agree, the knife had been "chucked" while running. *Id*. at 2256.

- Hopkins then coaches Simmers on which direction he was supposed to have fled, telling Simmers to "think back real clearly" when he struggles to answer. *Id*.

All of this impacted Simmers as a juvenile given that he was suggestable and the statement had been contaminated by manipulative tactics and themes that came from the officers. 3ER-542, 552-53.

Simmers' childish and outlandish/fantasy comments continued during the recorded statement. Simmers calls the murder weapon a "fat chunky knife," 9ER-2249, and adds he normally has a "fat throwing

23

knife." 9ER-2252. When he draws the wrong type of knife, Simmers says, "I'm a master at drawing blades," 9ER-2250. Simmers makes statements implying he has a typical process for killing people with knives (like "when I knife somebody, because I've done it before," is to grab the shoulder, 9ER2253); makes repeated references to "shanking" (a way to sound "cool"), 9ER-2252-53, 2255; and goes into grandiose storytelling about the officers' self-defense motive and the victim being "kind of tweeked" due to being on cocaine (which is something the officers learned about Gochanour and apparently told Simmers). 9ER-2261.

## G. Defendants Fabricated Evidence Concerning Jon Wyatt And The Interrogations

*Fabricated Reports About Jonathan Wyatt*

Detective McSwain was the primary person who interrogated Wyatt, both about the property crimes and then as part of the Defendants' plan to accuse Simmers of the murder and attempt to use Wyatt as a witness against Simmers.

In his report, McSwain writes as if Wyatt was eager to speak to him; suggests that Wyatt was emotional due to having seen Simmers commit a crime; and reports that Wyatt implicated Simmers in the murder. 8ER1893.

24

These claims are untrue and include things Wyatt never said. Wyatt did not ever see Simmers have a confrontation with anybody on the trail, including "any kind of violence" or an "altercation [that] took place for someone to stab." 3ER-482-83. Instead, like Simmers, Wyatt learned about the murder after they were arrested, *id.* at 483, and it was the police who informed him of Gochanour and that it was via stab wound. 3ER-488.

Wyatt was pressured by the officers' questioning via what he called "investigation abuse." 3ER-486. Contrary to McSwain's suggestion that Wyatt was eager to speak to him, Wyatt actually had asked for his mom, his dad, and a lawyer repeatedly, but they brushed him off, would not stop the questioning—they "were like Gestapo." *Id.*

Despite knowing he had railroaded Wyatt's requests, McSwain wrote reports falsely claiming that Wyatt equivocated about whether he wanted to talk to the police because, according to McSwain's false reports, Wyatt was eager to tell the authorities that he had witnessed Simmers murder someone (perhaps out of some remorse). 4ER-923-32.

This never happened. Simmers did not murder Gochanour, Wyatt did not see Simmers commit a crime that Simmers did not himself

25

commit, and Wyatt did not tell McSwain or Rusk Simmers killed anyone whatsoever. 3ER-489-90. When informed officers wrote a report saying he told the police Simmers "had hurt that man on the trail," 3ER-489, Wyatt confirmed such reports are "not true at all." *Id*. Indeed, when Wyatt was told an officer put into a police report Wyatt said he saw Simmers hurt a main on the trail, Wyatt was unequivocal: the "cop that typed that into there [i]s a flagrant, baldfaced liar." 3ER-490.

*Officers Fabricate Additional Evidence*

The leads developed into Fred, Fleishaker, and the victim's drug debts were completely abandoned. Instead, as they had already decided to do before Simmers was interrogated, 3ER-581, Defendant Miner wrote out an affidavit and obtained a warrant for the search and seizure of Wyatt's and Simmers' clothes. 4ER-729-731. The teens were stripped down in the King County police station, photographed, and had their clothing confiscated; it was humiliating. 3ER-487. The investigators took Simmers' clothing knowing he had been wearing them since he set out with Wyatt on Saturday. 4ER-729-731.

McSwain must have repeated the false claim that Wyatt implicated Simmers in the murder to Miner, as Miner included that falsehood in an affidavit for search warrant for the clothes. 4ER730.

Even though it was Rusk who brought up the potential that the victim was a transient, and even though Simmers simply denied what Rusk had suggested to him, several reports mischaracterize what happened. In these reports, the authors suggest that Simmers made a spontaneous inculpatory statement denying the killing but (supposedly) revealing that he knew the victim was a "bum." *See* 3ER-581 (Schlaegel's report); 3ER-571-72 (Hopkins' report); 8ER-1933 (Miner's report); 4ER-730 (Miner's affidavit). The characterization is false—Simmers heard this information from Rusk and did not volunteer information about the murder he had not known about before interacting with the police.

Hopkins also fabricated his report about the interrogation (before the recording began). In so doing, Hopkins destroyed his contemporaneous notes from the interrogation and wrote a report six days later that includes the same false claim about a "bum," includes false information from McSwain about Wyatt, and resorts to other mischaracterizations, material omissions, and falsehoods. 3ER-571-75.

27

For example, knowing full well that Simmers and Wyatt had described—even before the murder came up—setting out on Saturday evening, Hopkins wrote that Simmers "appeared to have some confusion as to exactly the date the incident took place, whether it was Friday or Saturday," 3ER-574. Hopkins included this statement because he knew Simmers used a date that did not match the murder. 4ER-745.

Hopkins wrote that Simmers said he could not remember stabbing anyone and that it "wasn't in his memory." 3ER-573. But, as Hopkins himself later admitted, Simmers had actually repeatedly denied involvement. 4ER-724; *see* 3ER-385, 623. Hopkins' misleadingly wrote that Simmers was "reminded of" his *Miranda* rights before being questioned but omits entirely that Simmers told the police that he did not want to speak to them and asked for an attorney. *Supra*, at 14-15.

To synch up with his affirmatively false or misleading claims, Hopkins omitted important information about the interrogation, including that: the officers provided Simmers with non-public details of the crime; the officers engaged in a rehearsal of the crime where they had to correct Simmers when he was unable to perform it directly; the officers used leading questions, suggestion, and correction when they guided

28

Simmers to a scenario they wanted to memorialize on recording. *Supra*, at 17-20.

### H. Defendants Knew, Or Should Have Known, Simmers Was Innocent, But Hopkins Fabricated Additional Evidence

Despite Defendants' attempts to paint a teenager as some sort of criminal mastermind, they actually knew that Simmers was innocent of the murder and a misguided child. Simmers (and Wyatt) consistently described their interactions beginning after Gochanour had been killed on Saturday; the alleged motive for the crime was entirely fabricated by the officers; Simmers made clearly fantastical claims; Simmers' description of the murder weapon was wrong; Defendants supplied the non-public facts to Simmers; and Defendants abandoned legitimate leads that directly related to the victim. *E.g.*, *supra*, at 6-20.

