No. 24-3636

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

―――――――――――――

ESTATE OF IAN SIMMERS By And Through Administrator Donna Berube,
Plaintiff-Appellant,

v.

KING COUNTY, et al.,
Defendants-Appellees.

―――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

―――――――――――――

**KING COUNTY APPELLEES' ANSWERING BRIEF**

―――――――――――――

Geoff Grindeland
    WSBA No. 35798
Jesse A. Townsend
    WSBA No. 63238
SEAMARK LAW GROUP PLLC
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510

*Counsel for King County Appellees*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION.......................................................3

ISSUES PRESENTED.........................................................................3

STATEMENT OF THE CASE...............................................................3

   I.   Procedural history................................................................3

   II.  Relevant facts.....................................................................6

       A.    Mr. Simmers was arrested for arson and property crimes. ..................6

       B.    Mr. Simmers confessed to stabbing Mr. Gochanour. .........................11

       C.    A jury convicted Mr. Simmers of murder. ..........................................14

       D.    Mr. Simmers' conviction was vacated by agreement. ........................16

SUMMARY OF ARGUMENT ..............................................................18

ARGUMENT ......................................................................................23

   I.   The District Court correctly found there were no material factual disputes. ..................................................................23

       A.    The District Court properly granted summary judgment on the coerced-confession claim. ........................................26

           1.    No admissible evidence suggests that Mr. Simmers' rights to remain silent or to counsel were violated. ......................................................27

               a.    The record clearly contradicts this claim.......................28

               b.    Mr. Simmers did not testify to clearly invoking his right to counsel or that his right to remain silent was not honored. ..................30

           2.    There is no genuine dispute about the voluntariness of Mr. Simmers' confession. ..............33

           3.    The Superior Court's admission of the confession was a superseding cause of any alleged harm..........................39

B.    The District Court properly granted summary judgment on the denial-of-fair-trial claim. ...........................................41

    1.    There is no evidence that Sergeant Rusk "fabricated" anything. ...............................................42

    2.    The claim against Major McSwain fails for multiple reasons. .......................................................44

    3.    If preserved, the Estate's nondisclosure theory is meritless. ...................................................................46

C.    The District Court correctly granted summary judgment on the remaining claims. .........................................48

    1.    There is no evidence of an unlawful agreement. .....................49

    2.    There is no evidence of an opportunity to intervene. .................................................................50

    3.    The Estate cannot show that King County evinced deliberate indifference. .........................................51

II.    Alternatively, the Estate's claims have been waived. ...................53

III.    If remanded on any issue, there is no ground for judicial reassignment. .................................................................56

CONCLUSION ....................................................................57

ADDENDUM .......................................................................58

CERTIFICATE OF COMPLIANCE ......................................................59

# TABLE OF AUTHORITIES

## Cases

*Allen v. State*, 498 P.3d 552 (Wash. Ct. App. 2021) ................................55

*Ayers v. City of Cleveland*, 773 F.3d 161 (6th Cir. 2014) .......................38

*Bahreman v. Allegiant Air, LLC*, 122 F.4th 1155 (9th Cir. 2024)...........23

*Barren v. Harrington*, 152 F.3d 1193 (9th Cir. 1998)..............................24

*Berkemer v. McCarty*, 468 U.S. 420 (1984) ............................................34

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007)................24

*Bradford v. Davis*, 923 F.3d 599 (9th Cir. 2019).....................................34

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................47

*Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999) ......................................53

*Connick v. Thompson*, 563 U.S. 51 (2011).........................................51, 52

*Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101 (9th Cir. 2010) .........44

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010) .........40, 41

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003) ....... 34, 35, 36, 39

*Davis v. United States*, 512 U.S. 452 (1994) ...........................................32

*Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 43 P.3d 4 (Wash. 2002)..............55

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ...............................46

*Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011)....................................34, 36

*Est. of Stern v. Tuscan Retreat, Inc.*, 725 F. App'x 518 (9th Cir. 2018).......... 28, 31

*Fong v. American Airlines, Inc.*, 626 F.2d 759 (9th Cir. 1980)...............................26

*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003)...................................................25

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010).................................................31

*Galen v. Cnty. of Los Angeles*, 477 F.3d 652 (9th Cir. 2007) ................... 39, 40, 41

*Gallegos v. Colorado*, 370 U.S. 49 (1962) ............................................................37

*Haley v. Ohio*, 332 U.S. 596 (1948) ............................................................... 36, 53

*Hall v. City of Los Angeles*, 697 F.3d 1059 (9th Cir. 2012) ............................ 48, 51

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)......................................................38

*Hernandez v. Ducart*, 824 F. App'x 491 (9th Cir. 2020) .......................................39

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) .................................32

*Indep. Towers of Wash. v. Washington*, 350 F.3d 925 (9th Cir. 2003) ...... 23, 47, 50

*Jeong Ko v. City of La Habra*, 637 F. App'x 973 (9th Cir. 2015) .........................57

*JL Beverage Co. v. Jim Beam Brands Co.*,
828 F.3d 1098 (9th Cir. 2016) ................................................................... 24, 25, 26

*Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164 (9th Cir. 2017) ..............57

*Kyles v. Whitley*, 514 U.S. 419 (1995)...................................................................42

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)............................. 48, 49, 50

*Larson v. State*, 447 P.3d 168 (Wash. Ct. App. 2019)............................................55

*McSherry v. City of Long Beach*, 423 F.3d 1015 (9th Cir. 2005)...........................56

*Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283 (9th Cir. 1999)............50

*Minnesota Mut. Life Ins. Co. v. Ensley*, 174 F.3d 977 (9th Cir. 1999)...................55

iv

*Nelson v. City of Davis*, 571 F.3d 924 (9th Cir. 2009) ...........................................30

*Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999 (9th Cir. 2002) .................................24

*Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772 (9th Cir. 2001) .................... 49, 50

*Raley v. Ylst*, 470 F.3d 792 (9th Cir. 2006) ...................................................... 41, 47

*Richards v. Cnty. of San Bernardino*, 39 F.4th 562 (9th Cir. 2022)................ 41, 46

*Sabbe v. Washington Cnty. Bd. of Comm'rs*, 84 F.4th 807 (9th Cir. 2023) ..... 28, 30

*Scott v. Harris*, 550 U.S. 372 (2007) ........................................................................44

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ......................................................45

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009).................................... 40, 53

*Tobias v. Arteaga*, 996 F.3d 571 (9th Cir. 2021)........................................ 32, 42, 51

*Tsao v. Desert Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012)....................................52

*United States v. Bagley*, 473 U.S. 667 (1982) ..........................................................48

*United States v. Crawford*, 372 F.3d 1048 (9th Cir. 2004) .....................................35

*United States v. Gonzalez-Godinez*, 89 F.4th 1205 (9th Cir. 2024) .......................30

*United States v. Hsu*, 852 F.2d 407 (9th Cir. 1988).......................................... 32, 33

*United States v. Leal-Del Carmen*, 697 F.3d 964 (9th Cir. 2012)...........................26

*United States v. Lindsey*, 931 F.3d 852 (9th Cir. 2019)...........................................26

*United States v. Lynch*, 903 F.3d 1061 (9th Cir. 2018) ...........................................56

*United States v. Villalpando*, 588 F.3d 1124 (7th Cir. 2009) .................................38

*USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276 (9th Cir. 1994)..........23

*Vega v. Tekoh*, 597 U.S. 134 (2022) ........................................................................34

**Statutes**

42 U.S.C. § 1983 ..................................................................................................3

Wash. Rev. Code Ann. § 4.100.080 ....................................................................54

**Rules**

Fed. R. Civ. P. 45 ...............................................................................................26

Fed. R. Civ. P. 56 ............................................................................... 24, 26, 45

Fed. R. Evid. 801 ...............................................................................................25

Fed. R. Evid. 804 ...............................................................................................25

## INTRODUCTION

A jury convicted Ian Simmers of murder following his confession to stabbing Rodney Gochanour to death. Twenty-three years later, his conviction was vacated by agreement with the State—not on the basis of any finding of innocence or police misconduct, but on the grounds that he should be allowed to present new evidence regarding the risk of false confession. He then brought this civil action against King County, several of its retired sheriff's deputies, the City of Bothell, and several of its former officers. Mr. Simmers—and, after his death, his Estate—alleged a variety of federal and state-law claims arising from his conviction, principally alleging that the confession had been coerced. The U.S. District Court for the Western District of Washington (Rothstein, J.) granted summary judgment in favor of the Defendants on all claims, holding that there were no genuine factual disputes requiring trial.

This Court should affirm. The Estate lacks evidence supporting its key contentions, especially regarding the two King County Defendants against which it is still pursuing claims. The belated contention that Mr. Simmers invoked his right to remain silent or to consult an attorney is contradicted by his prior positions about the events surrounding his confession. And there is no genuine dispute that the confession was voluntary, as the totality of circumstances do not support the claim that Mr. Simmers' will was overborn when he confessed. Moreover, the Superior Court's decision to admit the confession at Mr. Simmers' criminal trial was the

1

superseding cause of any alleged injury.

The Estate's denial-of-fair-trial claim was premised on three faulty fabrication-of-evidence theories. The first two theories fail because there is no evidence that King County detectives fabricated anything. And the third theory fails both for lack of evidence of fabrication and lack of materiality.

The District Court correctly granted summary judgment on the Estate's remaining claims due to lack of evidence of any underlying constitutional violation. The Estate's conspiracy claim additionally fails for lack of evidence of an agreement to deprive Mr. Simmers of his civil rights. The municipal-liability claim against King County fails because the Estate cannot show that the County evinced deliberate indifference to juvenile arrestees' rights, as there was no evidence of a prior pattern of constitutional violations.

Even if the Estate had come forward with evidence to support any of these claims, summary judgment would have been appropriate on the independent ground that Mr. Simmers waived the claims by pursuing a parallel action for compensation under Washington's Wrongly Convicted Persons Act. The plain language of the statute provides that pursuing relief waives other claims against the State's subdivisions and their employees under an election-of-remedies clause.

Finally, even if remand on any issue were required, there would be no need for judicial reassignment as the Estate has requested.

## STATEMENT OF JURISDICTION

The King County Appellees agree with the Estate's statement of jurisdiction.

## ISSUES PRESENTED

1. Did the District Court properly grant summary judgment in favor of King County and Major McSwain, where there were no triable factual disputes concerning whether Mr. Simmers' constitutional rights were violated, whether Major McSwain was personally involved in any violation, and whether King County's policies amounted to deliberate indifference to juvenile arrestees' rights?

2. Alternatively, was summary judgment appropriate because Mr. Simmers waived the claims in this action by pursuing a claim under Washington's Wrongly Convicted Persons Act?

