NO. 24-3636

**IN THE
UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT**

———————————

ESTATE OF IAN SIMMERS, by and through administrator,
Donna Berube,

Appellant

v.

KING COUNTY; et al.,

Appellees.

———————————

**ANSWERING BRIEF OF APPELLEES HOPKINS,
MINER, ERICKS, SCHLAEGEL, CITY OF BOTHELL**

———————————

Shannon M. Ragonesi, WSBA #31951
Keating Bucklin & McCormack, Inc., P.S.
1201 Third Avenue, Suite 1580
Seattle, WA 98101
(206) 623-8861 Telephone
(206) 223-9423 Facsimile
sragonesi@kbmlawyers.com
Counsel of Appellees Hopkins, Miner, Ericks, Schlaegel, City
of Bothell

## Table of Contents

I.  STATEMENT OF ISSUE PRESENTED FOR REVIEW ............................1

II.  STATEMENT OF THE CASE.................................................................1

    A. This case turns on key facts over which there is no dispute. ...........................1

        1. The Murder Weapon.................................................................1

        2. Undisputed Chronology of March 15, 1995..............................................2

        3. Kevin Olsen Initiated Contact With Hopkins – Not The Other Way Around. ..........................................................................4

        4. Additional Undisputed Admissions by Simmers .......................................5

III.  SUMMARY OF THE ARGUMENT .............................................................11

IV.  ARGUMENT .............................................................................................13

    A. Standards of review. .........................................................................13

    B. The Trial Court Correctly Ruled Simmers' confession was voluntary..........14

        1. Innocence or Guilt Is Irrelevant To The Issue Of Whether A Confession Was Coerced By Law Enforcement. .....................................................15

        2. Legal Precedent Does Not Support A Finding Of Coercion Based On The Totality Of Facts Present In This Case.....................................................17

        3. Simmers was not subjected to unlawfully coercive conduct. ..................19

        4. Simmers reaffirmed his understanding of his rights and his willingness to talk to the detectives before providing his confession. ............................20

        5. Simmers could not remember if he requested an attorney or not. ...........21

        6. Use of themes and ruses is lawful as long as no threats or promises are made – and it is undisputed none were made by Hopkins or Rusk. ........21

        7. Under The totality of the circumstances, no reasonable jury could conclude Mr. Simmers' will was overborn at the time he confessed to the murder.....................................................................................................22

i

C. The Trial Court Correctly Determined The Estate Lacked Sufficient Evidence To Prove The Bothell Defendants Fabricated Evidence...............23

    1. Hopkins did not fabricate his police report describing his interview of Simmers. ....................................................................................24

    2. The Court may not consider Jon Wyatt's 2018 interview as evidence because it is an inadmissible unsworn statement. ....................................25

    3. The Estate has zero admissible evidence to contradict the testimony of Kevin Olsen or Detective Hopkins or prove Hopkins' documents about Olsen were fabricated. .............................................................27

    4. The Estate Cannot Prove Proximate Cause Because The Criminal Court's Ruling Allowing Admission Of The Confession Was An Intervening Superceding Cause Of Simmers' Harm. .................................................27

D. The Estate's failure to intervene claim was properly dismissed. ...................29

E. The Estate has no evidence – not even circumstantial – to prove a conspiracy to violate Simmers' Constitutional rights....................................30

F. The trial Court Correctly Concluded the Bothell Defendants did not violate Ian Simmers' Constitutional Rights – And There Is No Evidence Of an Ongoing Policy, Practice or Custom that led to a violation of rights. ..........................................................................30

V.     CONCLUSION ............................................................................31

TABLE OF AUTHORITIES

## Cases

*Ashcraft v. Tennessee,* 322 U.S. 143, 149–54 (1944)................................19

*Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680–81 (9th Cir. 1985) ............ 13, 14

*Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008).....................................24

*Bishop v. Miche*, 137 Wn.2d 518, 973 P.2d 465, 472 (1999)..................................27

*Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988) ................................28

*Cadwell v. San Francisco*, 889 F.3d 1105, 1115 (2018).........................................24

*Carrillo v. Cnty. of Los Angeles*, No. 211CV10310SVWAGR, 2012 WL 12850128, at *10 (C.D. Cal. Nov. 14, 2012), *aff'd*, 798 F.3d 1210 (9th Cir. 2015).................................................................................................................28

*Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir.), *cert. denied,* 540 U.S. 968 (2003)...............................................................................................................19

*Com. of N. Mariana Islands v. Mendiola*, 976 F.2d 475, 478–79 (9th Cir. 1992).......................................................................................................................18

*Crowe v. Cnty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) .........................18

*Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) ................................29

*Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001)..............................23

*Fare v. Michael C.*, 442 U.S. 707, 725 (1979) ......................................................15

*George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) ..............................................18

*Haugen v. Fields*, 366 F. App'x 787, 788–89 (9th Cir. 2010) ...............................27

*Haynes v. Washington*, 373 U.S. 503, 513 (1963)...................................... 14, 15, 18

*Higazy v. Templeton,* 505 F.3d 161, 175 (2ⁿᵈ Cir.2007) .........................................28

*In re Gault*, 387 U.S. 1 at 45 (1967) ............................................................... 15, 16

*Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 808 (9th Cir. 2009)................14

*Martinez v. City of Stockton*, No. 2:18-CV-00964-TLN-AC, 2022 WL 658136, at *6 (E.D. Cal. Mar. 4, 2022)................................................................28

*Matsushita Elec. Indus. Co.*, 475 U.S. 574, 587 (1986) ........................................14

*McLaughlin v. Liu,* 849 F.2d 1205, 1208 (9th Cir.1988)........................................14

*Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir.1999) .................................................................................. 30

*Michigan v. Mosley*, 423 U.S. 96, 102 (1975) ........................................ 20

*Mincey v. Arizona,* 437 U.S. 385, 398–99 (1978) .................................. 19

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978) ............... 31

*Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011) ................................. 19

*Rogers v. Richmond*, 365 U.S. 534, 544 (1961) .................................... 15

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) .......................... 15

*Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ........ 14

*Smith v. Harrington*, No. C 12-03533 LB, 2015 WL 1407292, at *26 (N.D. Cal. Mar. 27, 2015), *aff'd sub nom. Smith v. Liddell*, 682 F. App'x 630 (9th Cir. 2017) ................................................................................ 28

*Spano v. New York*, 360 U.S. 315, 321–23 (1959) ................................. 18

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir.2009) .......................... 27, 28

*Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009) .......................................................................... 24

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) ............................... 31

*U.S. v. Miller,* 984 F.2d 1028, 1031 (1993) ........................................... 19

*United States v. Crawford*, 372 F.3d 1048, 1060–61 (9th Cir. 2004 ...... 21

*United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) ........... 14

*United States v. Hsu*, 852 F.2d 407, 410 (9th Cir. 1988) ....................... 20

*United States v. Orso,* 266 F.3d 1030, 1039 (9th Cir.2001) .................... 22

*United States v. Preston*, 751 F.3d 1008, 1018 (9th Cir. 2014) ............. 16

*United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) ................ 17

*United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir.1989) ............................................................................ 30

**Rules**

FRCP 56(c)(2) .......................................................................................... 26

FRCP 56(c)(4) .......................................................................................... 25

iv

## I.    STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether the trial court properly ruled the Estate lacked sufficient, admissible, factual evidence, or reasonable fact-based inferences, to support its claims against the Bothell Defendants?

## II.    STATEMENT OF THE CASE

**A.    This case turns on key facts over which there is no dispute.**

1.    <u>The Murder Weapon</u>.

When King County Sergeant Clement Rusk asked Jon Wyatt on the way to the marina if he knew anything about the guy who got stabbed on the trail, Wyatt told him Simmers had taken a kitchen knife having a black handle and a shiny, flimsy blade from Wyatt's apartment cabana.[1] 8ER-1821; 8ER-1827-1829; 8ER-1893. **Wyatt's description of the knife Simmers took from his cabana matched the knife that was used to murder Rodney Gochanour, which was a partially serrated Ginsu-type kitchen knife with a flexible, shiny blade and a black handle**. 8ER-1827-1829. Wyatt also said Simmers no longer had the knife when they got to Kenmore. 8ER-1893. During his recorded confession, Simmers admitted he took the knife from Jon Wyatt's cabana. 8ER-1833-1834; 8ER-2048:4-24; 8ER-2049:11-15.

---

[1] When interviewed in 2018, Jon Wyatt confirmed he told the detectives about the knife. 2ER-195:19-201:6.

1

2.　　Undisputed Chronology of March 15, 1995.

- 11:44 a.m.　Simmers and Wyatt are arrested by Deputy Janasz for reckless shooting of flares and outstanding juvenile warrants. 9ER-2145:16-2147:4.

- Time unknown.　Simmers signs Rights Advisement form administered by Detective A. Jarboe.　9ER-2111:16-2112:5.

- 1:15 p.m.　Simmers signs second Rights Advisement form administered by Deputy Janasz. 8ER-1997.

- 1:21 p.m.　Wyatt signs Rights Advisement form administered by Detective Jarboe. 8ER-2001.

- 1:45 p.m.　Simmers signs third Rights Advisement form administered by Rusk and provides statement regarding starting fires and breaking into boats at Davidson marina. 8ER-1998; 8ER-1956:14-8ER-1959:25.

- 2:10 p.m.　Wyatt signs Rights Advisement administered by McSwain and provides statement regarding breaking into cars and boats with Simmers. 8ER-2002.

- 2:20 p.m　Simmers draws pictures and words including "Murder" and "187 on a slob" in interview room – *before* anyone has mentioned the stabbing to him. 8ER-2085; 8ER-1892; 3ER-357:1-18.

- 3:15 p.m.　Rusk and Raftis take Simmers to Davidson marina. 98ER-1901.

- 5:00 p.m.　Rusk and McSwain take Wyatt to the marina. 8ER-1893; 8ER-

1977:1-12. Wyatt asks for an attorney when they arrive after he is asked about the stabbing so they return to the precinct. 8ER-1978:1-12.

- 5:30 p.m.    Bothell Detectives Ed Hopkins and Dave Schlaegel respond to the precinct after being notified King County has two male juveniles in custody who may have information about the murder. 8ER-1914.

- 5:58 p.m.    Wyatt asks for his mom to be called and is allowed to talk to her. 8ER-1894.

- 6:05 p.m.    McSwain speaks on the phone with Wyatt's attorney.  He tells Wyatt she is on the way to the precinct to see him. *Id.*; 8ER1980:10-8ER-1981:24.

- 6:30 p.m.    Raftis and Rusk provide Wyatt and Simmers with a McDonalds meal, soda and a blanket. 8ER-1894; 8ER-1982:21-1983:21; 8ER-2056:2-2057:11; 8ER-2058:7-19.

- 7:42 p.m.    Wyatt's attorney finally arrives at the precinct and meets with Wyatt. 8ER-1981:24; 8ER-1894.

- 8:45 p.m.    Wyatt speaks with his mom on the phone, again. 8ER-1894.

- 9:14 p.m.    Wyatt speaks with his dad on the phone. 8ER-1895.

- 9:45 p.m.    Rusk and Hopkins ask Simmers if he would be willing to talk some more and if he still remember his rights. Simmers said it was okay to talk to them and he remembered his rights. 8ER-1983:24-1985:13.

3

- 10:15 p.m.   Wyatt's father arrives at the precinct and meets with Wyatt. 8ER-1895.

- 10:40 p.m.   Simmers signs Rights Advisement and provides recorded confession.   8ER-1999;   8ER-1833-1847;   8ER-1990:5-1991:25;   8ER-1986:19-1994:14.

- 11:03 p.m.   Simmers' recorded confession is complete. 8ER-1846.

During the check-ins with Simmers by Sergeant Rusk to bring him food and a blanket, he was not interrogated and he did not ask for an attorney or to speak to his mother. 8ER-1982:18-1983:21; 8ER-1989-17; 8ER-1993:25-1994:14.