In addition, zero physical or forensic evidence linked to Simmers. In March 1995, Defendants had collected both the murder weapon (which had blood stains) and Simmers' clothing, which Hopkins sent to the crime lab for DNA testing. 3ER-565.

On November 14, 1995, the DNA testing results came back. *Id.* Simmers' blood was not found on the knife and he was eliminated as a

contributor to that sample. None of Gochanour's DNA was found on any of the samples taken from Simmers' pants. 3ER-568-69.

At that point, Defendants were aware of several problems with claiming Simmers committed the murder, even with the false confession. These included that: (1) Simmers and Wyatt repeatedly and consistently indicated they met-up on Saturday not Friday, (2) Simmers' description and drawing of the knife contradicted the murder weapon (both in terms of length and number of points), (3) the false confession could not account for the location of the victim's shoes (not on his body), and (4) the forensic evidence did not link Simmers to the messy crime.

On Defendants' telling, just days after the DNA results were completed, the "solution" to all of these problems innocently materialized in the form of Kevin Olsen, an adult who was housed at the King County jail in some proximity to Simmers. Olsen was incarcerated for an unrelated crime, had a lengthy criminal history including crimes of dishonesty, was a heroin user, was an incentivized "informant," and was known to be unreliable. 4ER-911-16, 919-22.

Hopkins met with Olsen at the jail and had a private, unrecorded meeting with him where Hopkins took contemporaneous notes, which he

later destroyed. 3ER-593, 602. Hopkins wrote a two-page report afterwards as the police documentation of his meeting. Before meeting with Olsen, Hopkins knew (1) the date given by Simmers (and Wyatt) did not match the crime; (2) the knife described by Simmers was too small and the knife he drew did not have two tips; that (3) Simmers could not explain why the shoes were in the slough; and (4) no physical evidence linked to Simmers. 3ER-564-70, 601, 602. Hopkins admits that his report about Olsen addresses discrepancies between the actual crime and the recorded confession. 3ER-602.

In fabricating evidence, Hopkins wrote a report indicating Olsen addressed each of these known flaws. Hopkins claims Olsen said: (1) Simmers intentionally gave the wrong day; (2) Simmers purposefully misdrew the knife; (3) Simmers provided a reason for why the shoes were not found with the body; and (4) Simmers wore gloves (mistakenly thinking this means Simmers' DNA could not be found on the crime scene evidence, which is incorrect from a scientific matter). 3ER-529, 601-02; 8ER-1848-61.

However, Simmers never spoke to Olsen. 3ER-399, 401. Instead, these claims—exceedingly "convenient" solutions to the exact

31

discrepancies in the false confession just days after the DNA cleared Simmers—were made-up by Hopkins.[3]

## I.    As a Result of Defendants' Misconduct, Simmers Is Wrongfully Convicted Of A Murder He Did Not Commit

Simmers was charged with murder based upon Defendants' actions, including the use of the police reports they wrote, and the recording of the false confession they had invoked. *See* 7ER-1675-87.

Simmers did not testify in the pretrial hearing about the confession. 5ER-939-1279. The cause proceeded to trial. Olsen's false claims were added to the mix. 2ER-252. Defendants did not ever reveal that they fabricated evidence against Simmers.

Simmers' defense was that he was innocent; that he could not have committed the crimes; and that Olsen was lying. To that end, among other things, counsel presented *alibi* testimony from family about watching *The Lion King* the night of the murder, and testimony from

---

[3] The non-public facts Olsen reported could have only come from Hopkins or Simmers. Simmers denies providing them to Olsen, and Hopkins had an unrecorded meeting with Olsen after which he claimed Olsen provided these details and even walked away with "notes" shared between them. These notes, Plaintiff contends, are evidence of fabrication between Hopkins and Olsen (which Hopkins denies). 3ER-519-29; 8ER-1850, 1862-83. Plaintiff's account must be credited here.

Wyatt's mother confirming he did not meet-up with Wyatt until Saturday evening. 9ER-2228. Simmers' testimony concerned his innocence; *i.e.*, about watching *The Lion King* and staying home Friday evening. 9ER2243-46. Simmers was not asked—and therefore did not answer— any questions about the interrogation. *Id.*

Despite his innocence, and as a result of Defendants' work, Simmers was nonetheless wrongfully convicted of a murder he did not commit. Given the murder charge, Simmers was prosecuted as an adult, sentenced to 46 years and 8 months incarceration, and spent decades in prison while the real killer remained free. 3ER-366, 380-81; 6ER-1341. At minimum, Simmers served 18 years and 14 days imprisoned for the murder alone. 8ER-2097.

## J.    Simmers' Wrongful Murder Conviction Was Vacated and the Charges Were Dropped

Decades later, Simmers obtained post-conviction counsel as many juveniles were subject to resentencing following *Miller v. Alabama*, 567 U.S. 460 (2012), and pursuant to *State v. Houston-Sconiers*, 391 P.3d 409 (Wa. 2017), in Washington. Post-conviction counsel went further and asked the State to review this as a case of wrongful conviction, and

33

the prosecutor agreed. In that process, in 2018, a prosecutor interviewed Simmers, Wyatt, and others. 3ER481; 3ER352.

Post-conviction investigation also included additional DNA testing with more sensitive techniques available in 2019 than were available in the 1990s. 4ER83; 9ER2299-302. That DNA testing further exculpated Simmers and was sensitive enough to point to the existence of an alternative suspect. *Id.*

On February 13, 2019, citing evidence concerning juvenile brain science, 4ER-816-31, the original DNA results, 4ER-805-13, and the new DNA evidence, *id.* at 832-33, post-conviction counsel filed a motion for a new trial. 4ER-749-837.

The State agreed the motion would likely be granted, moved to vacate the conviction and indicated it would not seek to re-try Simmers. 7ER-1763-71. The conviction was vacated on February 26, 2019, 7ER-1772-74, the State declined to attempt retrial, and Simmers was released.

34

## II.    Procedural History

Simmers filed this suit in 2021. Extensive discovery eventually commenced. Hopkins, Miner, Schlaegel, Raftis, and other officers were deposed. Simmers was deposed in 2022. 3ER352-381; 2ER138-166. At deposition, Simmers was asked about his 2018 interview and he did not deny what he said, backtrack, or recant. 2ER138-166. Instead, Simmers' deposition responses were consistent with and deferential to the prior interview. *See* 2ER-67 (with citations to 2ER-138-166).