3. In the event that remand on any issue is necessary, should Judge Rothstein continue to preside over this action where there is no evidence she could not set aside her prior views and no appearance of injustice?

## STATEMENT OF THE CASE

### I.    Procedural history

Ian Simmers initiated this action in the U.S. District Court for the Western District of Washington, naming as defendants King County and retired King County Sheriff's deputies Major John McSwain, Captain Kent Baxter, and Captain Pat Raftis ("the King County Defendants"); and the City of Bothell and former Bothell police officers Chief Mark Ericks, Detective Sergeant David Schlaegel, Detective Edward Hopkins, and Detective Rebeca Miner ("the Bothell Defendants"). (2-SER-299.) His Complaint alleged claims, under both state law and 42 U.S.C. § 1983, relating to his confession to and conviction for the murder of Rodney Gochanour.

3

(2-SER-301.)

The Complaint also purported to name as Defendants two deceased King County Sheriff's deputies: Major Jackson Beard and Sergeant Clement Rusk. (10-ER-2550.) Mr. Simmers moved in the District Court for an order appointing personal representatives for the estates of Major Beard and Sergeant Rusk and substituting them as defendants. (10-ER-2558–69.) The District Court denied the motion. (1-ER-51–56.) Mr. Simmers then petitioned state court for an order reopening Major Beard's and Sergeant Rusk's estates. The state court denied the petitions, and Mr. Simmers did not appeal those decisions. (Nor does the Estate's opening brief seek review of the District Court's ruling on this issue.)

The Defendants moved to dismiss the Complaint. (2-SER-297.) Although Magistrate Judge Creatura recommended dismissal of many claims (2-SER-326), Judge Rothstein largely overruled the recommendation and dismissed just the state-law claims for outrage and negligence (1-SER-294).

Two years into discovery in this action, Mr. Simmers died in a car accident. The District Court granted an unopposed motion to amend the Complaint to substitute as Plaintiff the Estate (through its personal representative, Mr. Simmers' mother, Donna Berube). (1-SER-242.) The Amended Complaint retained the same claims as the original: a Fifth Amendment coerced-confession claim, a Fourteenth Amendment shocks-the-conscience claim, a Sixth and Fourteenth Amendment

denial-of-fair-trial claim, a Fourth Amendment detention-without-probable-cause claim, a failure-to-intervene claim, a conspiracy claim, a municipal-liability claim, and state-law claims for malicious prosecution, civil conspiracy, "respondeat superior," and "indemnification." (1-SER-256–67.)

After discovery was completed, the King County Defendants and the Bothell Defendants both moved for summary judgment (5-ER-936–1231, 6-ER-1233–1529, 7-ER-1531–1807, 8-ER-1814–2105, 9-ER-2107–2404, 10-ER-2406–2541) and simultaneously moved to exclude opinions of the Estate's experts (1-SER-184–99, 1-SER-206–21). The Estate opposed these motions. (2-ER-283–350, 3-ER-352–632, 4-ER-634–932, 5-ER-934–35.) But the Estate did not oppose dismissal of all claims against King County Sheriff's Deputies Raftis and Baxter and Bothell Police Chief Ericks, or dismissal of the claims against all Defendants for malicious prosecution under state law, detention without probable cause under the Fourth Amendment, and conduct shocking the conscience under the Fourteenth Amendment. (2-ER-296.) The Estate also did not defend its state-law "respondeat superior" and "indemnification" claims. (1-ER-25.)

On reply, the Defendants moved to strike as inadmissible some of the material the Estate offered in opposition to summary judgment. (2-ER-215–16, 266–69.) The District Court allowed the Estate to respond to the motions to strike and to move to strike as well, and the Defendants to reply. (2-ER-58–167.)

The District Court then granted summary judgment to all Defendants, finding that there were no genuine issues of material fact on the coerced-confession, denial-of-fair-trial, failure-to-intervene, conspiracy, and municipal-liability claims. (1-ER-3–50.) The court did not address the Defendants' alternative grounds for summary judgment, including that the Estate had waived its claims by pursuing a separate action under Washington's Wrongly Convicted Persons Act and that the individual Defendants were entitled to qualified immunity. (10-ER-2522–24, 10-ER-2539–40). The court struck as moot the parties' motions to strike and to exclude expert opinions. (1-ER-49). This appeal followed. (10-ER-2570).

## II.  Relevant facts

### A.  Mr. Simmers was arrested for arson and property crimes.

On March 15, 1995, patrol officers with the King County Police Department (later renamed the King County Sheriff's Office) responded to a report that two juveniles were shooting flare guns near an apartment building. (9-ER-2145.) The officers found Ian Simmers and Jonathan Wyatt, each of whom had a flare gun. (9-ER-2145–46.)

Mr. Simmers was sixteen at the time. (8-ER-1888). He was a "very bright" young man who had an above-average IQ and read above his grade level despite possibly having attention-deficit disorder. (5-ER-1169, 9-ER-2280.) He already had experience interacting with law-enforcement officers, having been released from

juvenile detention just days earlier (8-ER-2062, 9-ER-2185), and having been questioned by Redmond police the previous month—after being given his *Miranda* warnings and waiving his associated rights. (9-ER-2273–74).

The officers who stopped them for illegal discharge of flare guns learned that Messrs. Simmers and Wyatt both were listed as runaways and also had outstanding warrants. (9-ER-2146–47.) They were arrested shortly before noon, given *Miranda* warnings, and transported to the nearby King County Police precinct. (9-ER-2145-46, 9-ER-2191–92.) At 1:15 p.m., Mr. Simmers was again given *Miranda* warnings and signed an acknowledgment of his rights. (9-ER-2146, 9-ER-2150.) One of the arresting officers contacted Mr. Simmers' mother to let her know Mr. Simmers had been arrested. (9-ER-2147.)

At the time of this arrest, King County had policies requiring officers to give *Miranda* warnings to suspects before interrogation, and requiring an additional warning for juveniles that their statements could be used in adult criminal proceedings. (4-ER-887.) The policies also required officers to contact a parent before questioning suspects under 12 years of age. (4-ER-894.) The County's practices included prohibitions on coercion, violence, threats, promises, and unreasonably long interviews while interrogating suspects. (4-ER-888–89, 4-ER-892, 4-ER-895.) The County also had written policies prohibiting the fabrication or nondisclosure of evidence. (4-ER-900.)

At the precinct, Officer Kent Baxter noticed the flare guns seized from Messrs. Simmers and Wyatt. (10-ER-2507.) A few days prior, Officer Baxter had responded to arsons along the Sammamish River/Burke-Gilman Trail that had been set with flare guns, and at which the perpetrators left shoeprints. (10-ER-2506–07.) Officer Baxter compared the shoes of Messrs. Simmers and Wyatt to the prints left at the arson scenes, and the soles matched the prints. (10-ER-2507–08.) Officer Baxter alerted the arresting officers and Sergeant Clement Rusk that he believed Messrs. Simmers and Wyatt had been involved in the arsons. (10-ER-2508.)

Around 1:45 p.m., Sergeant Rusk took Mr. Simmers to an interview room. (8-ER-1954–55, 9-ER-2224.) Mr. Simmers was again given *Miranda* warnings, acknowledged them, and signed a written waiver. (8-ER-1959, 9-ER-2224.) Mr. Simmers gave several statements to Sergeant Rusk detailing how he broke into boats and cars and how he started fires with the flare guns.[1] (8-ER-1960–66, 9-ER-2224–26.) Sergeant Rusk also questioned Mr. Simmers about break-ins at a local marina, and Mr. Simmers agreed to go with him to the marina to point out which boats he

---

[1]    Mr. Simmers ultimately pleaded guilty to twelve felonies committed during this crime spree along the Burke-Gilman Trail: two counts of arson and ten counts of vehicle prowl. (7-ER-1776–82.) He was sentenced as an adult to 84 months in prison. (7-ER-1800–02.) He served that sentence (concurrently with his sentence for murder), and those convictions were never vacated. He did not challenge the validity of his confession to these crimes, and any attempt to do so would have been barred by *Heck v. Humphrey*, 512 U.S. 477, 487 (1994) (barring civil claims that necessarily imply the invalidity of a conviction).

had broken into. (8-ER-1967–71.)

Detective John McSwain was assigned to interview Mr. Wyatt. (9-ER-2119). He confirmed Mr. Wyatt had received and understood *Miranda* warnings and signed a written waiver. (9-ER-2120, 9-ER-2137.) Mr. Wyatt described witnessing Mr. Simmers shoot flare guns, break into cars and boats, and start fires over several days. (9-ER-2121–22.) Mr. Wyatt then spoke to his attorney before telling Detective McSwain he wanted to sign a written statement, even though his attorney had advised him not to. (9-ER-2123.) Detective McSwain once again gave *Miranda* warnings, which Mr. Wyatt acknowledged before signing a waiver and signing his written statement. (9-ER-2124, 9-ER-2138–40.) During their interactions, Mr. Wyatt also told Detective McSwain that he wanted to speak to a counselor, that he feared Mr. Simmers, and that Mr. Simmers needed to be arrested. (9-ER-2125–27.)

Sergeant Rusk and Detective Pat Raftis drove Mr. Simmers to the marina. (8-ER-1972.) While hearing Mr. Simmers recount his criminal activities along the Burke-Gilman Trail, Sergeant Rusk recalled a newspaper report of a homicide that occurred on the portion of the trail that runs through Bothell. (8-ER-1974–75.) Sergeant Rusk had no other information about the homicide beyond what he recalled from the newspaper report. (*Id*.) On the way to the marina, Sergeant Rusk asked Mr. Simmers if he knew anything about the stabbing of a man on the trail, to which Mr. Simmers replied that he didn't "stab no bum." (8-ER-1975, 9-ER-2233.) Sergeant

9

Rusk then asked Mr. Simmers why he referred to the victim as a "bum," and Mr. Simmers claimed that Sergeant Rusk had used the word first. (8-ER-1975, 9-ER-2234.) Mr. Simmers later contended that he learned information about the murder during this drive (8-ER-2075), but the King County officers did not have nonpublic information about the murder at this point (8-ER-1816, 8-ER-1940, 8-ER-1974–75).

At the marina, Mr. Simmers pointed out the boats he and Mr. Wyatt had broken into and described what they had stolen. (8-ER-1940.) The officers found physical evidence corroborating Mr. Simmers' description of breaking into multiple boats. (*Id.*) The officers and Mr. Simmers returned to the precinct, and Mr. Simmers was returned to a holding cell. (8-ER-1941, 8-ER-1976.)