3.   <u>Kevin Olsen Initiated Contact With Hopkins – Not The Other Way Around.</u>

On November 16, 1995, King County Deputy Prosecutor, Tod Bergstrom, contacted Detective Hopkins and stated he had been contacted by a jail informant, Kevin Olsen, who was in a cell next to Simmers in the King County Jail. 8ER-1849. Olsen disclosed that Simmers had admitted details about killing Gochanour. During Simmers' confession in the King County jail, Olsen took notes of what Simmers told him, which he provided to Hopkins.   2ER-256:17-2ER-257:22. When Olsen was interviewed by King County Deputy Prosecutor Susan Mahoney, he told her he had tried to get Hopkins to confirm what he was telling him about Simmers but Hopkins refused to give him any information about the murder. 8ER-1866.

4

4.    Additional Undisputed Admissions by Simmers

During a January 26, 2016, parole board hearing, Simmers stated that when Gochanour's murder occurred, he was an angry person and he associated with a gang. 8ER-2012:6-8ER-2014:9. Simmers stated he did things to make sure people liked him, including breaking into cars, drinking, using drugs and being reckless. *Id*. Simmers said when he was released from juvenile detention in March 1995, he and Jon Wyatt did a "road trip of crime to my usual hangout in Bothell-Kenmore area." 8ER-2014:14-8ER-2015-10. Simmers stated he was "destructive" and "that was the kind of person I wanted people to think that I was." *Id*.  Simmers also stated he and Wyatt decided to start looting the marinas and "from that point to the marina was when the murder happened." *Id*. Simmers stated he did not have any memory of the murder. *Id*. He also stated he did not believe he drank to the point of blacking out during the murder, but it was possible and he didn't know. 8ER-2018:9-24. Simmers further told the parole board he gave the police details about being accosted on the trail when they interviewed him about the murder because he believed that was what they wanted to hear. *Id.*, 8ER-2016:14-8ER-2017:4. When asked by the parole board if he could have killed Gochanour, Simmers stated, "I think that it could have happened. My mental stability was not the greatest then. And I believe looking back that I was in a head space that easily could have done it. I just don't remember it." 8ER-2018:25-8ER-2020:11.

On March 6, 2018, Simmers was interviewed by King County Deputy Prosecutor Carla Carlstrom in the presence of his attorney. 8ER-2031. During that interview, Simmers told Carlstrom pantomiming the stabbing for the police was an opportunity to be able to increase his street credibility and reputation by being subjected to a murder investigation and trial, then being able to walk away from it. 8ER-2032:21-8ER-2033:3. Simmers stated he believed he would be exonerated of the murder charge because he could not remember committing the murder and could not think of any evidence that linked him to it, so he assumed that no matter what he told police, the outcome would be that he didn't do it, but "I would still end up going through the murder trial and investigation and that was a good thing." 8ER-2034:1-8ER-2035:18. When asked if he ever told police he did not actually remember committing the crime, Simmers stated "no, because that wasn't part of the plan." *Id*.

When asked why he did not deny committing the murder during his criminal trial, Simmers stated he believed he was going to get off on the murder charge. 8ER-2036:3-16. He stated his feeling of optimism about beating the murder charge only stopped when he was ultimately convicted. *Id*. To Simmers, it was "fairly shocking and numbing at the same time that the plan did not go through." *Id*.

During his deposition in this case, Simmers admitted he was living a reckless and out of control life at the time of Gochanour's murder. 8ER-2066:22-2068:5. He admitted he was abusing drugs and alcohol in March of 1995. *Id*. He also admitted

6

there were times in prison when he had doubts and wondered if he could have committed the murder, but concluded he had not because he believed he did not have any gaps in his memory of his crime spree. 8ER-2045:22-2046:7. Even Simmers' own mom admits she asked him, "many times in many different ways" about how he could have been there and if he was involved in the killing. 8ER-2092:23-2093:23. Simmers told his mom that if he had [committed the murder], he had no memory of it. *Id.* In other words, he did not rule it out.

Simmers testified at deposition that he did not remember the conversation with the police when he confessed to Gochanour's murder. 8ER-2050:4-17. He testified he also did not remember his 2018 conversation with Prosecutor Carlstrom 8ER-2051:19-2052:2 and that he could not remember what he said to the parole board in 2016. 8ER-2065:18-2066:13. Simmers further testified that he could not give details about the conversation he had with the two officers who drove him to the marina in March 1995 after being detained for the crimes of arson and malicious mischief. 8ER-2053:4-2055:6.

Although the foundation of this lawsuit is a claim that one or more of the Defendant officers fed Simmers details about the murder to coerce a false confession, Simmers conceded in his deposition that he could not actually remember *any* facts that he was allegedly given about the murder, by any of the officers. 8ER-2059:15-2061:6. Simmers simply speculated that he had extrapolated what he

7

thought had happened. *Id*. In his interview with Carlstrom, when asked if he remembered Hopkins telling him specifics about the case he responded, "Not specifically, but in general generality, yes." 8ER-2038:10-13. Simmers stated he didn't remember the specifics of how he got parts of those conversations, whether or not the officers were discussing amongst themselves and he was able to glean the information or whether they were talking with him about it. 8ER-2037:9-17; 8ER-3028:10-21. He believed he overheard things in the car or they may have been talking to him but he was not sure and did not remember any specifics. 3ER-388:7-3ER-389:5. The "generalities" of what he remembered were that the victim had been stabbed and it appeared he was a transient.

When asked how the pantomiming with Rusk and Hopkins started, Simmers said, "I do not know – remember specifically, no." 3ER-395:2-3ER-396:15.  He could not remember anything that was actually going on between the officers and himself during that portion of the interview. *Id*.

Simmers testified he "honestly" did not know who the officers were who drove him to the marina and questioned him about the stabbing; he could not recall any of the details of the conversation about the stabbing; he believed the murder came up but did not recall; he could not recall the details of what was discussed.  2-ER-158:9-160:14; 2-ER-162:12-14; 3ER-372. As a result, he was unable to actually dispute the officers' testimony of what was said during the conversation, or the fact

that he said, "I didn't kill no bum" when Rusk had made no mention about a bum. At best, he only remembered the "gist" of what he learned in the car going to the marina was that somebody had been stabbed along the trail, but, "The specifics, I don't know." 3ER-372:11-19; 3ER-373:3-6. He never testified he was certain one of the officers told him the vicitim was a bum.