Simmers died in the summer of 2023 in a tragic car accident. 1ER-07. His mother, Donna Berube, was made the administrator of Simmers' estate and was substituted in as Plaintiff. *Id.* Ms. Berube was then deposed. 2ER-240-51. Defendants moved for summary judgment. In their motions, Defendants did not apply the proper legal standards or accept Simmers' innocence. In response, Plaintiff presented a wealth of evidence—including from Simmers' deposition, his 2018 interview, Wyatt's 2018 interview, from experts, and from the Defendants themselves—that showed a reasonable jury could find for Plaintiff at trial. 2ER-292-350. The trial court granted the motions. 1ER-2-56.

This appeal followed.

35

## SUMMARY OF THE ARGUMENT

This is a coerced confession and fabrication-of-evidence suit concerning the wrongful conviction of Simmers for the murder of Rodney Gochanour. Simmers is innocent of this crime.

On Simmers' account, the officers used unlawful methods to coerce a false confession from a juvenile in violation of the Fifth Amendment. Crediting Plaintiff's evidence, particularly given Simmers' innocence, the officers included information in their reports that witnesses never said, mischaracterized statements that were made, and omitted material information. That is fabrication.

In violating bedrock standards governing summary judgment, the court below granted summary judgment. Though credibility determinations are forbidden, the court made them. Though the record must be construed favorable to Plaintiff, the court weighed evidence and construed the record against Plaintiff. Though inferences must be taken in his favor, inferences were made against Simmers. Reversal is required.

In addition, given the trial court has already settled upon the notion Simmers and his mother (now Plaintiff) are not credible, and is unlikely to be able to change that view, remand to a different judge is appropriate.

36

# ARGUMENT

## I.  Standards Of Review

Summary judgment is reviewed *de novo*. *Parsons v. Sanchez*, 46 F.3d 1143 (9th Cir. 1995). Summary judgment is only permitted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A "court may not make credibility determinations or weigh conflicting evidence." *Bator v. State of Hawai'i*, 39 F.3d 1021, 1026 (9th Cir. 1994), evidence must be construed "'in the light most favorable to the opposing party,'" and a court must "draw inferences in favor of the nonmovant." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *see Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 695 (9th Cir. 2023). Every reasonable factual inference must be drawn in favor of the party opposing the motion for summary judgment," including from "direct and circumstantial evidence." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005); *cf. Baker v. Roman Catholic*

37

*Archdiocese of San Diego,* 725 F. App'x 531, 532 (9th Cir. 2018) (reversing for failure to "properly consider various pieces of circumstantial evidence").

## II. REVERSAL IS WARRANTED BECAUSE THE TRIAL COURT IMPROPERLY MADE CREDIBILITY DETERMINATIONS AND CONSTRUED THE EVIDENCE AGAINST PLAINTIFF

The established law just cited forbids courts from rejecting the plaintiff's "version of the events, however implausible the court perceived it to be." *Bernal*, 73 F.4th at 695; *see, e.g.*, *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (reversing grant of summary judgment where trial court deemed plaintiff's account "worthless" because such "discounting of [the plaintiff's] testimony constitutes the sort of credibility finding properly left for a jury").

As in *Bernal* and *Manley*, where the trial court has erred in applying the basic summary judgment standards, this Court must reverse. *See also Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1187 (9th Cir. 2016) (reversing where trial court failed to  make appropriate inferences from evidence in favor non-moving party); *Furnace v. Sullivan*, 705 F.3d 1021, 1023 (9th Cir. 2013) (same); *Glenn v. Washington Cnty.*, 673 F.3d 864, 878 (9th Cir. 2011) (reversing where

38

disputed inferences could have supported plaintiff's account as "the district court is not permitted to act as a factfinder"); *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 480 (9th Cir. 1991) (reversing where "the district court relied improperly on credibility findings"); *Nealy v. Shinn*, 2024 WL 3842094, at *2 (9th Cir. Aug. 16, 2024) (reversing for failure to credit a declaration and interrogatory response); *Qidwai v. Prudential Ins. Co. of Am.*, 56 F. App'x 425, 426 (9th Cir. 2003) (reversing on the basis the "district court was not free simply to refuse to consider" plaintiff's evidence).

### A. The Trial Court Impermissibly Made Credibility Determinations, Construed the Record Against Simmers, and Misapplied the Law on The Fifth Amendment Claim

The Fifth Amendment provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V. Due process requires "defendants be able to exercise their constitutional right to remain silent and not be penalized at trial for doing so." *United States v. Baker*, 999 F.2d 412, 415 (9th Cir. 1993).

Confessions cannot be obtained via "'improper influence.'" *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)). Influence that "renders a confession

involuntary does not consist only of express threats so direct as to bludgeon a defendant into failure of the will. Subtle psychological coercion suffices as well, and at times more effectively, to overbear 'a rational intellect and a free will.'" *Id.* (quoting *Malloy*, 378 U.S. at 7).

A confession can be involuntary where a suspect's "will was overborne by official pressure, fatigue and sympathy falsely aroused after considering all the facts." *Spano v. New York*, 360 U.S. 315, 323 (1959). As a result, "the voluntariness inquiry 'is not limited to instances in which the claim is that the police conduct was 'inherently coercive,' but 'applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will.'" *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014) (*en banc*).

In assessing whether the Fifth Amendment has been violated, the inquiry "must be broad," *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960), and "'take[] into consideration the totality of all the surrounding circumstances—*both* the characteristics of the accused and the details of the interrogation.'" *Preston*, 751 F.3d at 1016 (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). As "interrogators have turned

to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

The totality of circumstances requires evaluating an interrogation in the aggregate not piecemeal. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Preston*, 751 F.3d at 1017; *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) (*en banc*).

Simmers described an interrogation that, in the totality of the circumstances, a reasonable jury could easily find violated the Fifth Amendment. The trial court resisted this conclusion by making adverse credibility determinations, making inferences against Simmers, and construing the record in Defendants' favor. Doing so was error.

## 1. The Trial Court Made Impermissible Credibility Determinations, Warranting Reversal

"When a suspect invokes his right to silence, the officers' interrogation must cease. Period." *Jones v. Harrington*, 829 F.3d 1128, 1132 (9th Cir. 2016). "Refusal to cooperate is every defendant's right under the Fifth Amendment" and "a defendant may not be made to suffer for his silence." *Tingle*, 658 F.2d at 1336 n.5. A request to cease questioning must be "scrupulously honored," *Michigan v. Mosely*, 423

41

U.S. 96, 103-04 (1975), and pressuring a suspect to answer questions after they have requested silence is coercive and "can only be seen as menacing,". *Collazo v. Estelle* 940 F.2d 411, 416-17 (9th Cir. 1991) (*en banc*).