Sergeant Rusk and Detective McSwain then drove Mr. Wyatt to the marina around 5 p.m. (8-ER-1976, 9-ER-2126.) During the drive, in response to a question from Sergeant Rusk about someone being stabbed in Bothell, Mr. Wyatt began crying and said that Mr. Simmers had a knife. (9-ER-2126.) He described the knife and said that Mr. Simmers had taken the knife from his apartment complex but no longer had it. (*Id.*) When asked if he saw Mr. Simmers stab someone, Mr. Wyatt said he was either behind or in front of Mr. Simmers on the trail. (*Id.*) Mr. Wyatt also said that he feared Mr. Simmers and that the police should not let him go, but that he wanted to speak to his attorney before telling the police what he knew. (9-ER-2127–28.) The officers returned Mr. Wyatt to the precinct. (9-ER-2128.)

### B.   Mr. Simmers confessed to stabbing Mr. Gochanour.

Back at the precinct, Sergeant Rusk informed Major Jackson Beard that he believed Messrs. Simmers and Wyatt had information about the Bothell homicide, so Major Beard called the Bothell Police Department. (9-ER-2235.) Major Beard spoke with Bothell Detective Edward Hopkins, the lead detective in the investigation of the murder of Rodney Wayne Gochanour, whose body had been found just off the Burke-Gilman Trail a few days earlier, on Saturday March 11, 1995. (8-ER-1821, 8-ER-1851–53.)

Detective Hopkins came to the precinct and was briefed on the information the King County officers had so far. (8-ER-1821–22.) Bothell Detectives David Schlaegel and Rebecca Miner also joined. (8-ER-1914.) The three Bothell detectives and "various" King County officers "discussed interview strategies and other investigative matters," including that Detective Hopkins would interview the suspects and Detective Miner would obtain a search warrant for their clothing. (*Id.*)

Mr. Simmers had been placed in a holding cell after he returned from the marina before 5 p.m. (8-ER-1976–77, 8-ER-1903.) Mr. Simmers was in the holding cell without being questioned for several hours, while the officers attempted to contact Mr. Wyatt's attorney. (8-ER-1980.) He received dinner around 6:30 p.m. and a blanket when he said he was cold. (8-ER-1903, 8-ER-1982–83.)

Many years later, Mr. Simmers testified at his deposition in this action that he

"believe[d]" he asked for an attorney at some point the day of his arrest, but that it was not "very clear to" him. (9-ER-2186–87.) He did not recall which detective he spoke to, nor when he made this request other than that it was while he was in the holding cell. (9-ER-2187–88.) Mr. Simmers also testified that he was periodically asked if he wanted to speak, and told the officers no, without identifying which officers approached him at what times, or about which topics. (3-ER-356.) Detective Raftis, who was watching the holding cell area that evening until about 9:00 p.m., did not hear him ask for or mention an attorney. (8-ER-1903.) Likewise, Sergeant Rusk never heard him ask to speak with an attorney or his parents. (8-ER-1983.)

Detective McSwain eventually was able to reach Mr. Wyatt's attorney and mother. (9-ER-2128–29.) Mr. Wyatt's attorney met with Mr. Wyatt around 7:42 p.m. (9-ER-2129–30.) Mr. Wyatt's attorney informed Detective McSwain that she did not want Mr. Wyatt to give a statement that evening, as she wanted to discuss it with her supervisor in the morning. (9-ER-2130.) Mr. Wyatt was transported to a juvenile detention center and, days later, he elected not to make a statement after the prosecutor declined to offer him immunity. (9-ER-2132–33.)

Detective McSwain never had any contact or communication with Mr. Simmers and did not testify at the subsequent murder trial. (9-ER-2134.)

Once Mr. Wyatt's attorney told the officers she did not want him to give a statement the night of the arrest, Detective Hopkins and Sergeant Rusk decided to

12

speak to Mr. Simmers. (8-ER-1983.) They began questioning him between 9:00 and 9:45 p.m. (5-ER-1100, 5-ER-1137, 8-ER-1984.) Mr. Simmers said he remembered his rights and was still willing to speak to the police. (8-ER-1822.) The two officers questioned Mr. Simmers about the murder, but he initially denied involvement because the victim was a "regular guy." (8-ER-1823). The officers then used "ruses" in their interrogation, telling Mr. Simmers that Mr. Wyatt had confessed being involved or said that Mr. Simmers had been involved in the murder. (5-ER-1052, 9-ER-2241.) Sergeant Rusk also asked if the victim had accosted Mr. Simmers. (8-ER-1823, 8-ER-1986–87.) Mr. Simmers then told the officers that the victim had hit him in the ribs and so Mr. Simmers drew the knife, slashed his face, and stabbed him in the back repeatedly. (8-ER-1823, 8-ER-1987–88.)

At 10:40 p.m., Mr. Simmers consented to Detective Hopkins and Sergeant Rusk audiotaping his confession. (9-ER-2206.) He again received *Miranda* warnings and waived his rights. (9-ER-2202, 9-ER-2207–08.) Mr. Simmers recounted how he took a knife, which he described and drew, from Mr. Wyatt's apartment complex the prior Saturday. (9-ER-2208-10.) Mr. Simmers further explained that they were walking on Burke-Gilman Trail later that night when a man who appeared high attacked him, leading Mr. Simmers to cut the man in the face and then stab him "about six times" in the back to keep him from going to the police. (9-ER-2211–12.) Mr. Simmers said he then threw the knife and ran. (9-ER-2215–16.) Although Mr.

13

Simmers' account described the homicide as happening Saturday night rather than Friday night/Saturday morning, Detective Hopkins believed that the account was consistent with the crime scene and included nonpublic information. (3-ER-597, 8-ER-1824–25.) Mr. Simmers provided information about the crime that Sergeant Rusk was unaware of. (3-ER-597.)

Decades later, in his deposition in this civil action, Mr. Simmers testified that he did not kill Mr. Gochanour. (3-ER-365.) He did not allege that the officers told him what to say, but rather claimed he shaped his confession based on their questions and interruptions. (8-ER-2075–76.) Mr. Simmers admitted that he confessed to the murder because he was trying to build his reputation as a "gangster" and that he wanted the officers to believe he had killed the victim. (9-ER-2188, 9-ER-2190.) Mr. Simmers also admitted that Detectives Hopkins and Rusk never raised their voices, yelled, cursed at him, or threatened him, and that he was not afraid of them. (9-ER-2189.)

### C.   A jury convicted Mr. Simmers of murder.

Mr. Simmers was charged with murder in the first degree of Mr. Gochanour in King County Superior Court. (7-ER-1668.) In March 1996, before trial, the parties stipulated that DNA found on the murder weapon and the victim's glasses was from the victim, not Mr. Simmers. (5-ER-0960.) And the prosecution and defense agreed to exclude any reference at trial to Mr. Wyatt's statements or reactions during

questioning. (8-ER-2005–06.) The prosecution understood that Mr. Wyatt would invoke his Fifth Amendment privilege against self-incrimination rather than testify at trial, and defense counsel did not intend to seek Mr. Wyatt's testimony either. (8-ER-2007).

Mr. Simmers' counsel moved to suppress Mr. Simmers' confession. (6-ER-1281–87.) Counsel argued the confession was involuntary due to Mr. Simmers' youth, lack of contact with his parents, and the police officers' deception in questioning; but counsel did not argue that Mr. Simmers had invoked his right to be silent or for an attorney. (*See id.*) The court held an evidentiary hearing at which Detective Hopkins (5-ER-1082–83, 5-ER-1097–1117, 5-ER-1123–1150), Sergeant Rusk (5-ER-1000–60), Detective Raftis (5-ER-1061–73), and Ms. Berube (5-ER-1160–73), among other witnesses, testified. Mr. Simmers did not. (5-ER-1194.) The Superior Court denied the motion, concluding that Mr. Simmers had been advised of his rights, understood them, and waived them, and that, under the totality of the circumstances, the confession was voluntarily. (6-ER-1254–61, 6-ER-1288–98.)

Detective Hopkins and Sergeant Rusk both testified at the murder trial. (6-ER-1310–11, 6-ER-1318, 9-ER-2230–41.) A jailhouse informant, Kevin Olsen, testified that Mr. Simmers had also confessed to him about the murder while they were in jail together. (9-ER-2293–98.) Mr. Simmers' mother and stepfather, Donna and David Berube, testified as well. (6-ER-1319–20.) Mr. Simmers testified briefly

15

about an alleged alibi. (9-ER-2243–46.)

The jury unanimously convicted Mr. Simmers of murder in the first degree. (6-ER-1335–37.) Mr. Simmers was sentenced to prison for 560 months. (6-ER-1339–41.)

His attorneys later moved for a new trial based on issues relating to Mr. Olsen's testimony (7-ER-1669), but the trial court found that Mr. Olsen's testimony was not material due to the "overwhelming" evidence of guilt from both Mr. Simmers' confession and the corroborating physical and circumstantial evidence (7-ER-1675). The Washington State Court of Appeals, Division I, denied Mr. Simmers' appeal in 1999. (7-ER-1678–87.)

In 2016, Mr. Simmers sought release from the Washington State Department of Corrections Indeterminate Sentence Review Board, but his request was denied. (7-ER-1691.) In his interview with the board, Mr. Simmers acknowledged he might have killed the victim, but claimed he didn't remember doing so. (8-ER-2020, 8-ER-2025.)

### D.  Mr. Simmers' conviction was vacated by agreement.

In 2019, Mr. Simmers moved in King County Superior Court for vacatur of his conviction. (7-ER-1690–1704.) The motion argued his confession was "suspect" because of inconsistencies between his account and the physical evidence (7-ER-1693–96), as well as "the circumstances surrounding" the interrogation, such as the

length of time Mr. Simmers had been in custody and the interrogating officers' use

of "ruses" (7-ER-1696–97). Mr. Simmers' motion represented that he was prepared

to testify that he "recalls being very tired, sleeping in a cell, and initially saying he

did not wish to make a statement," but the motion did not state that officers did not

honor his right to remain silent or that he had requested counsel. (7-ER-1696.) The

motion also argued that since Mr. Simmers' arrest and trial, new science concerning

juvenile brain development and research on false confessions showed that juveniles

were disproportionately likely to falsely confess, which "casts doubt" on the validity

of Mr. Simmers' confession and served as the "newly discovered evidence" that

could not have been presented earlier. (7-ER-1698–1703.) Mr. Simmers' motion

noted that the State had re-investigated the crime, including by interviewing him. (7-

ER-1703.)

In response, the State also moved to vacate his conviction. (7-ER-1764–69.)