To the best of his recollection, after returning from the marina, Simmers told officers he did not want to speak to them and he was left alone in a holding cell. 3ER-356:16-21. Then, Simmers was periodically asked if he wanted to talk to the officers. *Id*. Simmers said the police were helpful and were not aggressive or disbelieving. 8ER-2073:4-16. They never yelled at him or raised their voices, or cursed at him or threatened him. 8ER-2074:1-15. Simmers testified he was not afraid of the police. *Id*. Ms. Carlstrom asked Simmers in 2018 what his state of mind was when he agreed to talk to the police, and he said, "So it was a mix of, I guess you could say, happiness that I was being recognized for the troublemaker that I was and the gangster that I wanted to be and annoyed that it was taking place at all." 3ER-391:6-16. He said nothing about feeling overwhelmed, overborne or coerced into talking with the officers.

Simmers testified for the first time at deposition that he *believed* he asked to speak to an attorney before giving his confession, "but much of – much the same as a lot of the other answers, this was a long time ago, so these are not things that are

9

very clear to me anymore." 3-ER-369. He said he believes he asked for an attorney but he did not have a clear recollection of doing that. 3-ER-370. He does not remember which investigator he would have made this request to, or whether it would have happened before or after they drove to the marina. 8ER-2070:12-2072:8. He did not know if he asked to talk to his parents. 8ER-2072:6-8. He said the whole week after he was released from juvenile detention was fuzzy due to the passage of time. 8ER-2078:5-2079:4. Simmers also was not able to describe any sort of a timeline of events on March 15, 1995, or who asked him what that day, or when. 8ER-2080:18-2082:18.

Simmers again admitted during his deposition that he gave his statement to the detectives because he was trying to build up his reputation as a gangster. 8ER-2072:9-16. He testified he could tell from the questioning and interruptions by the detectives whether he was guessing information correctly or incorrectly because they ignored things that did not fit the narrative. 8ER-2075:17-2076:18. He was able to take what he learned in the car revolving around a murder "and weave them into a story where [I] claimed that I committed the murder after they started talking to me about it." *Id*. However, Simmers made clear he was not alleging the detectives told him what to say. 8ER-2076:13-18. Most importantly, Simmers admitted, "Yes, I was attempting to get them to believe that I had committed the murder." 8ER-2077:3-9. Simmers conceded, "I was confident that not doing the murder, that that would come

10

out in the trial." 3ER-371:22-24.

Simmers testified that when he failed to return home, his mother would typically notify his probation officer and Simmers would be arrested, and he expected that to happen this time too. 8ER-2062:9-124:2; 2039:6-24. Prior to his arrest for arson and malicious mischief, she had done this ten or more times. *Id*.

Sergeant Rusk attested he never heard Hopkins try to coach Simmers into what to say in the taped confession. 8ER-1995:5-8. Hopkins did not provide Simmers with any case information. 8ER-1816, ¶ 22.

The Estate's false confession expert Hayley Cleary, upon whom the Estate relies heavily in its Brief, admitted she is not offering an opinion that Mr. Simmers' confession was actually coerced, unreliable or false. SER-007:3-17. She also admits that just because some of the risk factors that can contribute to a false confession might be present, it does not mean the confession was in fact false. SER-007:9-13. She testified each factor that can contribute to a false confession can also contribute to a true confession. SER-007:22-SER-008:10. To the extent the Estate has implied in its brief that its expert corroborated Simmers' account and demonstrated misconduct, this is inaccurate. See, *Brief*, p.52-53.

## III.    SUMMARY OF THE ARGUMENT

The Estate exaggerates and misstates the actual factual evidence in this case – asserting "facts" as verities when they are merely conclusory or suppositions by

Simmers to fill in huge gaps in his memory. This practice was identified and rejected by the lower court and should be rejected by this reviewing Court as well. Simmers admitted repeatedly over the years that he had no actual memory of the events and could not provide any specific details of who said what or when. His extrapolations are not sufficient to create a genuine issue of material fact at summary judgment.

Simmers was an intelligent 16 year old who was a veteran of the criminal system and had been arrested many times before the events on March 15, 1995. He wanted the police to believe he murdered Rodney Gouchanour because he believed he would not be convicted and wanted to increase his street reputation by beating a murder rap. He never claimed he was tricked or influenced by the ruses employed by the detectives. His confession was voluntary – whether it was false or not.

The Estate's due process claims were properly dismissed because there is no evidence Detective Hopkins fabricated his police report describing the interview and confession because Simmers had zero memory of what actually occurred during the interview. There is also no factual evidence supporting the Estate's theory that Hopkins reached out to Kevin Olsen and fabricated his story and notes. The decision of the criminal court to admit Simmers' confession after a three day hearing considering the same issues the Estate raises in this lawsuit was a superceding and intervening action that broke causation of harm to Simmers.

The trial court properly relied on evidence – Simmers' own testimony – not

12

credibility determinations when finding Simmers did not invoke his right to remain silent and did not request an attorney. Judge Rothstein was right, the argument that Simmers waited 27 years to make this claim *does* defy credibility. However, this is not the basis on which the Court made its ruling. Rather, the Estate lacked substantial factual evidence to support the many inferences it asked the Court to make. As such these inferences were not reasonable and did not create a genuine issue of material fact and dismissal was proper.

## IV.   ARGUMENT

### A.   Standards of review.

A party opposing summary judgment is entitled to the benefit of only *reasonable* inferences that may be drawn from the evidence put forth. *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680–81 (9th Cir. 1985)(emphasis in original). The district court must therefore undertake some initial scrutiny of the inferences that could be reasonably drawn from the evidence. *Id.* A reasonable inference is one which "support[s] a viable legal theory," which by necessary implication cannot be supported by "only threadbare conclusory statements instead of 'significant probative evidence.' " *Id*, (internal citations omitted).