The same is true where a suspect asks for counsel. *See Smith v. Illinois*, 469 U.S. 91, 95 (1984) (noting the "bright-line rule that all questioning must cease after an accused requests counsel"). A confession obtained after an invocation, is presumptively involuntary, *Edwards v. Arizona*, 451 U.S. 477 (1981); *see, e.g., Cooper v. Dupnik*, 963 F.2d 1220, 1240-41 (9th Cir. 1992) (en banc).

Here, Simmers invoked his right to silence multiple times as he was trying to sleep. *Supra*, at 14-15. Rather than ceasing all questioning, Detectives Rusk and Hopkins continued to pressure Simmers until he understood he could not escape talking to them about the murder. *Id*. In addition, after Simmers sought counsel, Rusk and Hopkins did not cease questioning or ask about whether he actually wanted an attorney (if they thought his statements were ambiguous). *Id*. Instead, consistent with Simmers' making an invocation, the officers falsely told a teenager it would be better if he did not have an attorney present. *Id.*; 5ER-935.

42

The trial court acknowledged that Simmers testified that he invoked his right to silence, asking that questioning cease, and that he asked for an attorney. 1ER-378. The trial court acknowledged Simmers' mother, Berube, submitted a declaration further corroborating Simmers' account about asking for an attorney and that he was told it would be better if he did not have one (a topic also addressed at her deposition). 1ER-38-39 n.15; 5ER-935.

The trial court discounted and ignored entirely this evidence, reasoning that Simmers' claims "defy credibility" because Simmers had not described these events until his 2018 interview and then at his deposition in this case. 1ER-37. Berube's declaration was given the same treatment. 1ER-38-39 n.15. These sorts of credibility determinations are forbidden, requiring reversal. *Bator,* 39 F.3d at 1026.

The court's logic was faulty in other ways, too, given that it piled speculative inference upon speculative inference against Simmers. Essentially, the trial court held that Simmers made-up the invocation of his right to silence and counsel due to what happened in the original proceedings. The trial court seems to have reasoned that (1) if Simmers had invoked his right to silence or counsel he would have told his original

43

criminal defense attorneys (which is speculative), (2) if Simmers told his original criminal defense attorneys he demanded questioning cease or sought counsel, those attorneys would have necessarily made these arguments at the original suppression hearing (which is also speculative), (3) the original criminal defense attorney did not make these arguments (which is true), and, therefore, (4) Simmers never told them about refusing to speak with the officers or asking for an attorney *because that never happened* (which is speculative and a credibility determination). 1ER-37-39.

This reasoning—which stacked unsupported inference upon inference *against* Plaintiff in some bizarre sort of impeachment-by-omission—cannot be affirmed. "By weighing the evidence and reaching factual inferences contrary to [Plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Tolan*, 572 U.S. at 660.

Indeed, it would have been improper for the trial court to refuse to accept the best version of Simmers' account if the court found his account implausible or even if, hypothetically, Simmers had been inconsistent.

44

*See, e.g.*, *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) (reversing rejection of "equivocal" testimony as "just the type of credibility determination that must be left to the factfinder, and not made by a judge on summary judgment" because a "judge must not grant summary judgment based on his determination that one set of facts is more believable than another"); *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 730 n.9 (9th Cir. 2012) (denying summary judgment though plaintiff's testimony was arguably inconsistent); *Curtis v. ABB In*c., 622 F. App'x 661, 662 (9th Cir. 2015) (refusing to construe the record against plaintiff whose account was inconsistent and emphasizing the importance of these principles where the plaintiff is deceased because "a factfinder will need to scrutinize his word choices in his preserved deposition testimony even more carefully than where the deponent is available for trial"); *United States v. Two Tracts of Land in Cascade Cnty., Mont.*, 5 F.3d 1360, 1362 (9th Cir. 1993) (reversing court improperly considered affidavits "lacking in credibility" or "implausible").

But, again, Simmers was not even inconsistent. He simply did not testify about the interrogation in the original criminal proceedings. Yet, the court used that silence—which was protected by the Fifth

45

Amendment—as a damning credibility hit. Doing so contradicted summary judgment standards and the Fifth Amendment itself. *Tingle*, 658 F.2d at 1336 n.5.

### 2. The Trial Court Failed To Accept and Appreciate the Inferences that Flow From Simmers' Vulnerability Due to His Age

It has "long been established that the constitutionality of interrogation techniques is judged by a higher standard when police interrogate a minor." *Crowe v. County of San Diego*, 608 F.3d 406, 431 (9th Cir. 2010) (citing *In re Gault*, 387 U.S. 1, 55 (1967)). That Simmers was a juvenile "is of critical importance in determining the voluntariness of his confession." *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011). The Supreme Court long ago emphasized, for juveniles, "the greatest care must be taken to assure that [any] admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of *adolescent fantasy*, fright or despair." *Gault*, 387 U.S. at 56 (emphasis added).

Indeed, it would be a "callous disregard of … constitutional rights" to treat every child like "an adult in full possession of his senses and knowledgeable of the consequences of his admissions." *Gallegos v.*

46

*Colorado*, 370 U.S. 49, 54 (1962). These concerns remain regardless of how "sophisticated" the juvenile may appear, *id.,* as "youth is more than a chronological fact" and, instead, is "a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). As a result, juveniles cannot be treated by "more exacting standards of maturity" applicable to adults, because they are in a "period of great instability which the crisis of adolescence produces." *Haley v. Ohio*, 332 U.S. 596, 599 (1948).

Here, it is undisputed that Simmers was 16 years-old when he was questioned. It is also undisputed that Hopkins and Rusk treated Simmers just as they would an adult—they did not adjust their tactics due to Simmers' age whatsoever. 1ER30.

Contrary established law, and contrary to the court's limited role at summary judgment, the trial court essentially found that Simmers was "sophisticated" enough that his age did not matter. 1ER30-31. The trial court pointed to Simmers' experience with police from prior arrests, his IQ, and Simmers' statements as somehow rendering moot his age. *Id.* But, particularly where Plaintiff submitted expert testimony about how

47

juveniles—as a matter of brain function and science—are susceptible and vulnerable, 3ER540-42, the court weighed the evidence against Simmers.