The State did not agree that Mr. Simmers was innocent or that he had been

wrongfully convicted.[2] (7-ER-1764.) But it did concede that Mr. Simmers' motion

for a new trial likely would be granted, that a new trial would not be in the interests

of justice given that retrying the case decades after the homicide would be difficult,

and that Mr. Simmers had already served twenty-three years of his sentence. (7-ER-

---

[2]   The State has never agreed that DNA evidence suggests Mr. Simmers might have
     been innocent, and he was never exonerated on the basis of DNA testing.

17

1764–65.) The motion noted that the State had interviewed Mr. Simmers as part of its investigation, in which Mr. Simmers had claimed for the first time that he had overheard officers discussing the details of the murder before his taped confession. (7-ER-1768.)

The trial court granted the State's motion, vacated Mr. Simmers' conviction, and ordered his immediate release in February 2019. (7-ER-1773, 1-SER-22, 1-SER-32.)

Thereafter, Mr. Simmers commenced two civil actions: this one in U.S. District Court and a suit in King County Superior Court against Washington State under its Wrongly Convicted Persons Act for the period he was incarcerated for Mr. Gochanour's murder. (9-ER-2264–72.)

## SUMMARY OF ARGUMENT

This Court should affirm the District Court's grant of summary judgment. The admissible evidence shows that the Estate lacks evidence of necessary elements for each of its claims. The Estate's effort to argue the contrary relies, in large part, on information that is neither in admissible form nor capable of being presented in such form at trial, and thus must be disregarded at summary judgment.

The coerced-confession claim fails for three reasons. First, the assertion that Mr. Simmers invoked his right either to be silent or to consult an attorney should be disregarded. The record that Mr. Simmers and his attorneys created while litigating

his case over decades has no reference to Mr. Simmers invoking either right—an omission that clearly contradicts his new allegation. Moreover, Mr. Simmers' new testimony describing these purported invocations is too vague to establish that he clearly invoked his right to counsel or that the Defendants did not scrupulously honor his right not to answer questions.

Second, the totality of facts does not demonstrate that Mr. Simmers' will was overwhelmed such that his confession was involuntary. Mr. Simmers received multiple *Miranda* warnings throughout his day in custody, Detective Hopkins' and Sergeant Rusk's use of deception was not unconstitutional, the interrogation itself was less than two hours, and Mr. Simmers had both rested and eaten beforehand. The officers did not threaten or yell at Mr. Simmers, and he admitted he was not scared of them. He also admitted that he confessed in order to burnish his reputation as a "gangster," and he wanted the detectives to believe he had committed the murder. And although Mr. Simmers was a juvenile and might have had attention-deficit disorder, he was bright, had earned his GED, and had prior experience with the criminal-justice system, so his personal characteristics also do not support finding his confession was involuntary.

Third, the coerced-confession claim fails because of a lack of causation. The Superior Court judge presiding over Mr. Simmers' criminal trial made an independent decision to admit the confession. And officers did not mislead the

judge; on the contrary, the full record of the circumstances of the confession, including Mr. Simmers' age and diagnosis, as well as the use of ruses and the length of the interrogation, were part of the record before the court. In this circumstance, the court's decision admitting the confession was a superseding cause that broke any potential causal relationship between the officers' conduct and the alleged injury.

The Estate's denial-of-fair-trial claim is equally insufficient. First, its arguments that Sergeant Rusk fabricated evidence have no record support. On the contrary, Mr. Simmers never testified to Sergeant Rusk intentionally providing him with non-public information and, indeed, Sergeant Rusk did not have any such information regarding another agency's murder investigation. Likewise, Mr. Simmers never contradicted Sergeant Rusk's testimony that Mr. Simmers, not Sergeant Rusk, had first identified the homicide victim as a "bum."

Second, the Estate's assertion that Major McSwain fabricated the account of Mr. Wyatt's statements and reactions—the Estate's only theory of its claims directly involving Major McSwain—lacks evidence on multiple elements. The fabrication claim is not based on admissible evidence. (And even the inadmissible evidence of Mr. Wyatt's later interview does not suggest Detective McSwain fabricated anything, since it still inculpated Mr. Simmers in the homicide.) Moreover, since the jury that convicted Mr. Simmers did not hear from Major McSwain or Mr. Wyatt, or hear any account of Mr. Wyatt's statements and reactions, any alleged fabrication

could not have been material to Mr. Simmers' murder conviction.

Third, the Estate forfeited the nondisclosure theory of the denial-of-fair-trial claim by failing to brief it adequately on appeal. But even if it had been briefed, this theory would also fail. The information that the Estate asserts Sergeant Rusk did not disclose would have been known to Mr. Simmers, so it cannot be the basis of this claim. And again, since the jury heard nothing about Mr. Wyatt's statements or reactions, any alleged nondisclosure about Major McSwain was immaterial.

Summary judgment on the Estate's remaining claims—for conspiracy, failure to intervene, and municipal liability—was appropriate because each requires a constitutional violation as a predicate. As explained above, the Estate has no viable claim that Mr. Simmers' rights were violated. That aside, each of these claims would fail even if there were a factual dispute concerning the coerced-confession or denial-of-fair-trial claims.

The conspiracy claim fails because there is no evidence that Defendants agreed to deprive Mr. Simmers of his civil rights. All that the record supports is discussion of legitimate police activity, which is insufficient to support an inference of conspiracy.

The failure-to-intervene claim fails because there is no evidence that any Defendant was aware that any other officer was depriving Mr. Simmers of his rights. Without this awareness, there was no opportunity to intervene, a requirement for a

failure-to-intervene claim.

The municipal-liability claim against King County fails because there is no evidence it acted with deliberate indifference to the rights of juvenile arrestees. The Estate did not offer evidence of any pattern of violations of constitutional rights, and this is not the rare case where a single constitutional violation shows deliberate indifference on its own.

Alternatively, all of the Estate's claims should be dismissed on the grounds that Mr. Simmers waived the claims by filing a claim against the State under Washington's Wrongly Convicted Persons Act (WCPA). This statute specifies that a claimant waives other claims against the State, its political subdivisions, and their employees by bringing such a claim. Since Mr. Simmers elected to seek a remedy under the WCPA, his Estate cannot continue to pursue the remedies it seeks in this action.

Finally, even if this Court were to identify an error requiring remand, judicial reassignment would be unwarranted. Judicial reassignment would be inefficient and is disfavored under this Court's precedent, and nothing in the record suggests that the District Court judge could not set aside her previously stated views should she be required to do so, and there is nothing about retaining the same judge that would give the appearance of injustice.

# ARGUMENT

## I.   The District Court correctly found there were no material factual disputes.

Reviewing de novo, this Court should affirm the District Court's grant of summary judgment on the basis that there are no genuine factual disputes over the Estate's claims. *Bahreman v. Allegiant Air, LLC*, 122 F.4th 1155, 1158 (9th Cir. 2024). Notably, several aspects of the District Court's decisions should be affirmed as uncontested. First, below the Estate expressly conceded that it did not oppose the dismissal of all claims against Captains Baxter and Raftis, or dismissal of its Fourth Amendment, Fourteenth Amendment, and malicious-prosecution claims. (2-ER-296.) These concessions constituted a waiver of those three claims against all Defendants and all claims against Captains Baxter and Raftis. *USA Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1284 (9th Cir. 1994).

Second, the Estate's opening brief fails to address the District Court's denial of the motion to substitute the estates of deceased Sergeant Rusk and Major Beard as defendants. (*See* 1-ER-51–56.) The Estate has thus waived any challenge to that order as well. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

This leaves only two King County Defendants against which the Estate has potential claims: Major McSwain and King County itself. But to pursue claims against Major McSwain, the Estate must have evidence that he was personally

involved in a violation of Mr. Simmers' rights. *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). And to have a claim against King County, the Estate must show both that Mr. Simmers' constitutional rights were violated, and that the County evinced deliberate indifference in some omission that caused the violation. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007).

As to the contested claims against King County and Major McSwain, the District Court correctly granted summary judgment. Summary judgment is appropriate when there are no genuine factual disputes, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party opposing summary judgment must identify evidence that could be admitted at trial to show that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1)(B), (2), (4). The evidence does not have to be submitted in an admissible form at summary judgment but must be capable of being presented in such form at trial to defeat summary judgment. *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016). And the party seeking to rely on the evidence bears the burden of showing it is admissible. *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).

Below, as the King County Defendants explained in their motion to strike, the Estate relied on multiple pieces of evidence that cannot be presented in an admissible form at trial: the unsworn interviews Messrs. Simmers and Wyatt each gave to the State regarding Mr. Simmers' motion to vacate his conviction, and statements Ms.

24

Berube claimed in her deposition and declaration that Mr. Simmers made to her. (2-ER-215–16.) Each is inadmissible hearsay that cannot be used to defeat summary judgment. *JL Beverage Co.*, 828 F.3d at 1110.

As to the interview and other statements attributed to Mr. Simmers, there is no dispute that Mr. Simmers is deceased and thus cannot testify to the events described. *Cf. Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). And while his unavailability for trial may mean that his deposition testimony in this action would be admissible, that exception does not extend to Mr. Simmers' unsworn interview or his statements to Ms. Berube, which do not qualify as prior testimony. *See* Fed. R. Evid. 804(b)(1).

Nor may the Estate have these statements admitted under any other provision of the hearsay rules. While below it described these statements as prior consistent statements, that provision applies where a witness testifies at trial and is subject to cross-examination. *See* Fed. R. Evid. 801(d)(1). But Mr. Simmers cannot take the stand at trial. Nor is the entire interview a statement against Mr. Simmers' interest, *see* Fed. R. Evid. 804(b)(3), particularly since the Estate offers portions of the interview to support its claims. Finally, the Estate did not show that Mr. Simmers' interview is one of the "rare[]" and "exceptional circumstances" that would justify the application of the residual hearsay exception. *Fong v. American Airlines, Inc.*, 626 F.2d 759, 763 (9th Cir. 1980). Among the reasons the exception does not cover

the interview are that it was not taken under penalty of perjury and Defendants were unable to cross-examine Mr. Simmers at the interview. *See United States v. Lindsey*, 931 F.3d 852, 866 (9th Cir. 2019). Nor was it videotaped for a factfinder to view. *Cf. United States v. Leal-Del Carmen*, 697 F.3d 964, 974 (9th Cir. 2012).

As for Mr. Wyatt's interview, the Estate did not carry its burden of showing that Mr. Wyatt would testify at trial or that the contents of the interview would somehow otherwise be admissible. *See JL Beverage Co.*, 828 F.3d at 1110. It is not testimony, despite the Estate's contention to the contrary. (*See* Br. for Appellant 66.) Notably, Mr. Wyatt invoked his Fifth Amendment privilege rather than testify at Mr. Simmers' criminal trial. (8-ER-2007.) The Estate made no showing that he would not do so again. Nor did the Estate subpoena Mr. Wyatt for a deposition in this action. *See* Fed. R. Civ. P. 45(a)(1)(B). Thus, there is no indication that Mr. Wyatt would voluntarily appear for trial in this action, nor what he would say if he were subpoenaed to testify.