In determining whether an inference may be reasonable, the district court should not weigh competing inferences against each other. *Id.* When there is "substantial factual evidence" supporting both inferences, summary judgment is

inappropriate. *Id*. But when there is a failure to produce such substantial factual evidence to combat summary judgment and there is overwhelming evidence favoring the moving party, it may be unreasonable to draw an inference contrary to the movant's interpretation of the facts. *Id*.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. 574, 587 (1986). The Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir.1988). See also, *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 808 (9th Cir. 2009) (Scott's suppositions are "only threadbare conclusory statements" that cannot support a reasonable inference); *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## B.    The Trial Court Correctly Ruled Simmers' confession was voluntary.

"The Constitution demands that confessions be made voluntarily." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). A confession is involuntary if the circumstances that surround the giving of the confession are such that the suspect's "will was overborne at the time he confessed." *Haynes v. Washington*, 373

14

U.S. 503, 513 (1963). In determining whether a confession was involuntary, courts assess the totality of the circumstances involved—both the characteristics of the accused and the details of the interrogation—and their effect upon the will of the accused. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (noting that no one criterion is controlling; rather, scrutiny must be done of all the surrounding circumstances). The "admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1 at 45 (1967). When the suspect is a child, the evaluation of the circumstances surrounding the confession must include his "age, experience, education, background, and intelligence, and [inquire] into whether he has the capacity to understand the warnings given him, the nature of this Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

1.      Innocence or Guilt Is Irrelevant To The Issue Of Whether A Confession Was Coerced By Law Enforcement.

In this case, the Estate repeatedly takes issue with the trial court not taking Simmers' claimed innocence into consideration when dismissing his claims. However, the question of whether a confession was voluntary is "to be answered with complete disregard of whether or not [the confessor] in fact spoke the truth." *Rogers v. Richmond*, 365 U.S. 534, 544 (1961) ("The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear

15

petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth."); *see also*, *United States v. Preston*, 751 F.3d 1008, 1018 (9th Cir. 2014) ("In evaluating the voluntariness of a confession under the totality of the circumstances, [courts should] not try[] to determine whether the suspect told the truth when he confessed."). The cases cited by the Estate to support its argument that innocence is relevant are from other circuits and do not reflect Ninth Circuit law.

Here, the trial court considered all of the factors required by *In re Gault, supra*. It simply found insufficient *admissible* evidence for a reasonable jury to conclude the confession was involuntary. Instead, most of the assertions made by the Estate are conclusory suppositions and lack underlying testimonial evidence to support them.

For example, the Estate asserts numerous times that the officers corrected Simmers' misstatements, used leading or suggestive questions, and provided him non-public details that only the killer would know. But in reality, Simmers consistently admitted he could not remember <u>any</u> of the details of what was said at the interview. There is a huge disparity between his actual testimony and the conclusions the Estate makes about what happened during the interview.

A good example of where Simmers was just guessing what happened is his deposition testimony about the drawing of the knife during his recorded confession.

16

3ER-373:7-3ER-374:22. Simmers claimed that after he drew the knife, the detectives asked it if he was "sure it was this way, could it have been this other way, what about these issues, what about these ones." *Id*. But review of audio recording and transcript of the interview shows the detectives did not ask these questions. 10ER-2504; 8ER-1833-1835. They asked clarifying questions regarding what Simmers meant when he said serrations, but they never asked him if he was sure the knife looked like the drawing he made. *Id*. He was guessing at what was said by the detectives and he guessed incorrectly.

The Estate refers to Simmers in its Brief as a "child" and his conduct as "childish." In truth, Simmers had committed prior crimes before the arson and malicious mischief road trip of crime, had been arrested many times, was very familiar with police interviews, and wore gang apparel because he wanted to be in a gang. 2ER-241:23-2ER-245:8; 2ER-246:2-2ER-249:23. At one point his mother had him living in a tent on her property instead of in the house due to his refusal to participate in his substance abuse treatment program; and he was arrested for assaulting his mother in their kitchen. 2ER-249:24-2ER-250:23.

    2.    <u>Legal Precedent Does Not Support A Finding Of Coercion Based On The Totality Of Facts Present In This Case.</u>

The cases where the court has found confessions were coerced were based on far more egregious allegations or are easily distinguishable from this case. See, for example, *United States v. Tingle*, 658 F.2d 1332, 1336 (9th Cir. 1981) (law

17

enforcement officers deliberately preyed upon the maternal instinct and inculcate fear in a mother that she would not see her child in order to elicit cooperation); *Spano v. New York*, 360 U.S. 315, 321–23 (1959) (Petitioner was a foreign-born young man of 25 with no past history of subjection to official interrogation; had progressed only one-half year into high school; had a history of emotional instability; was subjected to questioning by 14 men; was questioned continually for eight straight hours beginning in early evening until sunrise; his requests to call the attorney he had already retained were ignored); *Haynes v. State of Wash.*, 373 U.S. 503, 512 (1963) (invalidating a confession where the authorities held the suspect for more than five days and never advised him of his rights and said he would not be allowed to call his wife until he signed a confession); *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) (14 year old brother who was ill and who was in shock over his sister's brutal murder was interviewed by numerous officers four times over two days with the last two interviews lasting three and six hours long until he finally said he would lie and say he did it even though he didn't); *Com. of N. Mariana Islands v. Mendiola*, 976 F.2d 475, 478–79 (9th Cir. 1992), *overruled by George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) (suspect questioned at least 5 times over three days, one session lasted over 5 hours, mentally disabled, academic skills were at or below the first grade level and he dropped out of school after the sixth grade, and his ability to read English was doubtful yet the officers had him sign that their

18

written notes were accurate); *Mincey v. Arizona,* 437 U.S. 385, 398–99 (1978) (finding that a statement could not have been voluntary when obtained from a defendant who was in the hospital, in near coma condition, and in great pain, while fastened to tubes, needles, and a breathing apparatus); *Ashcraft v. Tennessee,* 322 U.S. 143, 149–54 (1944) (invalidating a confession because police officers questioned a suspect in relays for thirty-six hours straight, allowing him only a single five-minute respite).