In addition, completely ignoring that Simmers had invoked his right to silence and been refused by the police, the trial court construed Simmers' statements from the 2018 post-conviction interview and discovery deposition *against* Simmers to find age irrelevant. 1ER-30. The trial court neglected that it was not until *after* Simmers came to believe he had no choice but to speak with the police, and after (truthfully) denying the crime, that Simmers went along with the officers' story and made outlandish claims (nominally about his "reputation" but really that were totally childish). *Supra*, at 14-16, 18-19, 21.[4]

Moreover, the trial court failed to appreciate that coercion need not involve the "third degree," and so the fact that Simmers was not afraid of the police does not mean they could not have used subtle interrogation tactics. Even for an adult, coercion is not limited to "express threats so direct as to bludgeon a defendant into failure of the will" but includes

---

[4] The court's analysis was backwards—it determined that certain statements were credible (*e.g.,* about "reputation") while deeming other statements from the exact same transcripts incredible (*e.g.*, that Simmers only spoke after repeatedly asking not to be questioned).

"[s]ubtle psychological coercion" that can at times be more effective in overbearing rational intellect and free will. *Tingle*, 658 F.2d at 1335; *see Connelly*, 479 U.S. at 164.

Juveniles, even ones who have been previously arrested, are suggestable. *Gallegos*, 370 U.S. at 54; *Eddings*, 455 U.S. at 115. And there is evidence that Simmers was specifically suggestable: he testified that he was subject to suggestion and went along with what they said or implied; the narrative of the false confession came from the police; and Hopkins used suggestive, leading questions. *Supra*, at 19-20, 23-24.

Independently erroneous is that the trial court's construal of the evidence, and inferences from it, ignored that a jury could find Simmers' made the statements following "official pressure, fatigue and sympathy falsely aroused," *Spano*, 360 U.S. at 323, and/or that Simmers was engaging in "adolescent fantasy." *Gault*, 387 U.S. at 56. Abundant evidence of this exists including Simmers' testimony he was trying to sleep, the obvious exhaustion from being away from home for days, being in police custody all day, and by the fantastical things Simmers said (*e.g.*, claiming he killed 13 people, claiming that there are "gangsters" and "real people," being "a master at drawing blades," etc.).

49

The interpretation of any statements Simmers made about wanting to be seen as a "gangster"—again, which came *after* Simmers had been refused when indicating he did not want to talk to the detectives—must be interpreted for what Hopkins recognized they were: claims by a teenager trying to pretend to be cool, but that were unknowing, foolish, and consistent with the science of juvenile's lack of self-control, lack of future orientation and lack of comprehension. 3ER-540-42.

The trial court's reasoning that youth did not matter improperly construed the evidence and inferences from it in Defendants' favor.[5]

### 3. The Trial Court Construed the Evidence Against Simmers By Disregarding Evidence of Simmers' Mental Vulnerabilities

The voluntariness inquiry includes "the particular circumstances of the case," *Preston*, 751 F.3d at 1016, and "mental condition is surely

---

[5] The court's treatment of the absence of a parent suffers from similar flaws. Though it is undisputed Simmers was interrogated about the murder without the presence of his mother or a concerned adult, despite the established "concern over the inability of children to make mature choices." *Bellotti v. Baird*, 443 U.S. 622, 636 (1979), despite the fact no "counsel or friend was called during the critical hours of questioning." *Haley v. State of Ohio,* 332 U.S. 596, 600 (1948), and despite evidence that Simmers' family was trying to see him, 5ER934-35, the trial court put the burden *on Simmers* (rather than the officers) to provide access to a parent or concerned adult. Doing so erroneously weighed the evidence against Plaintiff.

relevant to an individual's susceptibility to police coercion." *Connelly*, 479 U.S. at 165. Defendants had an obligation to "ascertain the petitioner's character and background," including his mental health vulnerabilities. *Fikes v. Alabama*, 352 U.S. 191, 193 (1957). Persisting with an interrogation in the face of evidence of mental health issues is a factor that contributes to a finding of coerciveness. *E.g. Spano*, 360 U.S. 315, 321-23 (1959) (finding questioning of adult suspect with mental instability as unconstitutional); *Gladden v. Unsworth*, 396 F.2d 373, 381 (9th Cir. 1968) ("If by reason of mental illness . . . the confession in fact could not be said to be the product of a rational intellect and a free will . . . it is not admissible and its reception in evidence constitutes a deprivation of due process.").

Here, the record includes evidence of Simmers' mental health vulnerabilities, including his ADHD diagnosis, which is the type of thing that can render a suspect—and particularly a juvenile suspect—"highly suggestable," as a matter of law, *Fikes*, 352 U.S. at 197, and science. 3ER544. Refusal to construe this factor in Simmers' favor was error. *Tolan*, 572 U.S. at 659; *Bernal*, 73 F.4th at 695.

51

The court recognized Plaintiff submitted expert evidence that would enable a jury to find that ADHD impacted Simmers' functioning during the interrogation. 1ER31. The trial court refused to construe this evidence in Plaintiff's favor, too, surmising that someone with ADHD *can* provide a voluntary false confession. But, the record also shows that someone with ADHD can provide an *involuntary* false confession and that ADHD is a risk factor either way. 3ER544-45. It is for the jury to make this determination. *Manley*, 847 F.3d at 711.

The court also ignored the expert's analysis on an improper basis. As elsewhere, the court pointed to the pretrial suppression hearing from the 1990s as some sort of "evidence." There are many problems with this approach. First, the 1990s court obviously lacked a wealth of information before in the record here (*e.g.*, Simmers' post-conviction interview, Simmers' deposition, Hopkins' deposition, and Plaintiff's experts). Second, the question in this case is not about what happened at a different proceeding with different parties with different evidence three decades ago. It was about whether a reasonable jury can find the officers' liable in this case and on the record adduced here. *Tolan*, 572 U.S. at 659.

Nonetheless, court reasoned the expert testimony should be ignored because "there is no reason why" the expert's interpretation of the evidence should "supplant" the criminal court's perspective and ability to "make credibility determinations." 1ER32.

To the contrary: there are many reasons why Plaintiff should be permitted to support his claims at *this* trial with expert testimony submitted in *this* case. Evidence that corroborates a party's account is of course relevant and admissible even if discovered later, *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1078-79 (9th Cir. 2019), *Boyd v. City and County of San Francisco*, 567 F.3d 938, 944 (9th Cri. 2009). Plaintiff here was permitted to present expert testimony that would corroborate Simmers' account and demonstrate the misconduct. *E.g.*, *Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018). In addition, confirming the trial court was asking the wrong questions, the record evidence is not used to make "credibility determinations." 1ER31. Neither the trial court or any expert should be making credibility determinations. *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017).

### 4. The Trial Court's Refusal To Accept that a Child Being In Police Custody for 11 Hours Can Contribute to Involuntariness Was Error

"A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror." *Blackburn*, 361 U.S. at 206. It is undisputed that Simmers was arrested around noon and that the interrogation recording did not end until just after 11:00 p.m. Defendants could point out that Simmers was not questioned this entire time. Plaintiff could point out that hours of isolation, even when not being questioned, bear on a suspects' vulnerability are part and parcel of psychological manipulation.