Although Defendants moved to strike these hearsay statements, the Estate continues to rely on them on appeal. (*See* Br. For Appellant 65–66.) But these statements cannot defeat summary judgment and cannot justify reversing the District Court. *See* Fed. R. Civ. P. 56(c)(2).

### A. The District Court properly granted summary judgment on the coerced-confession claim.

The District Court correctly held that the admissible evidence did not create a

26

factual dispute over whether Mr. Simmers' 1995 confession was coerced. The Estate's claim that Mr. Simmers invoked his right to silence or to counsel was not supported in the record, and there is no genuine factual dispute that Mr. Simmers' confession was voluntary. Even if there were, the Superior Court's fully informed decision to admit the confession during the murder trial was the superseding cause of any injury to Mr. Simmers.

As a threshold point, the Estate's description of the allegedly coerced confession involves only Sergeant Rusk and Bothell Detective Hopkins and so the coerced-confession claim does not lie against Major McSwain. (Br. For Appellant 13–24; *see also* 2-ER-304.) Since he was not personally involved in Mr. Simmers' interrogation, Major McSwain would be liable for this claim only if the Estate's conspiracy or failure-to-intervene claims survived summary judgment. But as explained below, these claims cannot do so, even if the coerced-confession claim could.

### 1.  No admissible evidence suggests that Mr. Simmers' rights to remain silent or to counsel were violated.

The District Court correctly held that the Estate's contentions that Mr. Simmers invoked his right to be silent or to have access to counsel do not create a genuine factual dispute. (1-ER-37–39.) These claims are contradicted by the record and, in any case, are insufficiently specific to create a factual dispute.

### a.     The record clearly contradicts this claim.

While the Estate argues that the District Court made an impermissible credibility judgment or applied inferences against the Estate concerning Mr. Simmers' deposition testimony that he invoked his right to be silent or to have counsel (Br. for Appellant 41–46), the court merely followed established law that a party's assertions that the record "quite clearly contradicts" are not to be credited. *Sabbe v. Washington Cnty. Bd. of Comm'rs*, 84 F.4th 807, 816 (9th Cir. 2023) (internal quotation marks omitted). This Court has made clear that "the record" can include a party's prior court filings and testimony. *Est. of Stern v. Tuscan Retreat, Inc.*, 725 F. App'x 518, 523–24 (9th Cir. 2018).

Here, multiple elements of the record created by Mr. Simmers' own attorneys contradict the Estate's current assertions that Mr. Simmers invoked his rights before confessing. Mr. Simmers' criminal-trial counsel aggressively challenged the voluntariness of his confession, using many of the same arguments that the Estate makes now, but did not argue that Mr. Simmers had invoked either right. (6-ER-1281–87.) Ms. Berube testified at the hearing, but did not state that Mr. Simmers had told her that he asked for an attorney. (5-ER-1160–73.) Mr. Simmers also had the opportunity to testify at the hearing, where he could have made this claim, but did not. (5-ER-1194.)

After Mr. Simmers' conviction, his appellate counsel litigated a thorough

motion for a new trial based on alleged constitutional violations, but again did not claim that Mr. Simmers had invoked his rights. (*See* 7-ER-1669.) And in 2016, Mr. Simmers discussed his conviction with the parole board, but did not claim his rights had been violated. (*See* 8-ER-2010–26.)

Indeed, even when moving for vacatur of his conviction in 2019 on the basis that Mr. Simmers' confession was suspect, Mr. Simmers' new counsel did not assert that he had invoked his right to counsel before or during the interrogation. (*See* 7-ER-1690–1704.) And as to his right to not answer questions, all the motion alleged was that Mr. Simmers "initially" did not wish to make a statement, not that he definitively invoked his right not to speak. (7-ER-1696.) And if Mr. Simmers' 2018 interview were admissible, he notably did not describe an invocation of his right to counsel at that point either. (*See* 3-ER-405–77.)

In short, for more than twenty years, Mr. Simmers and his attorneys made a variety of arguments against his conviction or sentence, including several concerted attacks on the validity of his confession, but never suggested that officers ignored a request to consult with counsel. And only in 2019 did Mr. Simmers' counsel even suggest he had invoked his right not to answer questions. These omissions, in contexts where Mr. Simmers and his counsel had every incentive to allege that the questioning officers had ignored his rights, clearly contradict Mr. Simmers' testimony in 2022 that he "believed" he had requested counsel and told officers he

did not want to answer questions before being interrogated about the murder. A jury could not reasonably believe such contradicted assertions, and as such there is no genuine factual dispute on this point. *See Sabbe*, 84 F.4th at 816.

The Estate does not address this principle of summary judgment, instead citing cases where a plaintiff's account was said to be different from a witness's or implausible. *See, e.g.*, *Nelson v. City of Davis*, 571 F.3d 924, 929 (9th Cir. 2009) (holding "sham affidavit" rule does not apply to "arguably inconsistent" testimony from third parties). Those decisions do not apply in this situation, where the Estate's account is not just equivocal or implausible, but contradicted by the record of Mr. Simmers' interrogation that his own attorneys created over many years. And the Estate's claim that the District Court improperly held Mr. Simmers' prior silence against him ignores that doing so is appropriate in civil cases. *See, e.g.*, *United States v. Gonzalez-Godinez*, 89 F.4th 1205, 1209 n.1 (9th Cir. 2024).

### b.  Mr. Simmers did not testify to clearly invoking his right to counsel or that his right to remain silent was not honored.

Their clear contradiction by the record aside, Mr. Simmers' allegations that that his rights to counsel and to silence were violated lack sufficient support to create a genuine factual dispute. The record at summary judgment is equivocal and does not describe the clear invocation of the right to counsel, or the disregard of the right to silence, that precedent requires.

30

First, Mr. Simmers' deposition testimony was far too nonspecific to create a factual dispute. Vague, conclusory testimony lacking in essential details is insufficient to create a triable dispute. *Est. of Stern*, 725 F. App'x at 524. This is even more true when the conclusory and bald statements are self-serving. *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010). Mr. Simmers' testimony about his supposed assertions of both the right to silence and counsel has all these attributes.

As to the right to counsel, Mr. Simmers testified merely that he "believe[d]" he asked for counsel, but his recollection was not "very clear," and he could not identify when he did so, to whom he made this request, or what words he used. (9-ER-2186–88.) The two officers who testified to interacting with or observing Mr. Simmers after he returned from the marina testified without contradiction that they did not hear him ask for or even mention an attorney. (8-ER-1903, 8-ER-1983.)

And as to his right to remain silent, Mr. Simmers testified just that "to the best of [his] recollection," officers asked him if he wanted to speak and sporadically followed up with him after he said no, without identifying which officers sought to question him, about which topics, and at what times. (3-ER-356.) The officers who questioned Mr. Simmers after his return to the precinct testified that they didn't do so until 9 p.m. or later, because they were hoping to question Mr. Wyatt first, and that Mr. Simmers consented to being questioned when they approached him. (5-ER-1100, 5-ER-1137, 8-ER-1984.) Mr. Simmers' vague, self-serving testimony on both

topics thus does not provide the required specificity to create a factual dispute, especially when contradicted by the rest of the record.

Second, the vagueness of Mr. Simmers' testimony is particularly insufficient in this setting, because an invocation of the right to counsel must be clear. A "reference to an attorney that is ambiguous or equivocal" does not require an officer to cease questioning a suspect. *Davis v. United States*, 512 U.S. 452, 459 (1994). "Whether a suspect unambiguously requested an attorney is an objective question" and turns on the specific words the suspect used. *Tobias v. Arteaga*, 996 F.3d 571, 580 (9th Cir. 2021). Here, Mr. Simmers did not testify to the words he used, let alone identify when or to whom he made this request. (*See* 9-ER-2186–88.) Thus, the Estate has failed to produce sufficient evidence that could support a reasonable finding in its favor on this issue, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010), because the record does not allow the Court to determine whether Mr. Simmers used words that expressed a clear request for counsel.

Mr. Simmers' vague testimony is equally insufficient when it comes to his supposed invocation of the right to remain silent, because such an invocation is not necessarily permanent. On the contrary, so long as officers "scrupulously honor" the right to remain silent, answers given after a subsequent waiver do not violate a suspect's rights. *United States v. Hsu*, 852 F.2d 407, 409–10 (9th Cir. 1988) (internal quotation marks omitted). Whether officers failed to honor the right depends on a

variety of factors, most importantly, administration of fresh *Miranda* warnings, as well as "the amount of time that elapsed between interrogations," "the scope of the second interrogation," and the identity and behavior of the officers after the initial assertion of the right to not answer questions. *Id.* at 410–11.

Here, leaving aside that Detective Hopkins and Sergeant Rusk reminded Mr. Simmers of his rights before the interrogation that led to his confession, Mr. Simmers' deposition testimony does not establish any of the other factors: he gave no indication about the length of time between the officers' inquiries, what they wanted to ask him about, their identities, or their demeanor in approaching him. (*See* 3-ER-356.) Once again, Mr. Simmers' testimony lacks sufficient detail to call into question whether officers scrupulously honored the described invocation of his right to remain silent before seeking to question him again. Without a sufficient record, there is no triable dispute.

### 2.    There is no genuine dispute about the voluntariness of Mr. Simmers' confession.

The District Court correctly held that there was no genuine factual dispute regarding whether Mr. Simmers' confession was voluntary. Indeed, none of the factors relevant to this inquiry point to any coercion.

First, as explained above, there is no genuine factual dispute that Mr. Simmers received *Miranda* warnings multiple times and waived their protections. (8-ER-1998–99.) That fact is all but dispositive of the Estate's coerced-confession claim,

because "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). The Estate cannot show that Mr. Simmers' case was one of the rare cases where a properly warned suspect confessed involuntarily.

And even if there were any factual dispute over whether Mr. Simmers invoked his *Miranda* rights, that would not create a factual dispute about the voluntary nature of the confession. Violations of *Miranda*, on their own, do not make a subsequent statement involuntary. *See Bradford v. Davis*, 923 F.3d 599, 616 (9th Cir. 2019). Nor is a violation of *Miranda* sufficient to establish liability under § 1983 by itself. *Vega v. Tekoh*, 597 U.S. 134, 141 (2022).