      3.    <u>Simmers was not subjected to unlawfully coercive conduct</u>.

In determining whether a defendant's confession was voluntary, "the question is 'whether the defendant's will was overborne at the time he confessed." *Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir.), *cert. denied,* 540 U.S. 968 (2003). In cases involving psychological coercion, "the pivotal question ... is whether [in light of the totality of the circumstances,] the defendant's will was overborne when the defendant confessed." *Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011). The interrogation techniques employed must be "the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Ortiz,* 671 F.3d at 869. Police deception alone "does not render [a] confession involuntary." *U.S. v. Miller,* 984 F.2d 1028, 1031 (1993). "[A]s long as th[e] decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Id.*

Here, Simmers made a decision to convince the detectives he was the murderer so he would stand trial and beat a murder rap. He wanted his friends and the officers to believe he was a gangster. The officers treated him well by his own admission and he was not afraid of them. He was not expecting his mom to come since he knew she would report him missing and have a warrant put out (which she did). He had already confessed to arson and malicious mischief and knew he was going to jail. Under the totality of the circumstances, his confession was voluntary.

4.   <u>Simmers reaffirmed his understanding of his rights and his willingness to talk to the detectives before providing his confession.</u>

A blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. *Michigan v. Mosley*, 423 U.S. 96, 102 (1975). The admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored. *Id*. "[N]either the amount of elapsed time nor the identity of subject matter are of primary importance. Rather than these factors, we have focused on the validity of the second waiver, and in so doing, have been most concerned about 'the provision of a fresh set of warnings.' " *United States v. Hsu*, 852 F.2d 407, 410 (9th Cir. 1988).

Here, Simmers was advised of his constitutional rights at least four times during the ten hours he was in custody at the King County precinct. He was unable to recall any details regarding how often he was reapproached by detectives to see if he wanted to talk, or how much time elapsed between these check-ins. Importantly, he was advised of his rights again, including his right to remain silent, right before he provided his confession and he signed an advisement form waiving those rights. 8ER1999.

5.     Simmers could not remember if he requested an attorney or not.

Jon Wyatt asked for his attorney and was allowed to speak with her on the phone, and to meet with her in person at the precinct. He also asked to speak with both his mother and father and spoke with both of them on the phone, and met with his dad at the precinct. It is undisputed that Simmers never asked to speak with his mother. And Simmers did not remember if he actually asked to speak to an attorney. He mentioned this for the first time in 2022 at his deposition, 27 years after the night in question, but he was not sure because he could not remember.

6.     Use of themes and ruses is lawful as long as no threats or promises are made – and it is undisputed none were made by Hopkins or Rusk.

"Trickery, deceit, even impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises." *United States v. Crawford*, 372 F.3d 1048, 1060–61 (9th Cir. 2004. "Indeed, the police commonly

21

engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect. While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations." *Id.* S*ee also United States v. Orso,* 266 F.3d 1030, 1039 (9th Cir.2001) (*en banc*) (holding that an inspector's misrepresentation that a piece of evidence existed, while reprehensible, does not constitute coercive conduct).

Here, Hopkins and Rusk employed lawful ruses and detailed these in their contemporaneous police reports so the criminal defense would know. Simmers confirmed during his recorded confession that Detective Hopkins did not make any threats or promises to him. 8ER-1842. At deposition, Simmers still made no claim that he was made any promises by Hopkins. He similarly did not state that he was threatened in any way. Instead, he testified the officers treated him well and he was not afraid of them. [2]

7. <u>Under The totality of the circumstances, no reasonable jury could conclude Mr. Simmers' will was overborn at the time he confessed to the murder.</u>

Contrary to the Estate's characterization of Simmers' conduct in March 1995 as "childish," it is undisputed that Simmers broke into at least 32 boats and caused damage, broke into cars and engaged in a self-admitted "road trip of crime" with Jon

---

[2] Of note, Simmers never testified that he was actually tricked by the ruses.

Wyatt. Simmers also admitted he was accustomed to being arrested and spending time being detained. Most importantly, even if Simmers was annoyed because the detectives woke him up to ask if he wanted to talk, and he decided to talk to them to get it over with – the undisputed evidence consisting of testimony from Simmers himself is that by the time he gave his confession, he was readvised of his rights and waived them on the recording; and he wanted to please the detectives and to increase his reputation as a gangster and trouble-maker by making them believe he committed the crime and beating a murder rap at trial.  He did not believe he would be convicted so he wanted the police to think he committed the murder and his "plan" was to go all the way through a trial.  He was intentionally picking up on signals or conversations he overheard to weave the story of how the murder was committed so he could make the officers think he did it.  Ill advised, but not coerced.

In sum, the Estate lacks any evidence to prove Simmers' will was overborne by Detective Hopkins (or any other Defendant) when he confessed to Rodney Gochanour's murder. The questioning techniques used with Simmers were not shocking to the sensibilities of a civilized society as to warrant a federal intrusion into the criminal matters of the state. This claim was properly dismissed.

## C.  The Trial Court Correctly Determined The Estate Lacked Sufficient Evidence To Prove The Bothell Defendants Fabricated Evidence.

The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official. *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001).

23

"[T]here is a clearly established constitutional due process right not to be subject to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Id*. A due process violation under the Fourteenth Amendment only occurs when official conduct "shocks the conscience", a determination that "depends on the context". *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009).

If the plaintiff is successful in raising a triable issue on whether a government official deliberately fabricated evidence, then the plaintiff must "still come forward with a showing that the fabrication caused him some harm." *Cadwell v. San Francisco*, 889 F.3d 1105, 1115 (2018). To establish causation, the plaintiff must raise a triable issue that the fabricated evidence was the cause in fact and proximate cause of his injury. *Id*. "Like in any proximate cause analysis, an intervening event may break the chain of causation between the allegedly wrongful act and the plaintiff's injury. *Id*. citing *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008).