Plaintiff submitted expert testimony that prolonged isolation and the entire duration of custody (not just the periods of active questioning) is the relevant measure for assessing the psychological impact of duration here, particularly in light of Simmers immaturity and mental health vulnerabilities. 3ER548-49. Yet, the trial court made the apparent factual determination that this time *could not* factor into Simmers decision to confess. 1ER33. This, again, was error. What weight this factor ultimately had on Simmers in the totality of the circumstances

54

is one for the jury to make, as "no single factor, such as length of interrogation," is dispositive. *Preston*, 751 F.3d at 1017. At this juncture, the trial court was required to find length of time—include time in isolation and trying to sleep—contributed to Simmers' fatigue, at least in some way. *Tolan*, 572 U.S. at 659.

### 5. The Trial Court's Refusal to Accept Simmers' Innocence, and Inferences that Flowed From It, Was Error

Tellingly, the Court expressly did not accept Simmers innocence, calling it *alleged*. 1ER-35. The court found innocence does not "*establish* that his confession was coerced." *Id.* (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 306, n.31 (3d. Cir. 2014) (emphasis added)). Plaintiff agrees that innocence alone does not *establish* coercion. Plaintiff's claim is not that being innocent necessarily means the Fifth Amendment was violated. Instead, as part of the totality of the circumstances, Plaintiff's claim is that Simmers' innocence supports an inference of involuntariness that would permit, with other circumstances, a jury to find a Fifth Amendment violation.

"Police conduct that influences a rational person who is innocent to view a false confession as more beneficial than being honest is necessarily coercive, because of the way it realigns a suspect's incentives during

55

interrogation." *United States v. Villalpando,* 588 F.3d 1124, 1128 (7th Cir. 2009). In a § 1983 suit like this one, innocence is relevant to rebutting a claim that the plaintiff honestly confessed, including by showing the defendants (rather than the plaintiff) provided the details of the case. *See, e.g.*, *Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014). Indeed, the decision cited by the trial court (which also reversed the grant of summary judgment on a coerced confession claim) is in the same vein: "the circumstance that [plaintiff] was innocent proves he could not have known certain details about the crime that nevertheless were included in his confession." *Halsey*, 750 F.3d at 307 n.31.

The manner in which these details are communicated to an innocent person—*e.g.*, leading or suggestive questions, "correcting" misstatements, etc.—is further evidence of coercion. *See Fikes*, 352 U.S. at 195 (leading nature of questioning supported finding confession involuntary); *Spano*, 360 U.S. at 322 (similar); *Preston*, 751 F.3d at 1014 ("The officers also asked a number of leading and suggestive questions that introduced facts Preston himself never mentioned until the officers brought them up."); *Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th

Cir. 2001) ("Of particular concern … is the fact that the officers relied largely on leading questions to secure this confession.").

Put differently, supplying the non-public facts to Simmers was a form of pressure and influence. Yet, court below, again, refused to take any inferences in Simmers' favor from his innocence, and weighed Simmers' claims about his (farcical) "reputation as a gangster" was more important. 1ER37. This, again, was error.

### 6. The Trial Court's View of Defendants' Tactics Improperly Weighed The Evidence in Their Favor

The court did not consider all of the Defendants' tactics in questioning Simmers, a child. For example, the questioning was guilt-presumptive, rather than a search for the truth. This is evident in how the officers simply disregarded Plaintiff's denials, how they suggested to him made-up "themes" and how they prompted a confession even when Simmers could not get the details correct.

The trial court gave this no mention but officers "concerned primarily with securing a statement from defendant on which they could convict him," rather than obtaining information, must be subject "the most careful scrutiny." *Spano*, 360 U.S. at 324; *see also Haynes*, 373 U.S. at 511 (criticizing police for being focused on obtaining a confession).

Along with engaging in guilt-presumptive questioning, and keeping in mind that "psychological coercion can constitute police misconduct," *Com. of N. Mariana Islands v. Mendiola*, 976 F.2d 475, 485 (9th Cir. 1992), the officers blatant lies and ploys must be considered. *See, e.g., Crowe*, 608 F.3d at 432 (considering fact juveniles were "lied to" as part of totality of circumstances).

Here, Defendants falsely told Simmers he had been implicated by physical evidence and Wyatt, while also suggesting to him that he should not have to go down alone and acted in self-defense, and it would be better if he did not have an attorney. *Supra*, at 15-18. All of this is relevant to the totality of the circumstances, because the "test of voluntariness" includes "whether the confession was . . . obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam); *see also Williams v. Woodford*, 384 F.3d 567, 595 (9th Cir. 2004) ("[A] promise of leniency accompanied by threats or other coercive practices constitutes improper influence and makes a subsequent inculpatory statement involuntary.").

In excusing the officers' conduct, as elsewhere, the trial court simply weighed the evidence *against* Plaintiff rather than construing it all in the light most favorable to Simmers. 1ER35.

### 7. The Trial Court's Disposition of the Fifth Amendment Claim, On The Whole, Misapplied the Law

The trial court made its own determination on the ultimate issue— that Simmers' false confession was voluntary. *E.g.* 1ER37, 1ER39 n.16. This was error.

In so doing, as explained, the trial court's construed of some of the relevant interrogation circumstances in isolation (while, at each step, viewing the facts improperly in Defendants' favor). The trial court further misapplied the law by addressing factors piecemeal and in isolation rather than in their totality; an approach this Court has expressly rejected. *Preston*, 751 F.3d at 1017; *Doody*, 649 F.3d at 1011. Indeed, a "compartmentalized view of the interrogation process cannot be squared with settled Supreme Court precedent" *Halsey*, 750 F.3d at 305; *see also Wilson*, 260 F.3d at 953 ("[A] totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to

insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will.").

Here, the trial court did not construe all of the factors in Plaintiff's favor and then ask what—in their totality rather than isolation—impact they could have had on Simmers.

Reversal is warranted.

## III.  THE TRIAL COURT ERRONEOUSLY CONSTRUED THE EVIDENCE AGAINST SIMMERS IN GRANTING SUMMARY JUDGMENT ON THE DUE PROCESS CLAIMS

"[T]he wrongfulness of charging someone on the basis of deliberately fabricated evidence" is "virtually self-evident." *Devereaux v. Abbey,* 263 F.3d 1070, 1075 (9th Cir. 2001). Fabrication can be proven directly and circumstantially. *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017). Direct fabrication can occur where reports or documents include things that are simply false; where reports or documents "contain[] evidence" that does not exist or purport to record statements that were "never made." *Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1112 (9th Cir. 2010). Direct fabrication also occurs where officials "deliberately mischaracterize[]" evidence. *Spencer*, 857 F.3d at 798; *see also Costanich*, 627 F.3d at 1112.