Instead, the Estate must show that the totality of the circumstances "undermined [Mr. Simmers'] ability to exercise his free will," rendering his confession involuntary. *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003). This totality-of-the-circumstances test may be resolved as a matter of law on summary judgment. *See id.* at 811. On this record, the Estate cannot show that the totality of "both the characteristics of the accused and the details of the interrogation," *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (internal quotation marks omitted), compromised Mr. Simmers' free will.

Considering first the details of the interrogation, nothing the officers did was

coercive. While detectives used some deception when they told Mr. Simmers that Mr. Wyatt had implicated himself or Mr. Simmers in the murder and that the victim had accosted people on the trail (5-ER-1052–53, 8-ER-1986–87, 9-ER-2241), this Court and others have held that deception in itself does not prove coercion. *United States v. Crawford*, 372 F.3d 1048, 1060–61 (9th Cir. 2004). And aside from that, the officers' behavior was unimpeachable, as Mr. Simmers acknowledged that the officers did not use force against him, threaten him, or even raise their voices at him, and that he was not frightened of them either. (9-ER-2189.) The officers' restrained conduct suggests that Mr. Simmers' free will was not undermined. *Cunningham*, 345 F.3d at 810.

The duration of the interrogation and the other details of Mr. Simmers' detention also do not support coercion. Contrary to the Estate's argument (Br. for Appellant 54–55), the relevant period is the interrogation. *See, e.g.*, *Cunningham*, 345 F.3d at 810. While Mr. Simmers had been held for nearly twelve hours when he confessed, he was not interrogated for that entire period. Instead, he had been interrogated principally about his property crimes for a few hours in the afternoon, including the trip to the marina (8-ER-1954, 8-ER-1977), and then allowed to "sleep at his leisure" for several more hours at the precinct (6-ER-1286). And regardless of whether Mr. Simmers was being held at the precinct or not, he would certainly have been in detention after being arrested on a warrant and confessing to a series of

35

property crimes and arsons.

The actual homicide interrogation, before the taped confession, took less than two hours that evening, starting between 9:00 and 9:45 p.m. and ending by 10:40 p.m. (5-ER-1100, 5-ER-1137, 8-ER-1984, 9-ER-2206.) The taped confession lasted another twenty-three minutes. (*See* 9-ER-2206–22.) The record shows that Mr. Simmers was not interrogated for an unusually lengthy period, let alone overnight when he normally would be sleeping. *Cf. Doody*, 649 F.3d at 1009. Mr. Simmers was given dinner during the several-hour break after returning from the marina, (8-ER-1982–83), again suggesting officers did not use bodily needs to coerce a confession from him. *See Cunningham*, 345 F.3d at 810.

Mr. Simmers' personal characteristics likewise do not create a factual dispute over whether he voluntarily confessed. Contrary to the Estate's argument, the fact that Mr. Simmers was sixteen at the time of his confession is not dispositive. While the Supreme Court has warned "special care" must be taken in reviewing the interrogations of juveniles, *Haley v. Ohio*, 332 U.S. 596, 599 (1948), it has not relied on age alone in holding that certain interrogations violated due process. Rather, it has considered age in conjunction with the circumstances of the interrogation. *See id.* at 599–600 (noting suspect's age together with officers interrogating him overnight, not informing him of right to counsel, and holding him incommunicado after confession); *accord Gallegos v. Colorado*, 370 U.S. 49, 53–54 (1962) (noting

suspect was fourteen and held incommunicado for days before signing confession). As already explained, the circumstances of Mr. Simmers' interrogation, unlike those described in *Haley* or *Gallegos*, do not raise suspicions of coercion.

Nor does Mr. Simmers' attention-deficit-hyperactivity disorder diagnosis establish that he lacked free will when he confessed. There is no evidence in the record that Mr. Simmers' ADHD meant he did not understand the officers' questions or his responses. And while the Estate's putative expert opined that ADHD is a risk factor for false confessions, that confuses the relevant question, which is whether ADHD contributed to a *coerced* false confession, rather than a voluntary false confession. (2-ER-86–87.) Only the former is legally actionable, and the omission is significant given Mr. Simmers' testimony that he had a specific goal in confessing: to burnish his reputation as a "gangster." (9-ER-2188, 9-ER-2190.) The Estate's proffered expert opinion thus would not allow the factfinder to infer that Mr. Simmers' ADHD led to his free will being overborne, rather than him making a calculated choice to confess for his own ends.

On the other hand, Mr. Simmers' other personal characteristics point strongly against the idea that he was coerced into confessing against his will. He was a "very bright" young man with an above-average IQ and above-grade-level reading ability. (9-ER-2280.) Indeed, he had completed a GED before his March 1995 arrest. (6-ER-1297.) And he also had prior experience with the criminal-justice system, having

already served time in juvenile detention and having been questioned by officers from another agency shortly before this arrest. (8-ER-2062, 9-ER-2185, 9-ER-2273–74). He was thus acutely aware of the consequences of criminal investigations and speaking with police officers.

Finally, the District Court correctly held that Mr. Simmers' alleged innocence is not relevant to whether his confession was involuntary. Indeed, the Third Circuit specifically rejected the Estate's argument in the decision the Estate cites, correctly noting that adopting this rule "would eviscerate the required causal link between police misconduct and the confession" and ignore the reality that "sometimes individuals confess on a completely voluntary basis." *Halsey v. Pfeiffer*, 750 F.3d 273, 306 n.31 (3d Cir. 2014). And the other decisions the Estate cites do not hold that innocence is relevant to whether a confession was coerced. *See Ayers v. City of Cleveland*, 773 F.3d 161, 169 (6th Cir. 2014) (noting evidence of innocence relevant to whether plaintiff confessed at all in malicious prosecution case); *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009) (holding officer did not make a false promise of leniency).

In short, viewing the facts together, there is nothing from which a reasonable jury could conclude the confession was coerced. This was not the case of a juvenile being subjected "to 13 hours of interrogation, [who] had not been involved in the criminal justice system before, and [who] had not received his *Miranda* warnings."

*Hernandez v. Ducart*, 824 F. App'x 491, 493–94 (9th Cir. 2020). Instead, this was an intelligent young man who had prior experience with police questioning, received his *Miranda* warnings, and was interrogated for fewer than two hours before confessing. And while the Estate suggests that the District Court could not weigh these factors in their totality on summary judgment (Br. for Appellant 58–59), this Court's precedent plainly supports a court's authority to do exactly that. *Cunningham*, 345 F.3d at 811. On this record, the District Court correctly concluded that summary judgment on the Estate's coerced-confession claim was appropriate.

### 3.  The Superior Court's admission of the confession was a superseding cause of any alleged harm.

Even if there were a factual dispute about the voluntariness of Mr. Simmers' confession, the Estate's claim would still fail because it could not show that any of the Defendants were the proximate cause of any injury. Instead, the Superior Court's fully informed decision admitting the confession at the criminal trial was the superseding cause.

This Court has held that "a judicial officer's exercise of independent judgment in the course of his official duties is a superseding cause that breaks the chain of causation linking law enforcement personnel to the officer's decision." *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007). There is an exception to this general rule if officers prevented the judicial officer from exercising independent judgment by "deliberately or recklessly" misleading him or her. *Id.* at

664.

In this case, the Estate cannot show that the Defendants misled the Superior Court about the voluntariness of Mr. Simmers' confession. Other than the belated claims that Mr. Simmers invoked his right to be silent or consult an attorney, the key facts about the confession were all fully presented to the Superior Court. This includes the length of the interrogation, the use of deception, Mr. Simmers' age, and his ADHD diagnosis. (6-ER-1297.) Having considered the evidence, the court independently determined that the confession was voluntary and thus admissible at trial. (6-ER-1298.) The Superior Court's decision to admit Mr. Simmers' confession was a superseding cause, breaking any causal chain between Defendants and his alleged resulting injury. *Galen*, 477 F.3d at 663.

This Court's decisions concerning coerced-confession claims in *Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009), and *Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010), did not overturn the general rule that a judge's independent decision breaks the chain of causation between alleged tortfeasor and injury. Both cases dealt with prosecutors' use of coerced statements in pretrial proceedings, before the judges presiding over the respective criminal cases ruled that the confessions should be excluded as involuntary. *Stoot*, 582 F.3d at 926–27; *Crowe*, 608 F.3d at 430–31. Here, on the other hand, a judge independently found that the confession was voluntary, allowing it to be used at Mr. Simmers' criminal trial.

Applying the doctrine of superseding cause in this scenario does not bar all claims concerning coerced confessions. *Cf. Crowe*, 608 F.3d at 430. Instead, it limits such claims to where a plaintiff can show that the law enforcement defendants truly caused any injury, by misleading the judge about the circumstances of the confession. *See Galen*, 457 F.3d at 664. As explained above, the Estate cannot make that showing here.

### B.  The District Court properly granted summary judgment on the denial-of-fair-trial claim.

The District Court correctly held that the admissible evidence did not create a factual dispute supporting the Estate's claim that various pieces of evidence were fabricated or wrongfully withheld during Mr. Simmers' criminal trial. A fabrication-of-evidence claim requires proof of both "deliberately fabricated" evidence and a "reasonable likelihood" that the fabricated evidence "could have affected the judgment of the jury" that convicted the defendant. *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 569, 574 (9th Cir. 2022) (internal quotation marks omitted). This Court allows both "direct evidence of deliberate fabrication" and circumstantial evidence of it. *Id.* at 569 (internal quotation marks omitted).

A nondisclosure claim requires proof that favorable evidence was withheld from the criminal defendant. *See Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006). This claim also requires a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have

been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation marks omitted).

As the Estate does not claim that any King County Sheriff's officer had any involvement with Mr. Olsen (*see* Br. for Appellant 29–31), the relevant allegedly fabricated pieces of evidence are Sergeant Rusk's report of the homicide-focused interrogation of Mr. Simmers, his account of his conversation with Mr. Simmers on the way to the marina, and Major McSwain's report about his interactions with Mr. Wyatt. And it is the alleged fabrication of this evidence that the Estate contends was allegedly not disclosed. But the Estate has no viable claim under any of these theories.

### 1. There is no evidence that Sergeant Rusk "fabricated" anything.

The Estate's fabrication theory concerning Sergeant Rusk's report fails for lack of evidence. To the extent this theory is distinct from the coerced-confession claim at all, *see Tobias*, 996 F.3d at 575 n.1, it relies on allegedly providing Mr. Simmers with nonpublic information about Mr. Gochanour's murder. (Br. for Appellant 62–63.) But there is no evidence that Sergeant Rusk gave Mr. Simmers nonpublic information about the crime or even could have done so.