1.    <u>Hopkins did not fabricate his police report describing his interview of Simmers.</u>

The Estate argues the trial court erred when it found Simmers' testimony about how details were allegedly fed to him by police to be insufficiently specific; and claims "Simmers was not required to have ***every*** single detail." *Brief*, p.62-63 (emphasis added). The problem though is that Simmers admitted he did not have ***any*** single detail. He did not remember anything specific about the interview that

occurred prior to his recorded confession.

There are a number of things Simmers could have done to preserve his memory of the interview, but he chose not to. He could have written down what happened to refresh his memory later. He could have audio recorded his version of events. He had access to attorneys who could have recorded his version for him. As the trial court properly noted, it was Simmers' responsibility to preserve the information, if it existed, and he did not. His claims cannot be allowed to go to a jury based on nothing more than supposition and extrapolation rather than personal knowledge. FRCP 56(c)(4).

The Estate returns to the argument that because Simmers was innocent, a reasonable jury could find the facts of the murder could have been supplied by the police. However, Simmers admitted in his 2018 interview that he did not know if he just overheard the officers talking about the details of the murder, or if they provided him the information. If he overheard information that enabled him to weave the story of the murder and trick the detectives into thinking he was the killer, this is not fabrication by the detectives.

2.     <u>The Court may not consider Jon Wyatt's 2018 interview as evidence because it is an inadmissible unsworn statement.</u>

The Estate wants this Court to consider some of the statements made by Mr. Wyatt in 2018 and disregard others; to wit, consider Wyatt's claim he did not get upset when asked if he knew about the stabbing, but ignore Wyatt's claim that

Simmers confessed to murdering Rodney Gouchanour while they were being transported in a patrol car together.[3]  The Court should actually not consider anything said by Mr. Wyatt in the 2018 interview because it is not sworn testimony and it is inadmissible to create an issue of fact on summary judgment.  FRCP 56(c)(2).  The Estate could have obtained a declaration or deposition of Mr. Wyatt but chose not to.  This interview is unreliable and no measures were taken by the interviewer to ensure the information provided was truthful.

What is undisputed is the chronology of events on March 15, 1995.  This demonstrates that Wyatt admitted to breaking into the boats and cars with Simmers at 2:10 pm; went to the marina with Rusk and McSwain at 5:00 pm; asked for an attorney after being asked about the stabbing; and then over the next four hours between 5:58 pm and 10:15 pm spoke to his mom on the phone twice, spoke to his dad on the phone, met in person with his attorney, and met in person with his dad before deciding not to give the officers a statement about the murder. It was clear Wyatt did not know what to do and was struggling with the decision of whether to give a statement or not.  This is entirely consistent with the reports of Rusk and McSwain indicating Wyatt was visibly upset when asked about the stabbing on the trail and indicated a desire to tell them what he knew in the right way because he

---

[3] They were in separate cars for the trips to the marina, but in the same car together when first arrested for arson and malicious mischief. 3ER-3867:11-22.

knew what they wanted to know.

3.    <u>The Estate has zero admissible evidence to contradict the testimony of Kevin Olsen or Detective Hopkins or prove Hopkins' documents about Olsen were fabricated.</u>

The Estate claims Mr. Olsen is deceased (*Brief* at 66); however, there is no evidence of this. What *is* true is that Olsen testified he was not given information by Detective Hopkins about the murder. Detective Hopkins testified he did not give Olsen information about the murder. Mr. Simmers was not present and can offer no testimony on the subject. It is undisputed that Olsen was the one who reached out to the King County Prosecutor's Office to report Simmers said he killed Gouchanour. Hopkins did not meet with Olsen until after that occurred.

The Estate again misstates the evidence by suggesting Hopkins and Olsen created Olsen's notes together. *Brief*, Fn 3. However, Olsen testified at the criminal trial he made the notes the night Simmers told him about the murder and he later gave the notes to Hopkins.

4.    <u>The Estate Cannot Prove Proximate Cause Because The Criminal Court's Ruling Allowing Admission Of The Confession Was An Intervening Superceding Cause Of Simmers' Harm.</u>

Judicial action may sufficiently disrupt the causal connection between a negligent act and subsequent harm to become a superseding, intervening cause. *See Bishop v. Miche*, 137 Wn.2d 518, 973 P.2d 465, 472 (1999); *Haugen v. Fields*, 366 F. App'x 787, 788–89 (9th Cir. 2010) (unpublished) (citing *Stoot v. City of Everett*, 582 F.3d 910 (9th Cir.2009) (The court's order was "an intervening decision of an

informed, neutral decision-maker [that broke] the chain of causation.)); *Martinez v. City of Stockton*, No. 2:18-CV-00964-TLN-AC, 2022 WL 658136, at *6 (E.D. Cal. Mar. 4, 2022). On one hand, defendants are generally responsible for the "natural" or "reasonably foreseeable" consequences of their actions. *Stoot*, 582 F.3d at 926–27. At the same time, however, liability may not attach if "an intervening decision of an informed, neutral decision-maker 'breaks' the chain of causation," meaning that the harm to the plaintiff can be traced more directly to an intervening actor. *Stoot*, at 926–27; *see also Higazy v. Templeton,* 505 F.3d 161, 175 (2nd Cir.2007).

Section 1983 liability will not be cut off by a prosecutor's decision to prosecute where the prosecutor had no information available to him other than that contained in a police report which included misrepresentation. *Carrillo v. Cnty. of Los Angeles*, No. 211CV10310SVWAGR, 2012 WL 12850128, at *10 (C.D. Cal. Nov. 14, 2012), *aff'd,* 798 F.3d 1210 (9th Cir. 2015) (citing *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988)). But, if a prosecutor's decision was made after a review of all the evidence and closely tested, it remains independent despite allegations that witnesses had been unduly influenced. *Id*.; *see also Smith v. Harrington*, No. C 12-03533 LB, 2015 WL 1407292, at *26 (N.D. Cal. Mar. 27, 2015), *aff'd sub nom. Smith v. Liddell*, 682 F. App'x 630 (9th Cir. 2017) (two independent bodies—SCHSD and the superior court—both independently reviewed evidence (of which Principal Mayer's and Ms. Craven's reports were only a part) in

28

support of and against A.S.'s removal and determined that there was enough there to warrant juvenile proceedings.).