60

Under the direct method, the investigator's knowledge or reason to know of the plaintiff's innocence is irrelevant, because the Constitution "prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent." *Spencer*, 857 F.3d at 800. Put differently, "motive evidence is never *required*." *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 569 (9th Cir. 2022).

Fabrication can also be proven circumstantially, including by evidence showing the defendants continued the investigation even though they knew or should have known Plaintiff was innocent. *Caldwell v. City & Cty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018); *Spencer*, 857 F.3d at 799. If "an investigator knows that a person is innocent, yet continues the investigation nevertheless, then the evidence suggests circumstantially that the investigator has an unlawful motivation to frame an innocent person, which supports a claim that the investigator deliberately fabricated evidence." *Id*.

Plaintiff's claim includes four categories:

61

1) Hopkins' and Rusk's interrogation reports, 3ER-571-75; 4ER-733-39;

2) reports suggesting Simmers and Wyatt knew about the murder, including Simmers saying something about a "bum" (when that came from Rusk), 3ER-571-75, 577-82; 4ER-733-39, 729-73[6];

3) McSwain's report concerning Wyatt, 4ER-923-32; and

4) Hopkins' documents about Olsen, 8ER-1814-19, 1849-50, 1862-83.

For each, the court violated the summary judgment standards and misconstrued the record.

First, the court found Simmers' testimony about *how* every single detail was provided to him in 1995 was not sufficiently specific. 1ER41. Simmers did describe that the facts were fed to him and provided examples about how he "gleaned" information from the officers, about the use of suggestive/leading questions, and about rehearsing the way the murder supposedly happened. *Supra*, at 19-20, 23-24. Simmers was not

---

[6] This includes both Miner's probable cause affidavit, which includes this language. 4ER-729-31.

62

required to have every single detail, which goes to his credibility. *Bator,* 39 F.3d at 1026; *Manley*, 847 F.3d at 711.

More important, there is an obvious inference that the trial court refused to make: because Simmers is innocent, a reasonable jury can easily find the non-public facts in the confession, and then recorded in the offices' reports, came *from the police*, and not from Simmers. *Ayers*, 773 F.3d at 169; *Halsey*, 750 F.3d at 307 n.31.

It is a mischaracterization, then, to write reports suggesting the details came from Simmers when he simply could not have provided them. An officer "who deliberately mischaracterizes witness statements in her investigative report . . . commits a constitutional violation." *Costanich*, 627 F.3d at 1112.

At most, there is a dispute of material fact on this issue. As the court understood, Defendants deny providing the non-public details to Simmers. 1ER42. Simmers testified he is innocent, and forensic evidence corroborates his account (as in *Ayers*). It is for the jury, not a court at summary judgment, to determine where these non-public details came from (as in *Halsey*).

Second, before being arrested by the police Simmers and Wyatt knew nothing of the murder, and it was Rusk who was in the habit of bringing it up while separately driving the boys to the marina. *Supra*, at 10-11. With Simmers, Rusk mentioned the victim may have been homeless, and when he asked Simmers about it, Simmers responded by saying he had not killed a "bum." That statement was both true and a *response* to Rusk's actions, not a spontaneous inculpatory statement about the victim potentially being unhoused. Rusk and others nonetheless wrote their reports in a misleading and mischaracterized way—they suggested Simmers made a spontaneous inculpatory statement about the murder, and even knew about the murder, which was untrue. The same is true of the reports about Wyatt at the marina (from McSwain) and about Miner's affidavit falsely included that Wyatt implicated Simmers in the murder. 4ER-730.

The trial court reasoned that Plaintiff could not counter Rusk's testimony because "Simmers has never testified that Rusk's description of the conversation was incorrect." 1ER42. Plaintiff was not required to have direct evidence of every aspect of his claims—circumstantial evidence is just as persuasive. *United States v. Gardner,* 475 F.2d 1273,

64

1277 (9th Cir. 1973) ("Circumstantial evidence is not less probative than direct evidence, and, in some instances, is even more reliable.").

In addition, the fabrication is a natural inference from the fact that Simmers (1) did not know anything about the murder, (2) testified he learned about the crime from the officers (including Rusk saying the person was a "transient"), and Simmers' innocence. A jury must weigh the evidence.

Third, as to McSwain's reports about Wyatt, there are many issues. The report claims Wyatt was eager to speak with the police and equivocated about asking for his parents or counsel, but Wyatt has indicated he was badgered and abused into speaking with the officers. This is a mischaracterization.

The report also includes things Wyatt never said. A key dispute of fact in this entire case is the officers' claim that Wyatt implicated Simmers in the murder. Wyatt called McSwain's claim that he suggested or implied to the officers he saw Simmers commit the murder a "baldfaced lie" and explained it was "not true at all." This is fabrication.

It is true that there is an inconsistency from other evidence with Wyatt's statement about being in a car with Simmers and hearing about

65

the murder. This is irrelevant for several reasons. For one, it does not undermine his direct testimony that McSwain fabricated the report claiming Wyatt implicated Simmers when he did not (*i.e.*, the point is immaterial). In addition, the inconsistency contradicts the officers' *own* account, and the one Simmers provided, too. A "judge must not grant summary judgment based on [its] determination that one set of facts is more believable than another." *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009). Moreover, it is Plaintiff's position that Wyatt just misspoke about this one point (in part because it contradicts all other evidence in the case, and is inconsistent with the overall arc of Wyatt maintaining that Simmers is innocent). Whether Wyatt misremembered this fact decades later due to poor memory is a credibility determination for the jury.

Fourth, as to Olsen, the trial court again applied the wrong standards. 1ER44-45. The court faulted plaintiff for not having direct evidence *from Olsen* that Hopkins fabricated his testimony. But, this was not required, *Coghlan.*, 413 F.3d at 1095, or possible because Olsen is deceased. The dispute, again, is really about the credibility of Simmers versus Hopkins. This Court has "'long recognized that summary

66

judgment is singularly inappropriate where credibility is at issue.'" *S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1054–55 (9th Cir. 2008) (quoting *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir. 1978)). Simmers did not speak to Olsen; Hopkins had knowledge of the discrepancies in the evidence that were "miraculously" addressed by Olsen; and the timing was around the time that the DNA results came back clearing Simmers. If Hopkins contends Olsen provided him the non-public facts (and not the other way around), the question is for the jury.