While the Estate attempts to rely on Mr. Simmers' testimony to establish that officers gave him this nonpublic information, his account is far too vague to support this contention. Mr. Simmers could not identify what nonpublic information he

learned, nor when or from whom. (8-ER-2059–61, 8-ER-2075–76.) Mr. Simmers even admitted he did not know if he had been coached deliberately or if he simply "glean[ed]" information from what he overheard and responded to "subconscious cue[s]" when being questioned. (3-ER-465-67.)

More fundamentally, the uncontradicted evidence establishes that Sergeant Rusk had no nonpublic evidence about the murder to share with Mr. Simmers when interviewing him, which makes sense, as a different agency was investigating the crime. (8-ER-1974–75.) Indeed, according to Detective Hopkins, Bothell Police Department's lead on the case, Mr. Simmers had more information about the murder than Sergeant Rusk did. (3-ER-597.) This record shows that Sergeant Rusk could not have deliberately provided Mr. Simmers with nonpublic information before his confession. And the Estate does not attempt to show that any other King County officer had greater nonpublic information about the murder, let alone that they shared it with Mr. Simmers.

The Estate's arguments concerning Sergeant Rusk's testimony about his conversation with Mr. Simmers on the way to the marina also lack support. Sergeant Rusk's testimony was that Mr. Simmers first said he didn't kill a "bum," and then falsely claimed that Sergeant Rusk had first called the victim a bum. (8-ER-1975, 9-ER-2234.) Sergeant Rusk's account is uncontradicted, as Mr. Simmers never testified that it was Sergeant Rusk who used the term first. Thus, there is no evidence

43

supporting the Estate's claim here. And while the Estate would have the Court infer that Sergeant Rusk must have been lying (Br. for Appellant 64–65), at summary judgment inferences must be drawn in favor of the nonmoving party only "*to the extent supportable by the record.*" *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). The Estate is not entitled to an inference without record support, which it lacks for its accusation that Sergeant Rusk testified falsely twice.

### 2. The claim against Major McSwain fails for multiple reasons.

The Estate's fabrication claim concerning Major McSwain's report of his interactions with Mr. Wyatt—which is the only theory of the Estate's claims involving Major McSwain directly—likewise cannot survive summary judgment. Indeed, this claim fails for multiple reasons.

The Estate's claim fails at the threshold because no admissible evidence contradicts Major McSwain's description of his interactions with Mr. Wyatt. Thus, there is no direct evidence of fabrication in the record. *See Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010). Indeed, the only way the Estate attempts to create a dispute on this point is through Mr. Wyatt's 2017 interview, which the Estate incorrectly describes as testimony, (Br. for Appellant 66), but actually is hearsay. And as explained above, since the Estate has shown neither that this document is admissible nor that its contents will be presented at trial in an admissible form, it may not be considered at summary judgment. *See* Fed. R.

Civ. P. 56(c)(1)–(2).

But even if the interview could be considered, it would not be sufficient to support a claim for deliberate fabrication. This Court has held that "carelessness," "mistakes of tone," and "trivial" mistakes cannot support a claim of deliberate fabrication. *Spencer v. Peters*, 857 F.3d 789, 799 (9th Cir. 2017). The differences between Mr. Wyatt's interview and Major McSwain's account fit within that limitation, as Mr. Wyatt described in 2017 how he was "freaked out" and "in tears" after being arrested because Mr. Simmers spontaneously confessed to the murder of Mr. Gochanour on the Burke-Gilman Trail. (2-ER-183, 2-ER-185–86.) Mr. Wyatt also confirmed that Mr. Simmers had taken a knife from Mr. Wyatt's apartment complex. (2-ER-198.) Finally, Mr. Wyatt acknowledged that he could have seen Mr. Simmers commit the murder but blocked it from his memory. (2-ER-199–200.) The material differences between this account and Major McSwain's report are minor, given that the overall interview inculpates Mr. Simmers, and the report likewise suggests that Mr. Wyatt's behavior did the same.

Nor can the Estate support its claim of fabrication against Major McSwain circumstantially as it contends. The Estate identifies no evidence that would show Major McSwain "knew or should have known" that Mr. Simmers was innocent, nor that Major McSwain "used investigative techniques that were so coercive and abusive" that he should have known it would lead to false information. *See*

*Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

But, however described, the Estate's fabrication claim against Major McSwain fails for an additional reason: a complete lack of materiality. Materiality, which incorporates causation, requires a "reasonable probability that the defendant would not have been convicted without the wrongful fabrication of evidence." *Richards*, 39 F.4th at 574 n.9.

The Estate cannot make that showing here. Major McSwain's report about Mr. Wyatt was not offered as evidence at Mr. Simmers' criminal trial. And since neither Major McSwain nor Mr. Wyatt testified at Mr. Simmers' trial (8-ER-2007, 9-ER-2134), there was no chance that it could have been. Moreover, the Superior Court, prosecution, and criminal defense agreed that none of the testifying witnesses would refer to Mr. Wyatt's statements or reactions. (8-ER-2005–06.) In short, from the perspective of Mr. Simmers' jury, it was as if Major McSwain's report about his interactions with Mr. Wyatt never existed. Thus, the Estate cannot show any probability that Mr. Simmers would not have been convicted without the report. And without a showing of materiality, the fabrication-of-evidence claim necessarily fails. *Richards*, 39 F.4th at 574 & n.9.

### 3.    If preserved, the Estate's nondisclosure theory is meritless.

The Estate forfeited its other denial-of-fair-trial theory, that the allegedly fabricated nature of the evidence discussed above should have been disclosed to Mr.

Simmers' defense counsel under *Brady v. Maryland*, 373 U.S. 83 (1963), by cursorily referencing it in a footnote. (Br. for Appellant 67 n.7.) This Court considers only matters "argued specifically and distinctly" in an appellant's opening brief by more than a "bare assertion." *Indep. Towers*, 350 F.3d at 929 (internal quotation marks omitted).

But even if it had not been forfeited, the Estate cannot make out a claim about nondisclosure of any piece of allegedly fabricated evidence. Regarding the Estate's assertions relating to Sergeant Rusk, "where the [criminal] defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense." *Raley*, 470 F.3d at 804 (internal quotation marks omitted). And Mr. Simmers obviously would have been aware of his own interactions with Sergeant Rusk. Therefore, he would have been aware of the "essential facts" that the Estate now claims should have been disclosed: that Sergeant Rusk fed him nonpublic information and was the first person to refer to Mr. Gochanour as a "bum." Mr. Simmers could have alerted his defense counsel to these "facts" at any time before or during his criminal trial, obviating the need for any disclosure from the State.

Likewise, the Estate's assertions concerning Major McSwain's report about Mr. Wyatt also cannot support a nondisclosure claim, even if the report had been fabricated. To make out such a claim, the alleged fabrication must have been

47

material, meaning there was a "reasonable probability that . . . the result of the proceeding would have been different" but for the nondisclosure. *United States v. Bagley*, 473 U.S. 667, 682 (1982). As explained above, the jury did not hear from Major McSwain or Mr. Wyatt, nor did it hear about Major McSwain's description of Mr. Wyatt's statements and reactions in any other way. (8-ER-2005–07, 9-ER-2134.) There is no reasonable likelihood that the alleged falsity of this report, which the jury never heard about, authored by someone the jury did not hear from, about someone else it also did not hear from, could have changed the jury's view of Mr. Simmers' guilt. *See Bagley*, 473 U.S. at 682.

### C. The District Court correctly granted summary judgment on the remaining claims.

The Estate's remaining claims—for conspiracy, failure to intervene, and municipal liability—all fail with the Estate's substantive claims, because each requires an underlying constitutional violation. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012) (conspiracy to violate civil rights); *Tobias*, 996 F.3d at 584 (failure to intervene); *Hall v. City of Los Angeles*, 697 F.3d 1059, 1070 (9th Cir. 2012) (municipal liability). Since, as explained above, summary judgment on the Estate's coerced-confession and denial-of-fair-trial claims was appropriate because the Estate lacks evidence that Mr. Simmers' rights were violated, summary judgment was appropriate for the conspiracy, failure-to-intervene, and municipal-liability claims as well. But as explained below, summary judgment on these three claims

would be appropriate even if the District Court had not dismissed either of the substantive claims.

### 1. There is no evidence of an unlawful agreement.

The District Court properly dismissed the Estate's conspiracy claim. For a § 1983 conspiracy claim to survive summary judgment, a plaintiff must "produce 'concrete evidence' of an agreement or 'meeting of the minds' between [the conspirators] to violate the plaintiff's rights." *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 782 (9th Cir. 2001). Each alleged conspirator "must at least share the common objective of the conspiracy," *i.e.*, the violation of the plaintiff's rights. *Lacey*, 693 F.3d at 935 (internal quotation marks omitted).

The Estate lacks concrete evidence that there was such an agreement among the Defendants. Even if there were evidence that an officer violated Mr. Simmers' rights, there is no evidence that any other officer involved in the investigation approved of that occurrence or was even aware of it. On the contrary, the various officers had different roles: for example, only Detective Hopkins and Sergeant Rusk interrogated Mr. Simmers, while Major McSwain had no interaction with Mr. Simmers at all, and there is no evidence he agreed with the interrogating officers' techniques, which may have been selected mid-interrogation. (8-ER-1986–87, 9-ER-2134.)

While the Estate relies on the meetings among officers before the

interrogation as evidence of a meeting of the minds, (Br. for Appellant 69), this argument ignores that a conspiracy requires an agreement specifically "to violate the plaintiff's rights." *Radcliffe*, 254 F.3d at 782. The officers testified that these meetings addressed routine law-enforcement issues such as who would interrogate a suspect and who would seek a search warrant. (5-ER-1098–1101, 8-ER-1914.) But to defeat summary judgment on a conspiracy claim, a plaintiff must come forward with evidence of something more than just standard discussions and coordination among law-enforcement officers. *See, e.g.*, *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1302–03 (9th Cir. 1999) (identifying multiple pieces of circumstantial evidence of a conspiracy, including evidence of pre-existing police bias against plaintiffs). In this case, all that the record establishes is a meeting of officers to discuss lawful topics. This record does not support the Estate's supposition that any, let alone every, Defendant shared the alleged objective to deprive Mr. Simmers of his rights. *Lacey*, 693 F.3d at 935.

## 2. There is no evidence of an opportunity to intervene.

By cursorily referencing its failure-to-intervene claim in a footnote, (Br. for Appellant 67 n.7.), the Estate has forfeited this claim. *Indep. Towers*, 350 F.3d at 929. But even if it were not forfeited, the claim is meritless. Even if there were evidence that an officer had violated Mr. Simmers' rights, the Estate cannot show that any other officer had the requisite "opportunity to intercede." *Tobias*, 996 F.3d

at 584 (internal quotation marks omitted). For example, even if another officer coerced Mr. Simmers or falsified some aspect of a report, the Estate cannot show that Major McSwain was aware of that, let alone that he could have stopped it. Thus, the failure-to-intervene claim fails independently of the substantive claims.