Here, the criminal trial court judge conducted an extended evidentiary hearing regarding the admissibility of Simmers' confession. 6ER-1233-1279. Simmers' defense attorney specifically argued the issue of juvenile false confession and potential coercion. *Id*. The court ruled Simmers' confession was knowing, voluntary, and admissible. *Id*. This was an informed decision made by a neutral decision maker and, as such, broke the chain of causation.

**D.    The Estate's failure to intervene claim was properly dismissed.**

Police officers "have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizens." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). An officer can be held liable only if they "had an opportunity to intercede." *Cunningham*, 229 F.3d at 1289.

The Estate's Complaint did not specifically articulate the basis for this claim against the Bothell Defendants. The Estate provided no further explanation in its Opening Brief. This claim should be dismissed for a lack of evidence or even articulation that Hopkins, Schlaegel, Minor and/or Ericks were ever in a specific position at a specific date and time where they witnessed a constitutional violation that they could have prevented, but failed to do so.

**E.    The Estate has no evidence – not even circumstantial – to prove a conspiracy to violate Simmers' Constitutional rights.**

To establish liability for a conspiracy in a §1983 case, a plaintiff must "demonstrate the existence of an agreement or meeting of the minds" to violate constitutional rights. *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir.1999) (internal quotation marks omitted). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir.1989).

The Estate argues evidence the detectives had a meeting to plan the next steps of their investigation is sufficient to allow a jury to infer there was a conspiracy. However, this falls short. There is no evidence or reasonable inference that the detectives from two completely different agencies reached a common agreement to get Simmers to confess knowing he did not commit the murder. The length of time between the Bothell officers arriving at the King County precinct and the interview with Simmers is also not evidence of a conspiracy since the reason it took so long was simply because the officers were waiting around for Mr. Wyatt's attorney to arrive and meet with him before interviewing Wyatt (if he agreed) and then Simmers.

**F.    The trial Court Correctly Concluded the Bothell Defendants did not violate Ian Simmers' Constitutional Rights – And There Is No Evidence Of an Ongoing Policy, Practice or Custom that led to a violation of rights.**

To state a viable 42 U.S.C. § 1983 claim against a municipality, a plaintiff

30

must allege facts to support a reasonable inference that the execution of a policy, custom, or practice of the municipality was the "moving force" behind a deprivation of his constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

In the case, the Estate failed to establish any custom, practice or policy of the City of Bothell was contrary to the standard of care for Washington State detectives in 1995. It further failed to show any evidence of a sufficient duration, frequency and consistency in the application of a policy or practice that led to a violation of Mr. Simmers' constitutional rights. As such, this claim was properly dismissed by the trial court.

## V.    CONCLUSION

For the foregoing reasons, the Bothell Defendants respectfully request the Court to affirm the rulings of the trial court.

31

KEATING, BUCKLIN & McCORMACK, INC., P.S.

By: _s/Shannon Ragonesi_
    Shannon M. Ragonesi, WSBA #31951
1201 Third Avenue, Suite 1580
Seattle, WA  98101
Phone:   (206) 623-8861
Email:    sragonesi@kbmlawyers.com

## STATEMENT OF RELATED CASES

There are no related cases pending in this Court to Defendant-Appellee's knowledge.

DATED this 21st day of January, 2025.

KEATING, BUCKLIN & McCORMACK, INC., P.S.

By: *s/Shannon Ragonesi*
    Shannon M. Ragonesi, WSBA #31951
1201 Third Avenue, Suite 1580
Seattle, WA  98101
Phone:   (206) 623-8861
Fax:       (206) 223-9423
Email:    sragonesi@kbmlawyers.com

33

**CERTIFICATION OF COMPLIANCE
WITH FRAP 32(a) FOR
CASE No.**

I certify that:

1.      Pursuant to FRAP 32(a)(7)(B), the attached ANSWERING BRIEF contains 7,610 words , excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.      The attached ANSWERING BRIEF complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface in 14-point Times New Roman.

DATED this 21st day of January, 2025.

KEATING, BUCKLIN & McCORMACK, INC., P.S.

By:  *s/Shannon Ragonesi*
     Shannon M. Ragonesi, WSBA #31951
1201 Third Avenue, Suite 1580
Seattle, WA  98101
Phone:   (206) 623-8861
Email:   sragonesi@kbmlawyers.com

## DECLARATION OF SERVICE

I, SARAH DAMIANICK, certify that on the 21st Day of January, 2025, a copy of

the foregoing Answering Brief of Appellees Hopkins, Miner, Ericks, Schlaegel, City

of Bothell was filed electronically with the Clerk of the Court for the United States

Court of Appeals for the Ninth Circuit by using the appellate CM/ECF and to the

following:

**Attorneys for Defendants McSwain, Raftus, Baxter, King County**
Geoffrey Grindeland, WSBA #35798
Nikki Carsley, WSBA #46650
Jesse A. Townsend
SEAMARK LAW GROUP, PLLC
400 Winslow Way E, Suite 230
Bainbridge Island, WA  98110
Email:  geoff@seamarklaw.com; nikki@seamarklaw.com;
nicole@seamarklaw.com; jesse@seamarklaw.com
☑ E-mail     ☐ United States Mail     ☐ Legal Messenger

**Attorneys for Plaintiff**
David B. Owens, WSBA #53856
LOEVY & LOEVY
c/o Civil Rights and Justice Center
University of Washington Law School
William H. Gates Hall, Suite 265
P.O. Box 85110
Seattle, WA  98145-1110
Email:  David@loevy.com; jon@loevy.com; gee@loevy.com
☑ E-mail     ☐ United States Mail     ☐ Legal Messenger

I declare under penalty of perjury that the foregoing is true and correct.

KEATING, BUCKLIN & McCORMACK, INC., P.S.

By:  *s/Sarah Damianick*
Sarah Damianick, Legal Assistant
sdamianick@kbmlawyers.com

35