Finally, at no point did the trial court address the circumstantial method for proving fabrication; namely, that the officers knew or should have known that Simmers was innocent and that the Defendants used abusive tactics likely to produce unreliable evidence. Because there is evidence of both of these contentions in the record, summary judgment was improper.[7]

---

[7] The court rested its conclusion dismissing Plaintiff's *Brady* claim on the basis of its analysis on the dismissal of Plaintiff's fabrication claim. 1ER45-46. Reversal on the fabrication issues thus requires reversal on the *Brady* claim, too. The trial court rested its dismissal of Plaintiff's failure-to-intervene claim on the notion Defendants did not violate Plaintiff's rights. Reversal on the Fifth Amendment and fabrication issues requires reversal on this claim as well.

## IV. THE TRIAL COURT CONSTRUED THE EVIDENCE AGAINST PLAINTIFF WHEN DISMISSING THE CONSPIRACY CLAIM

A § 1983 conspiracy involves showing "show an agreement or 'meeting of the minds' to violate [the plaintiff's] constitutional rights." *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983). Such an agreement "may be inferred from conduct and need not be proved by evidence of an express agreement"; a plaintiff need only point to some "facts probative of a conspiracy." *Id.*

As a consequence, the existence of an "unlawful conspiracy is generally a factual issue and should be resolved by the jury, "so long as there is a possibility that the jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding' to achieve the conspiracy's objectives." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301-02 (9th Cir. 1999) (quoting *Hampton v. Hanrahan,* 600 F.2d 600, 621 (7th Cir. 1979)).

Likewise, to the extent there is an issue of a defendant's intention or state of mind, such a question is also a factual issue "'inappropriate for resolution by summary judgment." *Id.* at 102 (quoting *Braxton-Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir.1985)). "'Direct evidence of

68

improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action.'" *Id.*

Here, as elsewhere, the court's discussion of Plaintiff's conspiracy claim failed to view the evidence in the light most favorable to Plaintiff. The trial court found that Defendants' actions were indicative of "standard police work" and were engaged in "innocuous undertakings." 1ER47. The Defendants' reports describe an actual meeting of the minds between two agencies and a course of conduct consistent with a conspiracy. Afterwards, an honest investigation—which had been revealing information about the night of the murder, included a potential suspect (Fred), and had been met with suspicious behavior by the last person known to have seen the victim alive (Fleishhacker), and of a potential drug motive for the crime—was completely abandoned. Instead, the officers accused Simmers of the murder, attempted to make Wyatt a witness, and worked together to strategize these efforts. *Supra*, at 12-13. That is beyond sufficient for a reasonable jury to find a conspiracy. *Mendocino Envt'l. Ctr.*, 192 F.3d at 1301-02.

69

## V. THE TRIAL COURT'S DISMISSAL OF PLAINTIFF'S *MONELL* CLAIMS MISAPPLIED ESTABLISHED LAW

Municipalities cannot be liable via *respondeat superior* but may be liable where their employees are "acting pursuant to an expressly adopted official policy," or pursuant to a "longstanding practice or custom." *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). Under these rules, while it is true that a jury must find Simmers' rights were *violated* in order to reach the question of municipal liability, it need not find a particular officer *liable*. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *Richards*, 39 F.4th at 574; *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 n.12 (9th Cir. 2016).

As these authorities demonstrate, the district court erred in relying on *City of Los Angeles v. Heller,* 475 U.S. 796 (1986), 1ER-49, because municipal liability can still occur in the absence of officer liability where there is still a constitutional violation. For example, an police officer may point to municipal policy as evidence they lacked sufficient *mens rea* (or were merely negligent) if a jury found a constitutional violation. *Richards*, 39 F.4th at 574. When it comes to criminal investigations, where training is necessary to avoid constitutional violations, a plaintiff's claim is not solely "premised on a theory of liability that first requires a

70

finding of liability on the part of the individual officers." *Id.* Finally, a jury could find that King County's practices or lack of training were what guided Rusk, even though he cannot be liable (because he is deceased).

Reversal is warranted.

## VI.    A Different Judge Should Be Assigned On Remand

Reassignment to a different judge under 28 U.S.C. § 2106, is appropriate where "the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously expressed views or findings determined to be erroneous or based on evidence that must be rejected, when "reassignment is advisable to preserve the appearance of justice," and so long as reassignment would not require a duplication that would be disproportionate to the "gain in preserving the appearance of fairness." *United Nat. Ins. Co. v. R&D Latex Corp.*, 242 F.3d 1102, 1118-19 (9th Cir. 2001) (citations omitted).

Reassignment is warranted here.

The district court has expressed its opinions about Simmers' credibility, the credibility of Plaintiff, and the credibility of the officers, too. Given the unusual nature of the Court's order in making explicit adverse credibility determinations, and refusal to accept Plaintiff's

71

innocence, it is difficult to see how the court could put these views out of its mind. In addition, given the explicit credibility findings, the appearance of impropriety would be present for any adverse ruling—including on pretrial motions and objections at trial—made by the trial judge. It would be different if the court simply erred in weighing the evidence but the court has made its views known about the personal credibility of Simmers and his mother, and so any trial must be separated from that suggestion.

The gain at trial is worth any minimal duplication occasioned by having a new judge at trial (which happens with some regularity).

## CONCLUSION

Respectfully, entry of judgment against Plaintiff should be reversed and the case remanded for trial before a different judge.

/s/David B. Owens
Loevy & Loevy
c/o Civil Rights And Justice Clinic
University Of Washington Law School
William H. Hates Hall, Ste. 265
P.O. Box 85110
Seattle, WA 98145
312-243-5900
312-243-5902 (Fax)
Counsel for Plaintiff-Appellant

72

## STATEMENT OF RELATED CASES

The undersigned attorney or self-represented party states the following:

[X]    I am unaware of any related cases currently pending in this court.

[ ]    I am unaware of any related cases currently pending in this court
other than the case(s) identified in the initial brief(s) filed by the
other party or parties.

[ ]    I am aware of one or more related cases currently pending in this
court. The case number and name of each related case and its
relationship to this case are:


                              /s/David B. Owens
                              Counsel for Plaintiff-Appellant

73

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

This brief contains 13,734 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief (select only one):

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because (select only one):

    [ ] it is a joint brief submitted by separately represented parties.

    [ ] a party or parties are filing a single brief in response to multiple briefs.

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

                /s/David B. Owens
                Counsel for Plaintiff-Appellant

74

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, I electronically filed the foregoing with the Clerk of Court using ACMS, which will electronically send notice to all counsel of record.

/s/ David B. Owens
*Counsel for Plaintiff-Appellant*