### 3. The Estate cannot show that King County evinced deliberate indifference.

Finally, the District Court also correctly granted summary judgment on the Estate's municipal-liability claim. The Estate's argument for reversal rests on a misreading of the summary-judgment order. Contrary to the Estate's framing, in context, it is clear that the District Court did not dismiss the municipal claim because there was a violation for which no individual defendant could be liable; instead, it held that there was no underlying constitutional violation. (1-ER-48–49.) This Court typically dismisses a municipal-liability claim in this situation. *Hall*, 697 F.3d at 1070.

But even if there were a factual dispute about whether Mr. Simmers' rights had been violated in some way, summary judgment on the municipal-liability claim would still be required. The Estate's arguments regarding King County's liability, which relate to alleged failures to train its employees and other alleged omissions in policy (2-ER-341), would fail independently of the underlying claims, because the Estate cannot show deliberate indifference, the "stringent standard of fault" for such claims. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks

omitted); *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012).

Deliberate indifference requires proof that municipal policymakers were on "actual or constructive notice that a particular omission" is causing municipal employees to violate residents' constitutional rights and, nonetheless, failed to act. *Connick*, 563 U.S. at 61. Ordinarily, such claims require evidence of a pattern of prior similar constitutional violations. *Id.* at 62; *Tsao*, 698 F.3d at 1145. But the Estate presented no evidence that King County had a pattern of prior juvenile interrogations leading to coerced confessions. This lack of pattern evidence is fatal to the municipal-liability claim because, without it, the Estate cannot show that King County was on "actual or constructive notice" that its alleged failure to do something was causing its employees to coerce confessions from juveniles.

While the Estate attempts to fit its claim within the "narrow range of circumstances" in which an omission is so obvious that a plaintiff can show deliberate indifference without pattern evidence, *see Connick*, 563 U.S. at 63 (internal quotation marks omitted), this Court's precedent forecloses that argument. In *Stoot v. City of Everett*, which like this case concerned a juvenile's alleged coerced confession resulting from the use of the "Reid" interview techniques, this Court affirmed the grant of summary judgment on the municipal-liability claim, because the plaintiffs had neither provided evidence of similar prior incidents nor "identif[ied] any case law establishing that a particular interview technique, applied

to juveniles, violates their constitutional or statutory rights." 582 F.3d at 930.

Similarly, the Estate's argument below that some of King County's policies were unwritten ignores this Court's precedent that municipal policy can be expressed through longstanding practice or custom as well as expressly stated policies. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999)

Finally, the Estate's criticism that King County's policies allegedly did not distinguish between juveniles and adults in interrogations is not accurate, as the County's written policies included an additional warning to be added to *Miranda* warnings for juveniles and addressed when to notify a young juvenile's parents. (4-ER-887, 4-ER-894.) And King County's policies and practices covered the constitutional protections given to all suspects, including requirements to give *Miranda* warnings and prohibitions on coercion, threats, promises, and unreasonably long interrogations. (4-ER-887–89, 4-ER-892, 4-ER-895.) While precedent admonishes that "special care" must be taken with the interrogations of juveniles, *Haley*, 332 U.S. at 599, the Estate does not "identify any case law establishing" that King County was required to adopt any specific additional requirements or prohibitions specific to juvenile interrogations, *Stoot*, 582 F.3d at 930. The Estate's failure to do so further forecloses a municipal-liability claim here.

## II.    Alternatively, the Estate's claims have been waived.

While the District Court granted summary judgment based on lack of evidence

to support any claim, all of the Estate's claims could also be dismissed on summary judgment because Mr. Simmers waived the Estate's claims by pursuing a parallel action for compensation under Washington's Wrongly Convicted Persons Act. Although the District Court did not reach this legal issue, the parties briefed it below. (2-ER-217–18, 2-ER-345–47, 10-ER-2522–24.)

The WCPA, under which Mr. Simmers has filed a claim against the State for compensation for his incarceration, states that "[a]s a requirement to making a request for relief under [the WCPA], the claimant waives any and all other . . . causes of action . . . against the state, any political subdivisions of the state, and their officers [and] employees . . . related to the claimant's wrongful conviction and imprisonment." Wash. Rev. Code Ann. § 4.100.080(1). This provision expressly includes § 1983 claims. *Id.* The statute thus creates a choice of remedies for compensation for alleged wrongful conviction: traditional civil causes of action, including § 1983 claims, or a WCPA claim, but not both.

The plain reading of the statute is that the choice of remedies occurs at the time a plaintiff files suit under the WCPA, because that is when the plaintiff "mak[es] a *request* for relief" under it. *Id.* (emphasis added). Mr. Simmers made such a request for relief in 2021, (9-ER-2264–72), and that action is still pending in state court with the Estate substituted as the plaintiff. Thus, under a plain reading of the statute, Mr. Simmers waived his right to pursue alternative remedies for his

54

alleged wrongful conviction, including the §1983 claims in this suit.

No Washington appellate court has faced the issue of whether the pursuit of a WCPA claim waives other claims relating to the same conviction. While two decisions from the Washington Court of Appeals have suggested that the waiver is not effective until a plaintiff *recovers* relief under one remedy, those decisions' language to that effect was dicta because, in both cases, the plaintiff had already recovered under § 1983, and the appellate court held the WCPA claim was barred as a result. *See Allen v. State*, 498 P.3d 552, 553 (Wash. Ct. App. 2021); *Larson v. State*, 447 P.3d 168, 170–71 (Wash. Ct. App. 2019).

This Court is not bound by the dicta of state appellate courts. *Minnesota Mut. Life Ins. Co. v. Ensley*, 174 F.3d 977, 983 (9th Cir. 1999). And the rationale for these decisions—that the statute's reference to a claimant executing a release before receiving compensation under the WCPA means that the claimant may pursue concurrent actions until executing such a release—is flawed. The Legislature may have referenced a release simply to provide a structure for settling WCPA claims. The Court should apply a plain reading of § 4.100.080(1), which is the proper interpretive approach for a Washington statute, *see Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 43 P.3d 4, 9 (Wash. 2002), and hold that the waiver occurs when a plaintiff *requests* relief, as Mr. Simmers did years ago.

### III.    If remanded on any issue, there is no ground for judicial reassignment.

If this Court were to vacate and remand any portion of the District Court's decision, judicial reassignment, which the Estate did not seek below, would be inappropriate. "Reassignment on remand is highly discouraged, and such a motion will be granted only in unusual circumstances or when required to preserve the interests of justice." *United States v. Lynch*, 903 F.3d 1061, 1085 (9th Cir. 2018) (internal quotation marks omitted). The Estate has not shown that either "the original judge would reasonably be expected … to have substantial difficulty in putting out of … her mind previously expressed views" or that reassignment is necessary to "preserve the appearance of justice." *Id.* (internal quotation marks omitted).

Judge Rothstein is an esteemed senior United States district judge, and nothing in this record remotely suggests she would have difficulty putting aside any prior views and faithfully implementing this Court's mandate. Below, "the judge treated the parties evenhandedly and with respect." *McSherry v. City of Long Beach*, 423 F.3d 1015, 1023 (9th Cir. 2005), *as amended* (Oct. 27, 2005). At an earlier stage of this litigation, Judge Rothstein even overruled Magistrate Judge Creatura's recommendation to dismiss many of Mr. Simmers' claims, instead dismissing just two state-law claims that the Estate no longer pursues. (1-SER-269–94, 2-SER-296–326.) These are not the actions of a judge who is implacably opposed to the Estate's claims.

Nor would there be an appearance of injustice if Judge Rothstein presided over a trial on remand. This Court has declined to reassign cases even where a district court reached erroneous credibility determinations at a bench trial. *See Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1184–85 & n.11 (9th Cir. 2017). And the fact that a jury, rather than the judge, would decide disputed facts at trial further counsels against reassignment. *See Jeong Ko v. City of La Habra*, 637 F. App'x 973, 975 (9th Cir. 2015). On the other hand, this litigation has a lengthy record, and reassignment would waste judicial resources by requiring a new judge to become familiar with the case before trial. Such a step is not justified on this record.

## CONCLUSION

For the foregoing reasons, this Court should affirm the order on appeal.

DATED: January 21, 2025

Respectfully submitted,

SEAMARK LAW GROUP PLLC
Attorneys for the King County Appellees

*s/Geoff Grindeland*
*s/Jesse A. Townsend*
Geoff Grindeland, WSBA No. 35798
Jesse A. Townsend, WSBA No. 63238
Seamark Law Group PLLC
400 Winslow Way E, Ste 230
Bainbridge Island, WA 98110
(206) 502-2510
geoff@seamarklaw.com
jesse@seamarklaw.com

57

# ADDENDUM

**Statutes**

Wash. Rev. Code Ann. § 4.100.080 (West)

Remedies and compensation exclusive--Admissibility of agreements

(1) It is the intent of the legislature that the remedies and compensation provided under this chapter shall be exclusive to all other remedies at law and in equity against the state or any political subdivision of the state. As a requirement to making a request for relief under this chapter, the claimant waives any and all other remedies, causes of action, and other forms of relief or compensation against the state, any political subdivision of the state, and their officers, employees, agents, and volunteers related to the claimant's wrongful conviction and imprisonment. This waiver shall also include all state, common law, and federal claims for relief, including claims pursuant to 42 U.S.C. Sec. 1983. A wrongfully convicted person who elects not to pursue a claim for compensation pursuant to this chapter shall not be precluded from seeking relief through any other existing remedy. The claimant must execute a legal release prior to the payment of any compensation under this chapter. If the release is held invalid for any reason and the claimant is awarded compensation under this chapter and receives a tort award related to his or her wrongful conviction and incarceration, the claimant must reimburse the state for the lesser of:

    (a)  The amount of the compensation award, excluding the portion awarded pursuant to RCW 4.100.060(5) (c) through (e); or

    (b)  The amount received by the claimant under the tort award.

(2)  A release dismissal agreement, plea agreement, or any similar agreement whereby a prosecutor's office or an agent acting on its behalf agrees to take or refrain from certain action if the accused individual agrees to forgo legal action against the county, the state of Washington, or any political subdivision, is admissible and should be evaluated in light of all the evidence. However, any such agreement is not dispositive of the question of whether the claimant was wrongly convicted or entitled to compensation under this chapter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**   24-3636

I am the attorney or self-represented party.

**This brief contains**   13,493   **words,** including   0   words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/Geoff Grindeland      **Date** January 21, 2025

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                      *Rev. 12/01/22*